IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

In re:  Michael Warren Reed                           Bankruptcy Case No.: 13-50202

       Myra Ruth Reed                              Adversary Case No.: 13-05011-KKS
       Plaintiff(s)

vs.

       Michael Warren Reed
       Defendant(s)

## AMENDED DEBTOR'S RESPONSE TO CREDITOR MYRA REED'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW TO DETERMINE DEBTS NON-DISCHARGEABLE UNDER SECTION 523(a)(5) AND 523(a)(15) [Doc. #10]

COMES NOW the Debtor, Michael Warren Reed ("Debtor"), by and through undersigned counsel, and files this Response to Creditor Myra Reed's Motion for Summary Judgment and states:

### Undisputed Material Facts

1.    Creditor Myra Reed asserts in her Motion for Summary Judgment three separate debts owed or allegedly owed her by the Debtor [Doc. #10, ¶ 2]: (1) a debt for past due child support and alimony payments (hereafter "Support Debt"); (2) an equalizer payment in the Supplemental Final Judgment in the amount of $922,837.52 (hereafter "Equalizer Debt"); and (3) an unliquidated contribution claim due to alleged monetary contributions Myra Reed made to the parties' joint indebtedness owed on the failed Annabella's real estate development (hereafter "Annabella's Debt").

2.    With regard to the Equalizer Debt, this is a debt arising out of a Partial Marital Settlement Agreement. A true and correct copy of this agreement along with an attached spreadsheet

is attached and incorporated herein as Exhibit "A." Section 7.1 of this Agreement provides that the sum of $928,465 shall be paid to Myra Reed as an equalizing payment to offset the greater property value Michael Reed received under the agreement. Creditor Myra Reed elected to convert this obligation into a Supplemental Final Judgment of $922,837.52. A true and correct copy of the Supplemental Final Judgment is attached as Exhibit "B."

3      The Annabella's Debt is listed as a $1.2 million contingent debt under Debtor's Schedule F. Annabella's was a Florida limited liability company created as a real estate venture. The Debtor, Creditor Myra Reed, Wilbur Ledman, Melanie Ledman, Frank Wood, and Valorie Wood (collectively, the "Guarantors") signed guarantees on loans issued to Annabella's LLC by Regions Bank. True and correct copies of the Debtor's guaranty and Creditor Myra Reed's guaranty, both dated November 5, 2003, are attached and incorporated herein as Exhibits "C" and "D," respectively.

4.      The property owned by Annabella's was foreclosed upon and a judgment entered against Annabella's and the Guarantors, jointly and severally, in the amount of $8,980,945.57. A true and correct copy of the Final Judgment in Favor of Annabellas Asset Management, Final Judgment of Foreclosure, and Final Judgment on Counterclaim Filed by Myra. A. Reed is attached and incorporated herein as Exhibit "E."

5.      After the foreclosed property was sold, a deficiency judgment was entered reducing the amount owed by Annabella's and the Guarantors to $2,321,966.79. A true and correct copy of the November 19, 2009 Supplement to Final Judgment ("Annabella's Judgment") is attached and incorporated herein as Exhibit "F."

6.      On or about April 29, 2010, Michael Reed negotiated a release of his liability under the Annabella's Judgment for $475,000. A true and correct copy of the Partial Release of Judgment is attached and incorporated herein as Exhibit "G."

7.      Myra Reed also negotiated her release of liability under the Annabella's Judgment. A true and correct copy of the Partial Release of Judgment is attached and incorporated herein as Exhibit "H." This release indicates that Myra Reed contributed real property at Carillon Beach as either full or partial consideration to secure her release. Page two (2), item 31 of the spreadsheet incorporated into the Partial Marital Settlement Agreement (Exhibit "A") shows that this property had a market value of $2,900,000 and equity of $1,980,270 in February 2008. Due to the economic downturn, in late 2009 or early 2010, the value of the real estate equity Myra Reed traded for her release would be substantially less than $1,980,270. The Warranty Deed dated March 23, 2010 conveying the property shows a value of $1,650,000. A true and correct copy of the Warranty Deed is attached and incorporated herein as Exhibit "I."

8.      Myra Reed has not sued the Debtor for contribution, though has filed a Motion for Stay Relief in an effort to pursue the contribution claim. [Doc. #128, Case No. 13-50202]. While Myra Reed broadly asserts that she has paid $2,500,000 toward a deficiency judgment of $2,321,966.79, she provides no supporting documentation. In fact, such a contribution, outside of the fact that it exceeds the deficiency judgment by nearly $180,000, seems even more spurious given the fact that the other Guarantors paid substantial sums to secure their own releases from the Annabella's Judgment, which would of course substantially reduce the $2.3 million deficiency.

9.      Whatever the amount owed, it is clear that the amount claimed by Myra Reed relates to a claim of contribution against the Debtor as a co-guarantor on a note naming Annabella's as the borrower. Based on the fact that Myra Reed agreed to a proportionate share of liability on Annabella's LLC in the amount of $1,500,000 in the Partial Marital Settlement Agreement (See Exhibit "A", Item #45 of the attached spreadsheet) , she could only ever seek contribution to the extent she paid beyond this amount to secure her release.

**Memorandum of Law**

3

10.    Debtor concedes that child support and alimony are not dischargeable debts in a Chapter 7, and Myra Reed is entitled to summary judgment with regards to the Support Debt. However, the remaining two debts claimed by Myra Reed are dischargeable. The Final Judgment converted an equalizer debt into an ordinary judgment, and therefore does not fall within Section 523(a)(15). The Annabella's Debt is an obligation that precedes the divorce, and therefore does not fall within Section 523(a)(15), Florida Statutes.

11.    The public policies underlying the Bankruptcy Code encourage a fresh start for debtors and require that exceptions to discharge be strictly construed against creditors. The creditor seeking an exception from discharge must show non-dischargeability based upon a preponderance of the evidence standard. *Grogan v. Garner*, 498 U.S. 279 (1991). The exceptions to discharge are read liberally in favor of a debtor. *Goldberg Secs., Inc. v. Scarlata*, 979 F.2d 521, 524 (7th Cir. 1992).

12.    With regard to the Final Judgment, Myra Reed elected to convert her equalizing payment into a final judgment. The equalizer payment due under the Partial Marital Settlement Agreement constituted a nonsupport divorce obligation under Section 523(a)(15), and would not have been dischargeable. However, Myra Reed elected to convert the amount owed to an ordinary money judgment. The Supreme Court of Florida has held that a final money judgment entered by a trial court is not an order "of the court of this state for alimony, suit money, or child support" within the meaning of Section 61.12, Florida Statutes. *Sokolsky v. Kuhn*, 405 So. 2d 975, 977 (Fla. 1981). In other words, conversion of divorce debt into an ordinary judgment, even when the judgment is based upon alimony arrearages, strips it of its character as an order for alimony, suit money, or child support within the meaning of the statute.

13.    When *Sokolsky* was written, Section 61.12(1) provided for "garnishment to enforce and satisfy the orders of the court[s] of this state for alimony, suit money, or child support."

Following *Sokolsky*, the Legislature revised the statute to read 'orders and judgments of the court[s]" rather than "orders of the courts." *See* Ch. 84-135, § 1, at 425, Laws of Fla. This revision superseded the *Sokolsky* decision. *Reyf v. Reyf*, 620 So. 2d 218 (Fla. 3d DCA 1993). Clearly, the Florida Supreme Court held that a final judgment did not constitute an 'order of the court' for alimony, suit money, or child support within the meaning of the statute, and only through revision of the applicable statute could courts arrive at a different result as a matter of statutory interpretation.

14.      Turning to the operative Bankruptcy Code language in this case, 11 U.S.C. 523(a)(15) provides for the non-dischargeability from any debt:

> "to a spouse, former spouse, or child of the debtor and not of the kind described in paragraph (5) that is incurred by the debtor in the course of a divorce or separation or in connection with a separation agreement, divorce decree or other **order of a court of record**, or a determination made in accordance with State or territorial law by a governmental unit."

(emphasis added). This subsection does not provide for the non-dischargeability of a judgment, but only an order of a court of record. The Supreme Court of Florida held in *Sokolsky* that the absence of any reference to a 'judgment' in Section 61.12(1), Florida Statutes, must be interpreted to mean that a debt arising out of a divorce (in that case, alimony) no longer fell within the meaning of the statute when the debt was converted to an ordinary judgment.[1] In this case, Section 523(a)(15) is clearly directed at separation agreements, divorce decrees, or orders entered in the course of divorce. A supplemental final judgment does not fall within any of these categories. Exceptions to discharge are liberally construed in favor of the debtor. Had Myra Reed not elected to convert the equalizer obligation to an ordinary money judgment bearing interest at the statutory rate (rather than the rate

---

[1]Case law carved out a limited exception to this rule with regard to foreign judgments based upon unpaid child support or alimony arrearages. *Haas v. Haas*, 59 So. 2d 640 (Fla. 1952). However, this exception is limited to instances in which the final judgment was not entered in a Florida court and related to a support obligation. Myra Reed is a resident of Florida, and the Final Judgment was based on an unpaid equalizer payment, not a support obligation. Therefore, *Sokolsky* clearly applies in this case.

16.    Following completion of all payments under a Chapter 13 plan, this statute specifies that all debts, with certain exceptions are dischargeable.  The statute provides that support debt arising out of divorce under § 523(a)(5) is one such debt that cannot be discharged in a Chapter 13. Conversely, the statute does not exempt non-support divorce debt under § 523(a)(15) from discharge. Several courts in addition to *In re Bullock* have interpreted 11 U.S.C. § 1328(a)(2) in this manner. *See In re Hutchens*, 480 B.R. 374 (Bankr. M.D. Fla. 2012); *In re Gaetaniello*, 2013 WL 3867089 (Bankr. M.D. Fla. Jul. 25, 2013); *In re Kennedy*, 442 B.R. 399 (Bankr. W.D. Pa. 2010); *Corso v. Walker*, 449 B.R. 838 (Bankr. W.D. Pa. 2011).

17.    As the Debtor has exercised his right to convert this case from a Chapter 7 to a Chapter 13, the Equalizer Debt and the Annabella's Debt will be subject to discharge after the Debtor completes all payments under a Chapter 13 plan.

WHEREFORE, the Debtor, MICHAEL W. REED, respectfully requests this Court enter an Order finding that the Equalizer Debt and the Annabella's Debt are both dischargeable under 11 U.S.C. §1382(a)(2) as non-support divorce obligations.

Respectfully submitted this 7th day of October, 2013.

/s/Ronald A. Mowrey
RONALD A. MOWREY
FL BAR #0122006
MARK L. MASON
FL BAR #0098013
MOWREY LAW FIRM, P.A.
515 North Adams Street
Tallahassee, Florida 32301
(850)222-9482 Telephone
(850)561-6867 Facsimile
rmowrey@mowreylaw.com
ADDITIONAL COUNSEL FOR DEBTOR

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the foregoing motion has been furnished to all interested parties on the Court's mailing matrix by electronic means this 7th day of October, 2013.

/s/Ronald A. Mowrey
RONALD A. MOWREY

J:\OPEN\Reed, Michael, M.D\Reed, Michael - Myra v. Adv. in Ch 7\Pleadings\Amended Response to Ch 7 MFSJ.wpd

IN THE CIRCUIT COURT OF THE FOURTEENTH JUDICIAL CIRCUIT,
IN AND FOR BAY COUNTY, FLORIDA

IN RE: THE MARRIAGE OF

MICHAEL REED,
     Petitioner/Husband,

v.

MYRA REED,
     Respondent/Wife.

CASE NO. 07-1540DR
FAMILY LAW DIVISION

## PARTIAL MARITAL SETTLEMENT AGREEMENT

     This Marital Settlement Agreement is effective on the date the last party signed the Agreement, and is between Michael Reed ("Husband") and Myra Reed ("Wife").

### Article 1. General Information.

  1.1.  **Factual Information.**

    1.1.1.  The full legal name of Husband is Michael W. Reed.

    1.1.2.  The full legal name of Wife is Myra A. Reed.

    1.1.3.  The parties were married on June 4, 1988.

    1.1.4.  There were three children born of the marriage, each of which is currently a minor child: ████████, born ████████████; ███████ born ████████; and ████████, born ████████.

  1.2.  **Agreement to Separate.** Husband and Wife have agreed to separate and live permanently apart, and expect to obtain a dissolution of their marriage in the marital dissolution proceeding now pending.

  1.3.  **Action Pending.** An action to dissolve the marriage of the parties is pending in the Circuit Court of the Fourteenth Judicial Circuit, Bay County, Florida, Family Law Division, Case Number 07-1540-DR. The Petition for Dissolution of Marriage was filed by Husband on May 9, 2007.

  1.4.  **Partial Settlement.** The purpose of this Agreement is to make a final and complete settlement of rights and obligations arising out of the marriage related to equitable distribution of the marital assets and liabilities. **Each party reserves all other rights regarding parenting, child support, alimony, attorneys' fees, and any other matters at issue in this cause.**

**1.5.   Consideration.** The consideration for this Agreement is the mutual benefits to be obtained by the parties and the promises of each party to the other. The parties stipulate to the adequacy of the consideration for this Agreement.

### Article 2. Division of Marital Assets and Liabilities.

**2.1.   Marital Assets; Fair Division.** An Assets and Liabilities Schedule of the parties' marital assets is attached to this Agreement as Exhibit A and incorporated herein by this reference. The parties agree that the division of their marital property is fair and equitable between them. Each party accepts that property to be distributed as full and complete satisfaction of all rights in and to the marital property. While the division of property contained in this Agreement may not be exactly equal, the parties acknowledge that considering all provisions of this Agreement and the circumstances of the marriage, the division of the property is equitable.

**2.2.   Equitable Distribution.** Except as otherwise provided in this Agreement, neither party will make any claim to such items of tangible personal property which are now in possession or control of the other. The parties agree that the following division of their marital property is fair and equitable between them. Each party accepts that property to be distributed is in full and complete satisfaction of all marital rights in and to the marital property.

**2.3.   Distribution Schedule.** The marital property of the parties not otherwise expressly addressed in this Agreement will be divided as set forth in the attached Exhibit A, incorporated into this Agreement by this reference. The division of the marital property reflected in this Agreement, and the values assigned to the various assets and liabilities listed, if any, are agreed to by both parties.

**2.4.   Credit Card Accounts.** All existing charge and credit accounts in the joint name of Husband and Wife, or in the name of either party if the other party can make purchases or secure credit, shall immediately be closed or changed to the name of the party retaining that account without recourse to the other party. Any outstanding indebtedness on those accounts not specifically assigned by the Distribution Schedule attached as Exhibit A, to either be paid by one party or divided between the parties, shall be paid by the party incurring the debt.

**2.5.   Assets to be Conveyed.** As to those assets distributed in their entirety to one of the parties, the party not receiving the asset shall convey the asset to the other, as the other's sole and absolute property, within 30 days of the Effective Date. The party receiving the asset shall be responsible for any fees associated with the transfer of the asset including recording fees and any taxes.

**2.6.   Allocation of Liabilities and Debts.** Unless specifically provided otherwise in this Agreement, each party shall be responsible for paying any and all debts, liabilities, and obligations (whether known or unknown to either party) assigned to that party in association with a specific asset in this Agreement (or Exhibit A) whether or not the amount of those debts, liabilities, and obligations is equal to the amount reflected herein. As to liabilities and debts assigned to a party in their entirety, that party ("the responsible party") shall pay the entire amount even if it is

not equal to the amount reflected in this Agreement, and the responsible party agrees to indemnify the other party and hold the other party harmless as to the liability or debt, and as to any costs incurred in connection with any proceeding to collect the liability or debt due to the responsible party's failure to make timely payment. As to any and all liabilities and debts divided between the parties, as reflected in this Agreement, each party (the "assuming party") agrees to assume responsibility for and to pay an amount of the actual total liability or debt proportional to the amount assumed by the assuming party, and to indemnify the other party and hold the other party harmless as to the portion of the liability or debt assumed by the assuming party, and as to any costs incurred in connection with any proceeding to collect the liability or debt due to the assuming party's failure to make timely payment of his or her portion of the liability or debt.

2.7.  **Responsibility for Other Liabilities and Debts.** Those debts, obligations, and liabilities known to both parties and incurred prior to the effective date of this Agreement, and not otherwise specifically assigned to a party under this Agreement, shall be paid by the party or parties responsible for incurring the debt. Except as otherwise provided in this Agreement, any debt or claim against the parties, unknown to one or both parties and incurred prior to the effective date of this Agreement, shall be the responsibility of the party or parties incurring the debt. Unless specifically provided otherwise in this Agreement, debts, known or unknown, incurred after the effective date of this Agreement shall be paid by the party incurring the debt.

2.8.  **Furniture and Furnishings and Personal Property.** Each party will retain his or her own clothing and personal effects without consideration of value. Husband shall retain the Wild Heron club membership and will be responsible for all fees associated with the membership.

2.8.1.  *Distribution of Wild Heron Personal Property.* The furniture, furnishings, and personal property located in the Wild Heron Residence ("Wild Heron Personal Property"), except for the audio/video equipment (and associated peripherals) which will remain with the residence, will be distributed equally pursuant to the distribution schedule on Exhibit B. Exhibit B, when executed, will automatically become part of this Agreement.

2.8.2.  *Alternate Distribution of Wild Heron Personal Property.* If the parties do not agree to and execute Exhibit B within 10 days of the date of this Agreement, then the distribution of the Wild Heron Personal Property shall be excepted from this Agreement, except that the parties agree that the distribution will be equal according to value, and both parties will retain the right to apply to the court to determine how to achieve the equal distribution of the Wild Heron Personal Property.

### Article 3. Retirement.

3.1.  **Husband's Benefits.**

3.1.1.  *Entitlement.* There is a marital property interest in Husband's benefits under the Michael Reed M.D. P.A. Profit Sharing Plan. Wife is

acknowledged to own and shall be accorded an account with the Plan in the amount of 100% of Husband's account as of April 30, 2007. No adjustment prior to that date shall be made to Wife's account. After that date, Wife's account shall be augmented by all subsequent earnings, dividends, interest accumulation, and plan performance, either positive or negative, attributable to Wife's shares from and after April 30, 2007. The benefits not allocated to Wife, including the contributions to the Plan made by Husband or forfeitures allocated and contributions made on or behalf of Husband after April 30, 2007, shall belong to Husband and are subject to Husband's disposition pursuant to plan provisions.

      3.1.2.   *Distribution to Wife*. Wife shall have the right to elect to have her interest in the account allocated to a separate account for her (if permitted by the Plan); distributed to her directly; or distributed to an IRA or eligible retirement plan of which she is a beneficiary. If Husband predeceases Wife, payment to Wife shall nonetheless be made under the terms of this Agreement. If Wife dies before full payment to her has been made, the amount unpaid shall be distributed to the beneficiary designated in writing by Wife to the plan administrator in the manner described by the Plan or, if no beneficiary has been designated, to Wife's estate.

      **3.2.**   **Qualified Domestic Relations Order.** The parties agree that a Qualified Domestic Relations Order will be entered to divide the retirement benefits provided for in the Plan. The order shall be prepared by Husband's attorney, who shall submit a copy of the Domestic Relations Order to the plan administrators for qualification under the Retirement Equity Act of 1984. The court shall retain jurisdiction to resolve any disputes concerning the content of the Qualified Domestic Relations Order or to implement or correct any nonqualifying provision by issuing an amended or subsequent order.

      **3.3.**   **General Reservation of Jurisdiction.** It is the intent of the parties that each party shall receive the full amount of all benefits due to him or her under the provisions of this Section, and that each party's right to benefits under this Section shall take priority over the claims of the other party's subsequent spouse, should the other party remarry. Should any portion of this Section be rendered invalid, illegal, unconstitutional, or otherwise incapable of enforcement, or should any of the provisions set forth in this Section need to be modified to accomplish the Section's objectives, or upon mutual consent of the parties, the court shall reserve jurisdiction to make such further order as will effect the intent of the parties. In addition, should either party fail to receive the full amount of any benefits otherwise due to him or her under the terms of this Section, that party shall have a claim directly against the other party, or the other party's estate, for the amount not received. The court shall retain jurisdiction to order the joinder of any retirement, pension, or deferred compensation plan covered by this Agreement.

### Article 4. Residence and Other Properties.

      **4.1.**   **Generally.** The parties presently own residences and other real properties distributed pursuant to this Agreement (Exhibit A, items 13 through 31)

Husband

Partial Marital Settlement Agreement
Page 4 of 12

Wife

("Properties"). The Properties include all improvements, appurtenant structures, grounds, and easements. Each party shall execute and deliver to the other a deed in a form suitable for recording confirming the transfer of their entire interest in the Properties in fee simple absolute. This Agreement is subject to the following:

4.1.1.    Each party warrants that he or she has not caused any additional encumbrances to be placed against the Properties during the parties' separation other than those of record.

4.1.2.    Each party hereby assigns to the other all interest in all homeowners' insurance policies covering the Properties, including fire and extended coverage.

4.1.3.    Each party shall pay any necessary fees incurred in connection with the transfer and with the recordation of the deed, including recording fees and documentary stamps.

4.1.4.    Each party shall promptly deliver to the other all files relating to the Properties, including documents related to its purchase, repairs, and improvements.

4.1.5.    Each party shall assume any debt associated with the asset and indemnify the other against debts and liabilities.

4.1.6.    Each party shall be entitled to any rents from the Properties distributed to them from February 1, 2008.

4.2.    **Wild Heron Residence.** The Wife is currently residing in the residence located at 1233 Water Oak Bend ("Wild Heron Residence").

4.2.1.    Wife shall vacate the Wild Heron Residence on or before March 31, 2008.

4.2.2.    Wife may, at her option, remain in the Wild Heron Residence until May 31, 2008, provided that she pays Husband the reasonable rental sum of $16,000 per month, prorated based on the number of days Wife remains in the Wild Heron Residence past March 31, 2008. Any rent payments due to Husband under this Section 4.2.2 shall be deducted from the principal amount of the equalizing payment from Husband to Wife pursuant to Section 7.1.

4.2.3.    Wife shall provide Husband written notice at least 15 days prior to vacating the residence and shall leave the residence "broom clean" and in good condition.

4.2.4.    Wife shall not remove any of the audio/video equipment (and associated peripherals) from the residence. Wife shall only take those items of tangible personal property listed in Exhibit B.

4.3.    **Property Taxes.** Each party shall pay all taxes on the Properties they receive for the 2007 and succeeding years.

Husband

Partial Marital Settlement Agreement
Page 5 of 12

Wife

### Article 5. Other Asset Distributions.

**5.1.    Transfer of Interest in Closely-Held Entities.** Each party shall execute all documents necessary to transfer any interest they have in any closely held entity they are transferring to the other party pursuant to <u>Exhibit A</u> (items 39 through 55).

**5.2.    Annabella's, LLC.** Each party shall retain their interest in Annabella's, LLC, and be responsible for their proportionate share of any joint and several liability pursuant to the provisions of Section 2.6. The parties agree that all payments made by either party either to or on behalf of Annabella's, LLC, came from marital assets. Should Husband recover any portion of that Note from Annabella's, LLC (Exhibit A, item 57) in the original amount of $528,550.00, he shall distribute 50% of such net recovery to Wife (less her share of the cost of collection). In the event of any action among the members of Annabella's, LLC, including for contribution or to dissolve the company, 50% of any financial expenditure made by Husband to or on behalf of Annabella's, LLC shall be appropriately credited to Wife. Husband shall execute any documents necessary to effectuate the provisions of this Section.

### Article 6. Marital Debts.

**6.1.    Credit Card Accounts.** All existing charge and credit card accounts in the joint name of Husband and Wife, or in the name of either party if the other can make purchases or secure credit, shall immediately be closed or changed to the name of the party retaining that account without recourse against the other party. Any outstanding indebtedness on these accounts, not specifically assigned according to <u>Exhibit A</u> to be paid by one party or to be divided between the parties, shall be paid by the party incurring the debt.

**6.2.    Responsible for Own Debts.** Each party shall be responsible for and indemnify and hold the other party harmless from those debts individually incurred by that party since the time of their separation except as otherwise provided herein.

**6.3.    No Present Debts.** Except as otherwise provided for herein, the parties have discharged all financial obligations incurred during the course of their marriage. No joint or individual debts of the parties are known to exist. Neither party will incur any further debt for which the other may be held liable. If a prior debt is subsequently discovered, the party who incurred the debt is responsible for its payment and agrees to hold the other harmless from any liability on it. If any action or proceedings is initiated to hold a party responsible for any obligation incurred by the other party, the party who incurred the obligation shall defend the other whether or not the action or proceeding is well-founded.

### Article 7. Equalizing Payment and Rehabilitative Alimony.

**7.1.    Equalizing Payment.** Husband shall pay to Wife as part of the equitable distribution of the marital assets and liabilities as provided for in Section 2.3 and <u>Exhibit A</u>, the sum of $928,465.00, unless modified by the terms of Section 4.2.2, within three years of the date the Wife vacates the Wild Heron Residence pursuant to Section 4.2, but no later than May 31, 2011. As security for this obligation, Husband

shall execute and deliver to Wife documents evidencing a security interest in his ownership of Summit Enterprises Partners, Inc.

**7.2.    Rehabilitative Alimony.** Until Husband pays the total amount described in Exhibit A and Sections 2.3 and 7.1, he shall pay to the Wife non-modifiable rehabilitative alimony. The amount of rehabilitative alimony shall be calculated at the annual rate of 5% of the outstanding balance of the Equalizing Payment, payable in quarterly installments consisting of 1.25% of the unpaid balance. The rehabilitative alimony provided herein shall terminate upon the death of the Wife if she dies prior to full payment of the lump sum amount. This rehabilitative alimony shall be taxable to Wife and deductible by Husband.

**7.2.1.    *Timing of Payments.*** Rehabilitative alimony payments will commence with a payment due three months after the Wife vacates the Wild Heron Residence pursuant to Section 4.2 ("Initial Payment Date"). Subsequent quarterly payments shall be due on each three-month anniversary of the Initial Payment Date ("Quarterly Payment Date") and shall be due quarterly until the equitable distribution equalizing payment described in Section 7.1 is paid in its entirety. If the Initial Payment Date is the 31st day of a calendar month, it shall be treated as if it occurred on the 1st day of the following calendar month and the Quarterly Payment Date shall be the 1st day of the relevant month.

**7.2.2.    *Additional Alimony.*** If Husband fails to make the quarterly rehabilitative alimony payment within 10 days of the Quarterly Payment Date, he shall pay additional rehabilitative alimony equal to 5% of the quarterly rehabilitative alimony payment, plus additional alimony equal to 1% of the quarterly rehabilitative alimony payment for each additional month until he makes brings all outstanding payments current.

**7.2.3.    *Transmittal of Payments.*** The payments of alimony shall be paid directly to Wife, on or by the date due, by check or money order. The parties agree that no income deduction order is currently necessary to assure the timely payment of alimony.

**7.3.    Reservation of Alimony Rights. Except as provided herein, each party reserves all rights with respect to any issue concerning alimony.** The parties agree that the payments described in Section 7.2 shall not waive Wife's rights to additional rehabilitative alimony, permanent periodic alimony, temporary alimony, or bridge-the-gap alimony.

### Article 8. Taxes.

**8.1.    Tax Returns.** The parties have filed jointly during the period of their marriage. For the 2007 tax year, the parties shall submit their documentation to a mutually agreed Certified Public Accountant and shall file jointly or independently based on the advice of that accountant. If the parties file jointly, any tax refund or liability will be distributed in accordance with the parties earned income from their medical practices. The parties shall file separately beginning in the 2008 tax year.

8.2.   **Tax Liability.** In the event the parties' joint returns filed during the marriage are examined or audited by the Internal Revenue Service subsequent to this Agreement and any deficiencies in tax are assessed, the party to whom the income or deduction is attributable shall be responsible for the taxes, interest and penalties and any expenses incurred because of the examination. Any errors made by the party reporting his or her income or scrivener errors in calculating tax liability shall be the responsibility of the person who erroneously reported to the preparer his or her income or to the party who made such scrivener's error in calculation. The refunds shall be distributed to whom the refund is attributable.

### Article 9. Releases and Waivers.

9.1.   **Mutual Release.** The parties intend to settle all aspects of their marital relationship and rights addressed by this Agreement. With respect to equitable distribution of their assets and liabilities, the parties mutually release and forever discharge each other from any and all actions, liabilities, claims, demands, and obligations of any kind or character, both in law and in equity, known or unknown, that either of them ever had, now has, or may have against the other upon or by reason of any matter, cause, or thing up to the effective date of this Agreement. It is the parties' intent that after the effective date of this Agreement, there shall be, as between them, only those rights and obligations as are specifically provided in this Agreement. Provided, however, they each reserve for future agreement or determination by the Court all claims and rights they may have with respect to parenting, child support, alimony, attorneys' fees, or any other equitable claim over which the Court now has jurisdiction.

9.2.   **Property Acquired After the Effective Date of This Agreement.** Any property acquired by either party after the effective date of this Agreement shall be the sole and exclusive property of the party acquiring it. Each party waives any property rights in or to any future acquisitions of property by the other.

9.3.   **Waiver of Inheritance Rights.** Except as provided in this Agreement, each party releases and relinquishes to the other party and to his or her heirs, executors, administrators, or assigns, any and all claims or rights which may now exist, or may arise later, because of the parties' marriage, with respect to any property, whether real, personal, intangible, or mixed, belonging to the other party, including, without limitation, all rights arising by operation of law or otherwise to share in any of the property or estate of the other party, except for any rights expressly conferred by a will executed subsequent to the date of this Agreement. Specifically, each party waives and releases all right of dower or curtesy; all right to share in the estate of the other party under the intestacy laws of any jurisdiction; all right of election to take against any last will and testament of the other party, whether executed before or after the date of this Agreement; and all right to secure administration or to act as executor, administrator, or personal representative of the other party or his or her estate, except for any such right expressly conferred by a will executed subsequent to the date of this Agreement.

## Article 10. Miscellaneous.

**10.1. Construction of Agreement.** The parties agree that the provisions of this Agreement shall not be construed more strictly against either party, regardless of which party is responsible for drafting this Agreement. In all other respects, the laws of the State of Florida shall govern the validity, construction, interpretation and effect of this Agreement.

**10.2. Attorney Representation and Fees.** Wife has retained Joseph R. Boyd and J.D. DuRant, attorneys at law duly licensed to practice in the State of Florida, to advise her in connection with this Agreement and proceeding for dissolution of marriage. Husband has retained Jerome M. Novey, an attorney at law duly licensed to practice in the State of Florida, to advise him in connection with this Agreement and proceeding for dissolution of marriage. Joseph R. Boyd, J.D. DuRant, and Jerome M. Novey have each explained to their respective clients the law as it applies to the client's situation. Each client understands the law as it applies to his or her situation and is satisfied with the result in this Agreement and with his or her respective attorney's explanation. Each client is freely and voluntarily entering into this Agreement, believing it to be in his or her best interest. Each party shall be responsible for their individual attorneys' fees.

**10.3. Full Disclosures.** Each party has made full disclosure to the other of their existing financial condition, and each party has relied upon the other's disclosures. Since the parties' filing of their most recent Financial Affidavit and production of documents, there have been no material changes in their financial status.

**10.4. Incorporation into Judgment.** If a judgment of dissolution of marriage is obtained by either party, the original of this Agreement or a copy shall be attached to the stipulated or proposed judgment. The court will be requested to (i) approve the entire Agreement as fair and equitable; (ii) order each party to comply with all of its executory provisions; and (iii) merge the provisions of the Agreement into the court's judgment. Notwithstanding the merger of the Agreement into the judgment, the parties expressly agree that the warranty and indemnity provisions and all executory provisions of the Agreement shall survive the merger and entry of judgment, and shall be enforceable in contract, tort, or as otherwise provided by law. The Agreement is not conditioned upon the merger with or filing of the judgment.

**10.5. Reservation of Jurisdiction.** The parties agree that the court shall retain jurisdiction (except as otherwise provided in this Agreement) to make orders and determinations that are necessary or appropriate (i) to enforce any of the terms of this Agreement or otherwise effectuate the division of property as specified in the Agreement; (ii) to resolve any matter subject to the jurisdiction of the court that has not otherwise been resolved by the terms of the Agreement, or to resolve any dispute that may arise concerning the terms of the Agreement; and (iii) to resolve claims regarding omitted or undisclosed property and obligations.

**10.6. Fees and Costs upon Default.** If either party is found by a court of competent jurisdiction to have defaulted, for any reason, in the performance of his or

her responsibilities under this Agreement, the defaulting party shall be responsible for all costs incurred by the non-defaulting party as a result of the default, including reasonable attorney's fees, costs, and suit monies.

10.7.  **Entire Agreement.** This Agreement is intended to be the final, complete, and exclusive agreement of the parties on the matters it covers. It supersedes any previous or contemporaneous oral or written agreements between the parties or Court orders with respect to these matters. There are no representations, warranties, promises or agreements with respect to these matters, except as set forth in this Agreement.

10.8.  **Amendments and Waivers.** This Agreement may not be amended or terminated except by an instrument in writing, signed by each of the parties. No failure to exercise and no delay in exercising any right, remedy, or power under this Agreement shall operate as a waiver thereof.

10.9.  **Interpretation.** This Agreement shall be construed as a whole, according to its fair meaning, and not in favor of or against any party. For example, no provision shall be construed in favor of the party receiving a benefit nor against the party responsible for any particular language. Section headings are used for reference purposes only and should be ignored in the interpretation of the Agreement. The Agreement shall not be construed more strictly against either party regardless of which party is responsible for drafting the Agreement.

10.10. **Execution of Documents.** Each party agrees, at the request of the other, to execute and deliver any instrument, furnish any information, and perform any other act reasonably necessary to carry out the provisions of this Agreement without undue delay or expense. Any party who fails to comply with this Section shall reimburse the other party for any reasonable expenses, including attorney's fees and court costs, that as a result of this failure become reasonably necessary to carry out the terms of this Agreement.

10.11. **Acknowledgements.** Each party acknowledges that the settlement terms reflected in this Agreement represent a compromise and negotiated settlement and that he or she respectively (i) is fully informed as to the facts relating to the subject matter of this Agreement, and as to the rights and liabilities of both parties; (ii) enters into this Agreement voluntarily, free from fraud, undue influence, coercion, or duress of any kind; and (iii) has read, considered, and understands each provision of this Agreement.

10.12. **Counterparts.** This Agreement may be executed in one or more counterparts, but all counterparts, when duly executed, will constitute one and the same Agreement.

10.13. **Time for Acceptance.** If this Agreement is not executed by and delivered to all parties, or fact of execution communicated in writing between all parties, on or before February 8, 2008 at 5:00 CT, this Agreement shall be void and ineffective. The "Effective Date" of this Agreement is the date the last one of the Husband and Wife has signed the Agreement.

Husband

Wife

Husband and Wife are executing this Agreement on the dates indicated below.

Signed in the presence of:

Print Name: _Terry Sowell Q._

Print Name: _Amy Minkewicz_

**Michael Reed**

Petitioner/Husband
Dated: February 5th, 2008

**ACKNOWLEDGEMENT AS TO HUSBAND**

**State of Florida**
**County of Leon**

The foregoing instrument was acknowledged before me on February _5TH_, 2008
by **Michael Reed**, who ☐ is personally known to me or ☑ produced _drivers license_
_____ as identification.

[Notary Seal]

Notary Public
Print Name: _Wanda B Segers_

My Commission Expires: _3/23/2010_

Notary Public State of Florida
Wanda B Segers
My Commission DD501877
Expires 03/23/2010

*[Signatures continue on the following page]*

Husband

Partial Marital Settlement Agreement
Page 11 of 12

Wife

Signed in the presence of:

Print Name: _Jerry Howell Jr._

Print Name: _Amy Minkewicz_

**Myra Reed**

Respondent/Wife
Dated: February _5_, 2008

**ACKNOWLEDGEMENT AS TO WIFE**

State of Florida
County of Leon

    The foregoing instrument was acknowledged before me on February _5th_, 2008 by **Myra Reed**, who ☑ is personally known to me or ☐ produced _____ _____ as identification.

[Notary Seal]

Notary Public State of Florida
Wanda B Segers
My Commission DD501877
Expires 03/23/2010

Notary Public
Print Name: _Wanda B. Segers_

My Commission Expires: _3/23/2010_

The foregoing Agreement is hereby approved by counsel for the parties.

Jerome M. Novey, Esquire
*Attorney for Husband*

Joseph R. Boyd, Esquire
James M. DuRant, Esquire
*Attorneys for Wife*

Husband

Partial Marital Settlement Agreement
Page 12 of 12

Wife

## Reed v. Reed - Partial Marital Settlement Agreement
### Exhibit A
### Distribution of Marital Assets Liabilities

| Asset/Liability | Titled Distrib. | Present Market Value | Tax Basis | Liability | Tax Liability | Dct % | Discount | Marital Net Value | H's Dist. | W's Dist. |
|---|---|---|---|---|---|---|---|---|---|---|
| **CASH** | | | | | | | | | | |
| 1 Trustmark Checking #4514 (9/12/07) | J W | 644,473 | | | | | | 644,473 | 0 | 644,473 |
| 2 Trustmark Checking #7357 (4/30/07) | J J | 1,311 | | | | | | 1,311 | 656 | 656 |
| 3 Trustmark Checking #0827 (4/30/07) | J W | 13,707 | | | | | | 13,707 | 0 | 13,707 |
| 4 Trustmark Checking #2458 (Carillon) (5/31/07) | W W | 17,983 | | | | | | 17,983 | 0 | 17,983 |
| 5 Bank of Montreal #3303 (4/30/07) | H H | 47,926 | | | | | | 47,926 | 47,926 | 0 |
| 6 Coastal Community Bank #9806 | W W | 7,418 | | | | | | 7,418 | 0 | 7,418 |
| 7 Trustmark Checking #0481 (Southwood Operating (4/30/07) | H H | 129,265 | | | | | | 129,265 | 129,265 | 0 |
| 8 Trustmark Checking #0358 (Southwood Deposit-Escrow (4/30/07) | H H | 12,586 | | 12,586 | | | | 0 | 0 | 0 |
| 9 Trustmark Checking #8977 (Rental acct-Hawaii) (50%) | H H | 660 | | | | | | 660 | 660 | 0 |
| 10 Trustmark Checking #8213 (5/4/07) (7/07) | H H | 40,942 | | | | | | 40,942 | 40,942 | 0 |
| 11 Trustmark Checking #7019 (5/18/07) (closed 6/13/07) | H H | 438 | | | | | | 438 | 438 | 0 |
| 12 Trustmark Business Account #0346 (9/12/07) | W W | 35,789 | | | | | | 35,789 | 0 | 35,789 |
| Subtotal | | 952,498 | 0 | 12,586 | 0 | | 0 | 939,912 | 219,887 | 720,026 |
| **REAL ESTATE** | | | | | | | | | | |
| 13 1233 Water Oak Bend, Lake Powell, FL (titled in FPE Reed, LLC) | J H | 2,700,000 | 2,300,000 | 2,300,000 | 49,500 | 10% | 270,000 | 80,500 | 80,500 | 0 |
| 14 Highway 79, Panama City Beach, FL (33%) (sold May 2007) | J H | 498,000 | 18,663 | | 71,901 | 0% | | 426,099 | 426,099 | 0 |
| 15 239 Southwood Drive, Panama City, FL (State Avenue West) (33%) | H H | 191,000 | 116,667 | 91,885 | 11,150 | 30% | 57,300 | 30,665 | 30,665 | 0 |
| 16 5000 Sandestin Blvd S, Miramar Beach, Units 6609 & 6611 (33%) | H H | 137,439 | 171,798 | 134,069 | | 30% | 41,232 | (37,862) | (37,862) | 0 |
| 17 1815 Weakfish Way, Panama City Beach, FL | H H | 1,050,000 | 192,000 | | 128,700 | 10% | 105,000 | 816,300 | 0 | 816,300 |
| 18 State Avenue East | J W | 815,750 | 300,000 | 220,141 | 77,363 | 10% | 81,575 | 436,672 | 436,672 | 0 |
| 19 1500 Marsh Point Lane, Panama City Beach, FL | J W | 1,150,000 | 437,971 | 291,346 | 106,804 | 10% | 115,000 | 636,850 | 0 | 636,850 |
| 20 Little Island Pond Road, Panama City, FL (50%) | J H | 137,500 | 30,000 | | 16,125 | 30% | 41,250 | 80,125 | 80,125 | 0 |
| Subtotal | | 6,679,689 | 3,567,099 | 3,037,441 | 461,542 | | 711,357 | 2,469,349 | 1,016,199 | 1,453,150 |

Husband:

Wife:

## Reed v. Reed - Partial Marital Settlement Agreement
### Exhibit A
### Distribution of Marital Assets Liabilities

| # | Asset/Liability | Titled | Distrib. | Present Market Value | Tax Basis | Liability | Tax Liability | Dct % | Discount | Marital Net Value | H's Dist. | W's Dist. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 21 | 2405 Jenks Avenue, Panama City, FL (Commercial Office Building) | H | W | 2,341,000 | 1,600,000 | 976,990 | 111,150 | 0% | 0 | 1,252,860 | | 1,252,860 |
| 22 | 2501 Jenks Ave, Panama City, FL | H | W | 550,000 | 410,000 | 260,542 | 21,000 | 10% | 55,000 | 213,458 | | 213,458 |
| 23 | 405 West 19th Street, Panama City, FL | H | H | 260,000 | 220,000 | 0 | 0 | 0% | 0 | 260,000 | 260,000 | 0 |
| 24 | 50 Nohea Kai Dr, Lahaina, Hawaii (50%) | H | H | 450,000 | 157,500 | 79,560 | 43,875 | 30% | 135,000 | 191,565 | 191,565 | 0 |
| 25 | 8401 Golden Bear Place, Whistler, BC, Canada | H | H | 1,287,150 | 278,754 | 518,459 | 151,259 | 10% | 128,715 | 488,717 | 488,717 | 0 |
| 26 | 1-2324 Taluswood Place, Whistler, BC, Canada | J | H | 1,973,630 | 972,435 | 830,217 | 150,179 | 10% | 197,363 | 795,871 | 795,871 | 0 |
| 27 | 500 W 19th St, Panama City, FL | J | H | 597,500 | 251,500 | 0 | 51,900 | 0% | 0 | 545,600 | 545,600 | 0 |
| 28 | 13700 Panama City Beach Pkwy Unit 205 FL | H | H | 164,900 | 164,100 | 143,356 | 120 | 10% | 16,490 | 4,934 | 4,934 | 0 |
| 29 | 1814 Thomas Drive, Panama City Beach, FL | W | W | 1,050,000 | 1,000,000 | 863,362 | 7,500 | 0% | 0 | 179,138 | | 179,138 |
| 30 | 200 Harrison Ave, Panama City, FL | W | W | 900,000 | 950,000 | 700,355 | 0 | 10% | 90,000 | 109,645 | | 109,645 |
| 31 | 322 Beachside Drive, Carillon Beach, FL | J | W | 2,900,000 | 200,000 | 224,730 | 405,000 | 10% | 290,000 | 1,980,270 | | 1,980,270 |
| | **Subtotal** | | | 12,474,180 | 6,204,289 | 4,597,571 | 941,984 | | 912,568 | 6,022,057 | 2,286,686 | 3,735,371 |
| 32 | Merrill Lynch Retirement #0787 (9/28/07) | H | H | 98,090 | | 0 | 34,332 | 35% | 0 | 63,759 | 63,759 | 0 |
| 33 | Merrill Lynch PSP #5076 (4/30/07) | H | W | 703,618 | | 0 | 246,266 | 35% | 0 | 457,352 | | 457,352 |
| 34 | Merrill Lynch Retirement #0844 (6/29/07) | W | W | 69,556 | | 0 | 24,345 | 35% | 0 | 45,211 | | 45,211 |
| 35 | Merrill Lynch PSP #5087 (4/30/07) | W | W | 374,274 | | 0 | 130,996 | 35% | 0 | 243,278 | | 243,278 |
| | **Subtotal** | | | 1,245,538 | | 0 | 435,938 | | 0 | 809,600 | 63,759 | 745,841 |
| 36 | Merrill Lynch #0771 (4/30/07) | H | H | 144,314 | 101,296 | | 8,153 | | | 136,161 | 136,161 | 0 |
| 37 | Merrill Lynch #0843 (6/29/07) | W | W | 72,409 | 28,797 | | 6,542 | | | 65,867 | | 65,867 |
| 38 | Merrill Lynch #0770 (4/30/07) | W | W | 60,096 | 13,519 | | 5,286 | | | 54,810 | | 54,810 |
| | **Subtotal** | | | 276,819 | 143,612 | 0 | 19,981 | | | 256,838 | 136,161 | 120,677 |
| 39 | Michael W. Reed, M.D., P.A. | H | H | 610,183 | 213,568 | | 138,817 | 0% | | 471,366 | 471,366 | 0 |
| 40 | Myra A. Reed, M.D., P.A. | W | W | 171,635 | 100 | | 60,037 | 0% | | 111,598 | | 111,598 |
| 41 | Destin Wings, Inc. (7,801.419%) | H | H | 50,000 | 25,000 | | 3,750 | 30% | 15,000 | 31,250 | 31,250 | 0 |
| | **Subtotal** | | | 831,818 | 238,668 | 0 | 202,604 | | 15,000 | 614,214 | 502,616 | 111,598 |

February 5, 2008

Husband:
Wife:



Reed v. Reed - Partial Marital Settlement Agreement
Exhibit A
Distribution of Marital Assets Liabilities

| # | Asset/Liability | Titled | Distrib. | Present Market Value | Tax Basis | Liability | Tax Liability | Dct % | Discount | Marital Net Value | H's Dist. | W's Dist. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 42 | Summit Enterprises Partners, Inc. (50%) (includes 17742 Ashley Dr.) (4.079%) and Northwest Florida Surgery | H | | 3,058,396 | 265,994 | 0 | 418,860 | 30% | 917,519 | 1,722,017 | 1,722,017 | 0 |
| 43 | Center, LTC (4.0627%) Northwest Florida Surgery Center, Inc. | H | | 458,134 | 338,619 | | 68,720 | 30% | 137,440 | 251,974 | 251,974 | 0 |
| 44 | Annabella's, LLC [16.67%] | H | | (1,500,000) | 338,619 | | | 0% | | (1,500,000) | (1,500,000) | 0 |
| 45 | Annabella's, LLC [16.67%] | W | W | (1,500,000) | 338,619 | | | 0% | | (1,500,000) | | (1,500,000) |
| 46 | North Bay Development Company LLC [15.38%] | H | H | 200,000 | 200,000 | | | 30% | 60,000 | 140,000 | 140,000 | 0 |
| 47 | Methbown Technologies, Inc. | H | H | 0 | 611,775 | | | 0% | | 0 | 0 | 0 |
| 48 | Osten, Inc. (50%) | H | H | 0 | 0 | | | 0% | | 0 | 0 | 0 |
| 49 | Labis, LLC (4%) | H | H | 100,000 | 46,662 | | 8,001 | 30% | 30,000 | 61,999 | 61,999 | 0 |
| 50 | Bone-A-Fide, Inc. | H | H | 0 | 0 | | | 30% | | 0 | 0 | 0 |
| 51 | CFGR Real Estate, LLC (25%) | H | H | 197,743 | 74,371 | | 18,506 | 30% | 59,323 | 119,914 | 119,914 | 0 |
| 52 | Coastal Development Partners, LLC (51%) | H | H | 187,405 | 110,059 | | 11,602 | 30% | 55,222 | 119,582 | 119,582 | 0 |
| 53 | Pax, LLC (16.67%) | H | H | 64,783 | 16,529 | | 7,234 | 30% | 19,424 | 38,093 | 38,093 | 0 |
| 54 | A & R Imagine, LLC (40%) | J | H | 134,000 | 134,000 | | | 30% | 40,200 | 93,800 | 46,900 | 46,900 |
| 55 | Daphanma Stockholder, LLC | H | H | 50,000 | 50,000 | | | 30% | 15,000 | 35,000 | 35,000 | 0 |
| | Subtotal | | | 2,282,249 | 2,425,291 | 0 | 735,527 | | 1,350,130 | 196,593 | 1,538,095 | (1,341,502) |
| 56 | Summit Enterprise Partners, Inc. | H | H | 1,197,533 | | | | | | 1,197,533 | 1,197,533 | 0 |
| 57 | Annabella's, LLC | H | H | 0 | | | | | | 0 | 0 | 0 |
| 58 | Prime Ridge Lake Properties, LLC | H | H | 200,000 | | | | | | 200,000 | 200,000 | 0 |
| 59 | Methbown Technologies, Inc. | H | H | 200,000 | | | | | | 200,000 | 200,000 | 0 |
| 60 | Bone-A-Fide, Inc. | H | H | 10,000 | | | | | | 10,000 | 10,000 | 0 |
| 61 | CFGR Real Estate, LLC | H | H | 62,500 | | | | | | 62,500 | 62,500 | 0 |
| 62 | Frank Wood Accounts Receivable | H | H | 0 | | | | | | 0 | 0 | 0 |
| | Subtotal | | | 1,670,033 | 0 | 0 | 0 | | 0 | 1,670,033 | 1,670,033 | 0 |
| 63 | None | | | 0 | 0 | 0 | 0 | | 0 | 0 | 0 | 0 |
| 64 | 2004 Chevrolet Suburban 2500 | W | H | 17,080 | | | | | | 17,080 | 17,080 | 0 |
| 65 | 2005 Ford GT | H | H | 157,000 | | | | | | 157,000 | 157,000 | 0 |
| 66 | 1996 Porsche | W | W | 32,200 | | | | | | 32,200 | 0 | 32,200 |
| 67 | 1995 Toyota Landcruiser | H | H | 9,365 | | | | | | 9,365 | 9,365 | 0 |

February 5, 2008

Husband:
Wife:

**Reed v. Reed - Partial Marital Settlement Agreement**

Exhibit A

Distribution of Marital Assets Liabilities

February 5, 2008

| | Asset/Liability | Titled Distrib. | Present Market Value | Tax Basis | Liability | Tax Liability % | Dct Discount | Marital Net Value | H's Dist. | W's Dist. |
|---|---|---|---|---|---|---|---|---|---|---|
| 68 | 1994 Harley Softail | H | 7,700 | 0 | 0 | 0 | 0 | 7,700 | 7,700 | 0 |
| 69 | 1990 Harley Softail Springer | H | 6,535 | 0 | 0 | 0 | 0 | 6,535 | 6,535 | 0 |
| 70 | 2006 Land Rover Range Rover | H | 75,430 | 0 | 0 | 0 | 0 | 75,430 | 75,430 | 0 |
| 71 | 1983 Porsche | H | 9,000 | 0 | 0 | 0 | 0 | 9,000 | 9,000 | 0 |
| 72 | 2003 Land Rover | H W | 33,060 | 0 | 0 | 0 | 0 | 33,060 | | 33,060 |
| 73 | Furniture & Furnishings (1233 W. Water Oak Bend) | H | 300,000 | 0 | 0 | 0 | 0 | 300,000 | 150,000 | 150,000 |
| 74 | Jewelry | W W | 96,398 | 0 | 0 | 0 | 0 | 96,398 | | 96,398 |
| 75 | Jewelry | W | 2,000 | 0 | 0 | 0 | 0 | 2,000 | | 2,000 |
| 76 | Speed Boat | H H | 33,000 | 0 | 0 | 0 | 0 | 32,000 | 32,000 | 0 |
| 77 | 2001 Century 2101 Bay 21' | H H | 9,260 | 0 | 0 | 0 | 0 | 9,260 | 9,260 | 0 |
| 78 | Eclipse 500 Jet (Deposit Only) | H H | 150,000 | 0 | 0 | 0 | 0 | 150,000 | 150,000 | 0 |
| 79 | Wild Heron Club Membership | J H | 32,000 | 0 | 0 | 0 | 0 | 32,000 | 32,000 | 0 |
| | Subtotal | J . | 969,028 | 0 | 0 | 0 | 0 | 969,028 | 664,350 | 304,678 |
| | **SUMMARY OF NET ASSETS/LIABILITIES** | | | | | | | | | |
| | Cash | | 952,498 | 0 | 12,586 | | | 939,912 | 219,887 | 720,026 |
| | Real Estate | | 6,679,699 | 3,567,099 | 3,037,441 | 461,542 | 711,357 | 2,469,349 | 1,016,199 | 1,453,150 |
| | Real Estate - Rental Property | | 12,474,180 | 6,204,289 | 4,597,571 | 944,984 | 912,568 | 6,022,057 | 2,286,686 | 3,735,371 |
| | Retirement & IRA | | 1,245,538 | | 435,938 | | | 809,600 | 63,759 | 745,841 |
| | Investments/Stocks/Partnerships | | 276,819 | 143,612 | 19,981 | | | 256,838 | 136,161 | 120,677 |
| | Closely Held Entities | | 2,282,249 | 2,425,291 | 735,527 | | 1,350,130 | 196,593 | 1,538,095 | (1,341,502) |
| | Notes & Accounts Receivable | | 1,670,033 | | 0 | | | 1,670,033 | 1,670,033 | 0 |
| | Life Insurance - Cash Value | | 0 | | 0 | | | 0 | 0 | 0 |
| | Personalty | | 969,028 | | 0 | | | 969,028 | 664,350 | 304,678 |
| | Equalization | | | | | | | 13,333,410 | 7,595,165 | (928,465) |
| | Totals | | 26,550,034 | 12,340,291 | 7,647,598 | 2,594,972 | 2,974,054 | 13,333,410 | 7,599,170 | 5,738,240 |

Husband:
Wife: 

## IN THE CIRCUIT COURT OF THE FOURTEENTH JUDICIAL CIRCUIT
## IN AND FOR BAY COUNTY, FLORIDA

IN RE: The Marriage of

MICHAEL REED,

      Former Husband

v.                                          CASE NO. : 07-1540-DR

MYRA REED,

      Former Wife

---

### SUPPLEMENTAL FINAL JUDGMENT

THIS ACTION was stipulated and agreed to by the parties hereto on Former Wife's Motion to Enforce Settlement. In accordance with the stipulation of the parties,

IT IS ADJUDGED that

1.    Former Wife, MYRA REED, whose address is 3664 Preserve Boulevard, Panama City Beach, FL 32408, recover from Former Husband, Michael Reed, the sum of $922,837.52, with interest from December 31, 2011, at the statutory rate, for which let execution issue.

2.    This judgment shall be deemed to supplement the Final Judgment of Dissolution of Marriage. Former Husband's monetary obligations under Article 7.1 and 7.2 of the Partial Marital Settlement Agreement incorporated into the Partial Final Judgment of Dissolution of Marriage in this cause dated April 2, 2008, are incorporated and merged into this judgment. This judgment does not extinguish or otherwise affect any security or other interest that Former Wife has or may have in Summit Enterprises Partners, Inc., and

1



does not affect any obligation Former Husband may have relating thereto, pursuant to Article 7.1 of said Agreement. This judgment does not affect and the Court retains jurisdiction as to any of the other rights which Former Wife may have pursuant to the Final Judgment of Dissolution of Marriage, including, but not limited to, the provisions of the Final Judgment relative to child support and alimony.

     3.    Jurisdiction is retained to tax costs and attorneys' fees in connection with the Petitioner's enforcement efforts.

     DONE AND ORDERED this _20th_ day of March, 2012.

/S/ James B Fensom
James B. Fensom, Circuit Judge

cc:    J.D. Durrant, Esq.
       Boyd, DuRant & Sliger, P.L.
       1407 Piedmont Drive East
       Tallahassee, FL 32308

       Samuel T. Adams, Esq.
       460 Grace Avenue
       Panama City, FL 32401

       Carroll McCauley, Esq.
       36 East Oak Avenue
       Panama City, FL 32401

       Jimmy Barr, Esq.
       P.O. Box 70
       Panama City, FL 32402

A CERTIFIED TRUE COPY
BILL KINSAUL CLERK
OF THE CIRCUIT COURT
By _Virginia Starling_
Deputy Clerk

2



*DOC155000006405002-9001000000*

Regions Bank

# COMMERCIAL GUARANTY

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| | | | | 100 / 3145 | | B41 | |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** ANNABELLA'S, LLC (SSN: [redacted]
1815 TURNER WOOD LANE
PANAMA CITY BEACH, FL 32407

**Lender:** REGIONS BANK
PANAMA CITY MAIN OFFICE
144 HARRISON AVENUE
PANAMA CITY, FL 32401

**Guarantor:** MICHAEL REED (SSN: [redacted]
500 WEST 19TH ST
PANAMA CITY, FL 32405

**AMOUNT OF GUARANTY. The amount of this Guaranty is Unlimited.**

**CONTINUING UNLIMITED GUARANTY. For good and valuable consideration, MICHAEL REED ("Guarantor") absolutely and unconditionally guarantees and promises to pay to REGIONS BANK ("Lender") or its order, in legal tender of the United States of America, the Indebtedness (as that term is defined below) of ANNABELLA'S, LLC ("Borrower") to Lender on the terms and conditions set forth in this Guaranty. Under this Guaranty, the liability of Guarantor is unlimited and the obligations of Guarantor are continuing.**

**INDEBTEDNESS GUARANTEED.** The Indebtedness guaranteed by this Guaranty includes any and all of Borrower's indebtedness to Lender and is used in the most comprehensive sense and means and includes any and all of Borrower's liabilities, obligations and debts to Lender, now existing or hereinafter incurred or created, including, without limitation, all loans, advances, interest, costs, debts, overdraft indebtedness, credit card indebtedness, lease obligations, other obligations, and liabilities of Borrower, or any of them, and any present or future judgments against Borrower, or any of them; and whether any such Indebtedness is voluntarily or involuntarily incurred, due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined; whether Borrower may be liable individually or jointly with others, or primarily or secondarily, or as guarantor or surety; whether recovery on the Indebtedness may be or may become barred or unenforceable against Borrower for any reason whatsoever; and whether the Indebtedness arises from transactions which may be voidable on account of infancy, insanity, ultra vires, or otherwise.

**DURATION OF GUARANTY.** This Guaranty will take effect when received by Lender without the necessity of any acceptance by Lender, or any notice to Guarantor or to Borrower, and will continue in full force until all Indebtedness incurred or contracted before receipt by Lender of any notice of revocation shall have been fully and finally paid and satisfied and all of Guarantor's other obligations under this Guaranty shall have been performed in full. If Guarantor elects to revoke this Guaranty, Guarantor may only do so in writing. Guarantor's written notice of revocation must be mailed to Lender, by certified mail, at Lender's address listed above or such other place as Lender may designate in writing. Written revocation of this Guaranty will apply only to advances or new Indebtedness created after actual receipt by Lender of Guarantor's written revocation. For this purpose and without limitation, the term "new Indebtedness" does not include Indebtedness which at the time of notice of revocation is contingent, unliquidated, undetermined or not due and which later becomes absolute, liquidated, determined or due. This Guaranty will continue to bind Guarantor for all Indebtedness incurred by Borrower or committed by Lender prior to receipt of Guarantor's written notice of revocation, including any extensions, renewals, substitutions or modifications of the Indebtedness. All renewals, extensions, substitutions, and modifications of the Indebtedness granted after Guarantor's revocation, are contemplated under this Guaranty and, specifically will not be considered to be new Indebtedness. This Guaranty shall bind Guarantor's estate as to Indebtedness created both before and after Guarantor's death or incapacity, regardless of Lender's actual notice of Guarantor's death. Subject to the foregoing, Guarantor's executor or administrator or other legal representative may terminate this Guaranty in the same manner in which Guarantor might have terminated it and with the same effect. Release of any other guarantor or termination of any other guaranty of the Indebtedness shall not affect the liability of Guarantor under this Guaranty. A revocation Lender receives from any one or more Guarantors shall not affect the liability of any remaining Guarantors under this Guaranty. **It is anticipated that fluctuations may occur in the aggregate amount of Indebtedness covered by this Guaranty, and Guarantor specifically acknowledges and agrees that reductions in the amount of Indebtedness, even to zero dollars ($0.00), prior to Guarantor's written revocation of this Guaranty shall not constitute a termination of this Guaranty. This Guaranty is binding upon Guarantor and Guarantor's heirs, successors and assigns so long as any of the guaranteed Indebtedness remains unpaid and even though the Indebtedness guaranteed may from time to time be zero dollars ($0.00).**

**GUARANTOR'S AUTHORIZATION TO LENDER.** Guarantor authorizes Lender, either before or after any revocation hereof, **without notice or demand and without lessening Guarantor's liability under this Guaranty, from time to time:** (A) prior to revocation as set forth above, to make one or more additional secured or unsecured loans to Borrower, to lease equipment or other goods to Borrower, or otherwise to extend additional credit to Borrower; (B) to alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of the Indebtedness or any part of the Indebtedness, including increases and decreases of the rate of interest on the Indebtedness; extensions may be repeated and may be for longer than the original loan term; (C) to take and hold security for the payment of this Guaranty or the Indebtedness, and exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any such security, with or without the substitution of new collateral; (D) to release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose; (E) to determine how, when and what application of payments and credits shall be made on the Indebtedness (F) to apply such security and direct the order or manner of sale thereof, including without limitation, any nonjudicial sale permitted by the terms of the controlling security agreement or deed of trust, as Lender in its discretion may determine; (G) to sell, transfer, assign or grant participations in all or any part of the Indebtedness; and (H) to assign or transfer this Guaranty in whole or in part.

**GUARANTOR'S REPRESENTATIONS AND WARRANTIES.** Guarantor represents and warrants to Lender that (A) no representations or agreements of any kind have been made to Guarantor which would limit or qualify in any way the terms of this Guaranty; (B) this Guaranty is executed at Borrower's request and not at the request of Lender; (C) Guarantor has full power, right and authority to enter into this Guaranty; (D) the provisions of this Guaranty do not conflict with or result in a default under any agreement or other instrument binding upon Guarantor and do not result in a violation of any law, regulation, court decree or order applicable to Guarantor; (E) Guarantor has not and will not, without the prior written consent of Lender, sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein; (F) upon Lender's request, Guarantor will provide to Lender financial and credit information in form acceptable to Lender, and all such financial information which currently has been, and all future financial information which will be provided to Lender is and will be true and correct in all material respects and fairly present Guarantor's financial condition as of the dates the financial information is provided; (G) no material adverse change has occurred in Guarantor's financial condition since the date of the most recent financial statements provided to Lender and no event has occurred which may materially adversely affect Guarantor's financial condition; (H) no litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Guarantor is pending or threatened; (I) Lender has made no representation to Guarantor as to the creditworthiness of Borrower; and (J) Guarantor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition. Guarantor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under this Guaranty, and Guarantor further agrees that, absent a request for information, Lender shall have no obligation to disclose to Guarantor any information or documents acquired by Lender in the course of its relationship with Borrower.

**GUARANTOR'S WAIVERS.** Except as prohibited by applicable law, Guarantor waives any right to require Lender (A) to continue lending money or to extend other credit to Borrower; (B) to make any presentment, protest, demand, or notice of any kind, including notice of any nonpayment of the Indebtedness or of any nonpayment related to any collateral, or notice of any action or nonaction on the part of Borrower, Lender, any surety, endorser, or other guarantor in connection with the Indebtedness or in connection with the creation of new or additional loans or obligations; (C) to resort for payment or to proceed directly or at once against any person, including Borrower or any other guarantor; (D) to proceed directly against or exhaust any collateral held by Lender from Borrower, any other guarantor, or any other person; (E) to pursue any other remedy within Lender's power; or (F) to commit any act or omission of any kind, or at any time, with respect to any matter whatsoever.

In addition to the waivers set forth herein, if now or hereafter Borrower is or shall become insolvent and the Indebtedness shall not at all times

EXHIBIT



Loan No: 6405002-9001

COMMERCIAL GUARANTY
(Continued)

until paid be fully secured by collateral pledged by Borrower, Guarantor hereby forever waives and gives up in favor of Lender and Borrower, and Lender's and Borrower's respective successors, any claim or right to payment Guarantor may now have or hereafter have or acquire against Borrower, by subrogation or otherwise, so that at no time shall Guarantor be or become a "creditor" of Borrower within the meaning of 11 U.S.C. section 547(b), or any successor provision of the Federal bankruptcy laws.

Guarantor also waives any and all rights or defenses arising by reason of (A) any "one action" or "anti-deficiency" law or any other law which may prevent Lender from bringing any action, including a claim for deficiency, against Guarantor, before or after Lender's commencement or completion of any foreclosure action, either judicially or by exercise of a power of sale; (B) any election of remedies by Lender which destroys or otherwise adversely affects Guarantor's subrogation rights or Guarantor's rights to proceed against Borrower for reimbursement, including without limitation, any loss of rights Guarantor may suffer by reason of any law limiting, qualifying, or discharging the Indebtedness; (C) any disability or other defense of Borrower, of any other guarantor, or of any other person, or by reason of the cessation of Borrower's liability from any cause whatsoever, other than payment in full in legal tender, of the Indebtedness; (D) any right to claim discharge of the Indebtedness on the basis of unjustified impairment of any collateral for the Indebtedness; (E) any statute of limitations, if at any time any action or suit brought by Lender against Guarantor is commenced, there is outstanding Indebtedness of Borrower to Lender which is not barred by any applicable statute of limitations; or (F) any defenses given to guarantors at law or in equity other than actual payment and performance of the Indebtedness. If payment is made by Borrower, whether voluntarily or otherwise, or by any third party, on the Indebtedness and thereafter Lender is forced to remit the amount of that payment to Borrower's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, the Indebtedness shall be considered unpaid for the purpose of the enforcement of this Guaranty.

Guarantor further waives and agrees not to assert or claim at any time any deductions to the amount guaranteed under this Guaranty for any claim of setoff, counterclaim, counter demand, recoupment or similar right, whether such claim, demand or right may be asserted by the Borrower, the Guarantor, or both.

**GUARANTOR'S UNDERSTANDING WITH RESPECT TO WAIVERS.** Guarantor warrants and agrees that each of the waivers set forth above is made with Guarantor's full knowledge of its significance and consequences and that, under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any such waiver is determined to be contrary to any applicable law or public policy, such waiver shall be effective only to the extent permitted by law or public policy.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Guarantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Guarantor holds jointly with someone else and all accounts Guarantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Guarantor authorizes Lender, to the extent permitted by applicable law, to hold these funds if there is a default, and Lender may apply the funds in these accounts to pay what Guarantor owes under the terms of this Guaranty.

**SUBORDINATION OF BORROWER'S DEBTS TO GUARANTOR.** Guarantor agrees that the Indebtedness of Borrower to Lender, whether now existing or hereafter created, shall be superior to any claim that Guarantor may now have or hereafter acquire against Borrower, whether or not Borrower becomes insolvent. Guarantor hereby expressly subordinates any claim Guarantor may have against Borrower, upon any account whatsoever, to any claim that Lender may now or hereafter have against Borrower. In the event of insolvency and consequent liquidation of the assets of Borrower, through bankruptcy, by an assignment for the benefit of creditors, by voluntary liquidation, or otherwise, the assets of Borrower applicable to the payment of the claims of both Lender and Guarantor shall be paid to Lender and shall be first applied by Lender to the Indebtedness of Borrower to Lender. Guarantor does hereby assign to Lender all claims which it may have or acquire against Borrower or against any assignee or trustee in bankruptcy of Borrower; provided however, that such assignment shall be effective only for the purpose of assuring to Lender full payment in legal tender of the Indebtedness. If Lender so requests, any notes or credit agreements now or hereafter evidencing any debts or obligations of Borrower to Guarantor shall be marked with a legend that the same are subject to this Guaranty and shall be delivered to Lender. Guarantor agrees, and Lender is hereby authorized, in the name of Guarantor, from time to time to execute and file financing statements and continuation statements and to execute such other documents and to take such other actions as Lender deems necessary or appropriate to perfect, preserve and enforce its rights under this Guaranty.

**GARNISHMENT.** Guarantor consents to the issuance of a continuing writ of garnishment or attachment against Guarantor's disposable earnings, in accordance with Section 222.11, Florida Statutes, in order to satisfy, in whole or in part, any money judgment entered in favor of Lender.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Guaranty:

**Amendments.** This Guaranty, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Guaranty. No alteration of or amendment to this Guaranty shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Arbitration.** Borrower and Guarantor and Lender agree that all disputes, claims and controversies between them whether individual, joint, or class in nature, arising from this Guaranty or otherwise, including without limitation contract and tort disputes, shall be arbitrated pursuant to the Rules of the American Arbitration Association in effect at the time the claim is filed, upon request of either party. No act to take or dispose of any Collateral shall constitute a waiver of this arbitration agreement or be prohibited by this arbitration agreement. This includes, without limitation, obtaining injunctive relief or a temporary restraining order; invoking a power of sale under any deed of trust or mortgage; obtaining a writ of attachment or imposition of a receiver; or exercising any rights relating to personal property, including taking or disposing of such property with or without judicial process pursuant to Article 9 of the Uniform Commercial Code. Any disputes, claims, or controversies concerning the lawfulness or reasonableness of any act, or exercise of any right, concerning any Collateral, including any claim to rescind, reform, or otherwise modify any agreement relating to the Collateral, shall also be arbitrated, provided however that no arbitrator shall have the right or the power to enjoin or restrain any act of any party. Judgment upon any award rendered by any arbitrator may be entered in any court having jurisdiction. Nothing in this Guaranty shall preclude any party from seeking equitable relief from a court of competent jurisdiction. The statute of limitations, estoppel, waiver, laches, and similar doctrines which would otherwise be applicable in an action brought by a party shall be applicable in any arbitration proceeding, and the commencement of an arbitration proceeding shall be deemed the commencement of an action for these purposes. The Federal Arbitration Act shall apply to the construction, interpretation, and enforcement of this arbitration provision.

**Attorneys' Fees; Expenses.** Guarantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's reasonable attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Guaranty. Lender may hire or pay someone else to help enforce this Guaranty, and Guarantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's reasonable attorneys' fees and legal expenses whether or not there is a lawsuit, including reasonable attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Guarantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Guaranty are for convenience purposes only and are not to be used to interpret or define the provisions of this Guaranty.

**Governing Law.** This Guaranty will be governed by, construed and enforced in accordance with federal law and the laws of the State of Florida. This Guaranty has been accepted by Lender in the State of Florida.

**Integration.** Guarantor further agrees that Guarantor has read and fully understands the terms of this Guaranty; Guarantor has had the opportunity to be advised by Guarantor's attorney with respect to this Guaranty; the Guaranty fully reflects Guarantor's intentions and parol evidence is not required to interpret the terms of this Guaranty. Guarantor hereby indemnifies and holds Lender harmless from all losses, claims, damages, and costs (including Lender's attorneys' fees) suffered or incurred by Lender as a result of any breach by Guarantor of the warranties, representations and agreements of this paragraph.

**Interpretation.** In all cases where there is more than one Borrower or Guarantor, then all words used in this Guaranty in the singular shall be deemed to have been used in the plural where the context and construction so require; and where there is more than one Borrower named in this Guaranty or when this Guaranty is executed by more than one Guarantor, the words "Borrower" and "Guarantor" respectively shall mean all and any one or more of them. If a court finds that any provision of this Guaranty is not valid or should not be enforced, that fact by itself will not mean that the rest of this Guaranty will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Guaranty even if a provision of this Guaranty may be found to be invalid or unenforceable. If any one or more of Borrower or Guarantor are corporations, partnerships, limited liability companies, or similar entities, it is not necessary for Lender to inquire into the powers of Borrower or Guarantor or of the officers, directors, partners, managers, or other agents acting or purporting to act on their behalf, and any Loan Indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Guaranty.

**Notices.** Any notice required to be given under this Guaranty shall be given in writing, and, except for revocation notices by Guarantor, shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Guaranty. All revocation notices by Guarantor shall be in

**COMMERCIAL GUARANTY**
**(Continued)**

writing and shall be effective upon delivery to Lender as provided in the section of this Guaranty entitled "DURATION OF GUARANTY." Any party may change its address for notices under this Guaranty by giving written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Guarantor agrees to keep Lender informed at all times of Guarantor's current address. Unless otherwise provided or required by law, if there is more than one Guarantor, any notice given by Lender to any Guarantor is deemed to be notice given to all Guarantors.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Guaranty unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Guaranty shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Guaranty. No prior waiver by Lender, nor any course of dealing between Lender and Guarantor, shall constitute a waiver of any of Lender's rights or of any of Guarantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Guaranty, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Successors and Assigns.** Subject to any limitations stated in this Guaranty on transfer of Guarantor's interest, this Guaranty shall be binding upon and inure to the benefit of the parties, their successors and assigns.

**Waive Jury.** Lender and Guarantor hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Borrower against the other.

**CONSTRUCTION WITH OTHER GUARANTIES.** No guaranty hereafter executed and delivered with respect to any liability, obligation or debt of Borrower to Lender shall be construed or deemed (i) to limit, restrict or otherwise adversely affect any security interest or other interest in property, or any other right, power or remedy, granted to or vested in Lender under or pursuant to either this Guaranty or any Related Document, or (ii) to alter or amend this Guaranty, or (iii) to be, or to give rise to, any waiver by Lender of any right under this Guaranty, unless such guaranty, or another written instrument signed by Lender, so provides by express reference to this Guaranty.

In addition, this Guaranty shall not be construed or deemed (a) to limit, restrict or otherwise adversely affect any security interest or other interest in property, or any other right, power or remedy, granted to or vested in Lender under or pursuant to any guaranty now existing with respect to any liability, obligation or debt of Borrower to Lender, or (ii) to alter or amend any such guaranty, or (iii) to be, or to give rise to, any waiver by Lender of any right under any such guaranty.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Guaranty. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Guaranty shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Borrower.** The word "Borrower" means ANNABELLA'S, LLC and includes all co-signers and co-makers signing the Note.

**Guarantor.** The word "Guarantor" means each and every person or entity signing this Guaranty, including without limitation MICHAEL REED.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Indebtedness.** The word "Indebtedness" means Borrower's indebtedness to Lender as more particularly described in this Guaranty.

**Lender.** The word "Lender" means REGIONS BANK, its successors and assigns.

**Note.** The word "Note" means and includes without limitation all of Borrower's promissory notes and/or credit agreements evidencing Borrower's loan obligations in favor of Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of and substitutions for promissory notes or credit agreements.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**EACH UNDERSIGNED GUARANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS GUARANTY AND AGREES TO ITS TERMS. IN ADDITION, EACH GUARANTOR UNDERSTANDS THAT THIS GUARANTY IS EFFECTIVE UPON GUARANTOR'S EXECUTION AND DELIVERY OF THIS GUARANTY TO LENDER AND THAT THE GUARANTY WILL CONTINUE UNTIL TERMINATED IN THE MANNER SET FORTH IN THE SECTION TITLED "DURATION OF GUARANTY". NO FORMAL ACCEPTANCE BY LENDER IS NECESSARY TO MAKE THIS GUARANTY EFFECTIVE. THIS GUARANTY IS DATED NOVEMBER 5, 2003.**

GUARANTOR:

X _____
MICHAEL REED

LASER PRO Lending, Ver. 5.22.30.002 Copr. Harland Financial Solutions, Inc. 1997, 2003.  All Rights Reserved.  - FL J:\APPS\LPWIN\CFI\LPL\E30.FC  TR-0470\0001358  PR-8904

*DOC155000006405002-9001000000*

# Regions Bank

## COMMERCIAL GUARANTY

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| | | | | 100 / 3146 | | B41 | |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing **** has been omitted due to text length limitations.

**Borrower:** ANNABELLA'S, LLC (SSN: ████████
1815 TURNER WOOD LANE
PANAMA CITY BEACH, FL 32407

**Lender:** REGIONS BANK
PANAMA CITY MAIN OFFICE
144 HARRISON AVENUE
PANAMA CITY, FL 32401

**Guarantor:** MYRA REED (SSN: ████████
500 WEST 19TH ST
PANAMA CITY, FL 32405

---

**AMOUNT OF GUARANTY.** The amount of this Guaranty is Unlimited.

**CONTINUING UNLIMITED GUARANTY.** For good and valuable consideration, MYRA REED ("Guarantor") absolutely and unconditionally guarantees and promises to pay to REGIONS BANK ("Lender") or its order, in legal tender of the United States of America, the Indebtedness (as that term is defined below) of ANNABELLA'S, LLC ("Borrower") to Lender on the terms and conditions set forth in this Guaranty. Under this Guaranty, the liability of Guarantor is unlimited and the obligations of Guarantor are continuing.

**INDEBTEDNESS GUARANTEED.** The Indebtedness guaranteed by this Guaranty includes any and all of Borrower's indebtedness to Lender and is used in the most comprehensive sense and means and includes any and all of Borrower's liabilities, obligations and debts to Lender, now existing or hereinafter incurred or created, including, without limitation, all loans, advances, interest, costs, debts, overdraft indebtedness, credit card indebtedness, lease obligations, other obligations, and liabilities of Borrower, or any of them, and any present or future judgments against Borrower, or any of them; and whether any such indebtedness is voluntarily or involuntarily incurred, due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined; whether Borrower may be liable individually or jointly with others, or primarily or secondarily, or as guarantor or surety; whether recovery on the Indebtedness may be or may become barred or unenforceable against Borrower for any reason whatsoever; and whether the Indebtedness arises from transactions which may be voidable on account of infancy, insanity, ultra vires, or otherwise.

**DURATION OF GUARANTY.** This Guaranty will take effect when received by Lender without the necessity of any acceptance by Lender, or any notice to Guarantor or to Borrower, and will continue in full force until all Indebtedness incurred or contracted before receipt by Lender of any notice of revocation shall have been fully paid and finally paid and satisfied and all of Guarantor's other obligations under this Guaranty shall have been performed in full. If Guarantor elects to revoke this Guaranty, Guarantor may only do so in writing. Guarantor's written notice of revocation must be mailed to Lender, by certified mail, at Lender's address listed above or such other place as Lender may designate in writing. Written revocation of this Guaranty will apply only to advances or new Indebtedness created after actual receipt by Lender of Guarantor's written revocation. For this purpose and without limitation, the term "new Indebtedness" does not include Indebtedness which at the time of notice of revocation is contingent, unliquidated, undetermined or not due and which later becomes absolute, liquidated, determined or due. This Guaranty will continue to bind Guarantor for all Indebtedness incurred by Borrower or committed by Lender prior to receipt of Guarantor's written notice of revocation, including any extensions, renewals, substitutions or modifications of the Indebtedness. All renewals, extensions, substitutions, and modifications of the Indebtedness granted after Guarantor's death, are contemplated under this Guaranty and, specifically will not be considered to be new Indebtedness. This Guaranty shall bind Guarantor's estate as to Indebtedness created both before and after Guarantor's death or incapacity, regardless of Lender's actual notice of Guarantor's death. Subject to the foregoing, Guarantor's executor or administrator or other legal representative may terminate this Guaranty in the same manner in which Guarantor might have terminated it and with the same effect. Release of any other guarantor or termination of any other guaranty of the Indebtedness shall not affect the liability of Guarantor under this Guaranty. A revocation Lender receives from any one or more Guarantors shall not affect the liability of any remaining Guarantors under this Guaranty. It is anticipated that fluctuations may occur in the aggregate amount of Indebtedness covered by this Guaranty, and Guarantor specifically acknowledges and agrees that reductions in the amount of Indebtedness, even to zero dollars ($0.00), prior to Guarantor's written revocation of this Guaranty shall not constitute a termination of this Guaranty. This Guaranty is binding upon Guarantor and Guarantor's heirs, successors and assigns so long as any of the guaranteed Indebtedness remains unpaid and even though the Indebtedness guaranteed may from time to time be zero dollars ($0.00).

**GUARANTOR'S AUTHORIZATION TO LENDER.** Guarantor authorizes Lender, either before or after any revocation hereof, without notice or demand and without lessening Guarantor's liability under this Guaranty, from time to time: (A) prior to revocation as set forth above, to make one or more additional secured or unsecured loans to Borrower, to lease equipment or other goods to Borrower, or otherwise to extend additional credit to Borrower; (B) to alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of the Indebtedness, including any part of the Indebtedness, including increases and decreases of the rate of interest on the Indebtedness; extensions may be repeated and may be for longer than the original loan term; (C) to take and hold security for the payment of this Guaranty or the Indebtedness, and exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any such security, with or without the substitution of new collateral; (D) to release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose; (E) to determine how, when and what application of payments and credits shall be made on the Indebtedness (F) to apply such security and direct the order or manner of sale thereof, including without limitation, any nonjudicial sale permitted by the terms of the controlling security agreement or deed of trust, as Lender in its discretion may determine; (G) to sell, transfer, assign or grant participations in all or any part of the Indebtedness; and (H) to assign or transfer this Guaranty in whole or in part.

**GUARANTOR'S REPRESENTATIONS AND WARRANTIES.** Guarantor represents and warrants to Lender that (A) no representations or agreements of any kind have been made to Guarantor which would limit or qualify in any way the terms of this Guaranty; (B) this Guaranty is executed at Borrower's request and not at the request of Lender; (C) Guarantor has full power, right and authority to enter into this Guaranty; (D) the provisions of this Guaranty do not conflict with or result in a default under any agreement or other instrument binding upon Guarantor and do not result in a violation of any law, regulation, court decree or order applicable to Guarantor; (E) Guarantor has not and will not, without the prior written consent of Lender, sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein; (F) upon Lender's request, Guarantor will provide to Lender financial and credit information in form acceptable to Lender, and all such financial information which currently has been, and all future financial information which will be provided to Lender is and will be true and correct in all material respects and fairly present Guarantor's financial condition as of the dates the financial information is provided; (G) no material adverse change has occurred in Guarantor's financial condition since the date of the most recent financial statements provided to Lender and no event has occurred which may materially adversely affect Guarantor's financial condition; (H) no litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Guarantor is pending or threatened; (I) Lender has made no representation to Guarantor as to the creditworthiness of Borrower; and (J) Guarantor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition. Guarantor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under this Guaranty, and Guarantor further agrees that, absent a request for information, Lender shall have no obligation to disclose to Guarantor any information or documents acquired by Lender in the course of its relationship with Borrower.

**GUARANTOR'S WAIVERS.** Except as prohibited by applicable law, Guarantor waives any right to require Lender (A) to continue lending money or to extend other credit to Borrower; (B) to make any presentment, protest, demand, or notice of any kind, including notice of any nonpayment of the Indebtedness or of any nonpayment related to any collateral, or notice of any action or nonaction on the part of Borrower, Lender, any surety, endorser, or other guarantor in connection with the Indebtedness or in connection with the creation of new or additional loans or obligations; (C) to resort for payment or to proceed directly or at once against any person, including Borrower or any other guarantor; (D) to proceed directly against or exhaust any collateral held by Lender from Borrower, any other guarantor, or any other person; (E) to pursue any other remedy within Lender's power; or (F) to commit any act or omission of any kind, or at any time, with respect to any matter whatsoever.

In addition to the waivers set forth herein, if now or hereafter Borrower is or shall become insolvent and the Indebtedness shall not at all times



## COMMERCIAL GUARANTY
### (Continued)

until paid be fully secured by collateral pledged by Borrower, Guarantor hereby forever waives and gives up in favor of Lender and Borrower, and Lender's and Borrower's respective successors, any claim or right to payment Guarantor may now have or hereafter have or acquire against Borrower, by subrogation or otherwise, so that at no time shall Guarantor be or become a "creditor" of Borrower within the meaning of 11 U.S.C. section 547(b), or any successor provision of the Federal bankruptcy laws.

Guarantor also waives any and all rights or defenses arising by reason of (A) any "one action" or "anti-deficiency" law or any other law which may prevent Lender from bringing any action, including a claim for deficiency, against Guarantor, before or after Lender's commencement or completion of any foreclosure action, either judicially or by exercise of a power of sale; (B) any election of remedies by Lender which destroys or otherwise adversely affects Guarantor's subrogation rights or Guarantor's rights to proceed against Borrower for reimbursement, including without limitation, any loss of rights Guarantor may suffer by reason of any law limiting, qualifying, or discharging the Indebtedness; (C) any disability or other defense of Borrower, of any other guarantor, or of any other person, or by reason of the cessation of Borrower's liability from any cause whatsoever, other than payment in full in legal tender, of the Indebtedness; (D) any right to claim discharge of the Indebtedness on the basis of unjustified impairment of any collateral for the Indebtedness; (E) any statute of limitations, if at any time any action or suit brought by Lender against Guarantor is commenced, there is outstanding Indebtedness of Borrower to Lender which is not barred by any applicable statute of limitations; or (F) any defenses given to guarantors at law or in equity other than actual payment and performance of the Indebtedness. If payment is made by Borrower, whether voluntarily or otherwise, or by any third party, on the Indebtedness and thereafter Lender is forced to remit the amount of that payment to Borrower's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, the Indebtedness shall be considered unpaid for the purpose of the enforcement of this Guaranty.

Guarantor further waives and agrees not to assert or claim at any time any deductions to the amount guaranteed under this Guaranty for any claim of setoff, counterclaim, counter demand, recoupment or similar right, whether such claim, demand or right may be asserted by the Borrower, the Guarantor, or both.

**GUARANTOR'S UNDERSTANDING WITH RESPECT TO WAIVERS.** Guarantor warrants and agrees that each of the waivers set forth above is made with Guarantor's full knowledge of its significance and consequences and that, under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any such waiver is determined to be contrary to any applicable law or public policy, such waiver shall be effective only to the extent permitted by law or public policy.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Guarantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Guarantor holds jointly with someone else and all accounts Guarantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Guarantor authorizes Lender, to the extent permitted by applicable law, to hold these funds if there is a default, and Lender may apply the funds in these accounts to pay what Guarantor owes under the terms of this Guaranty.

**SUBORDINATION OF BORROWER'S DEBTS TO GUARANTOR.** Guarantor agrees that the Indebtedness of Borrower to Lender, whether now existing or hereafter created, shall be superior to any claim that Guarantor may now have or hereafter acquire against Borrower, whether or not Borrower becomes insolvent. Guarantor hereby expressly subordinates any claim Guarantor may have against Borrower, upon any account whatsoever, to any claim that Lender may now or hereafter have against Borrower. In the event of insolvency and consequent liquidation of the assets of Borrower, through bankruptcy, by an assignment for the benefit of creditors, by voluntary liquidation, or otherwise, the assets of Borrower applicable to the payment of the claims of both Lender and Guarantor shall be paid to Lender and shall be first applied by Lender to the Indebtedness of Borrower to Lender. Guarantor does hereby assign to Lender all claims which it may have or acquire against Borrower or against any assignee or trustee in bankruptcy of Borrower; provided however, that such assignment shall be effective only for the purpose of assuring to Lender full payment in legal tender of the Indebtedness. If Lender so requests, any notes or credit agreements now or hereafter evidencing any debts or obligations of Borrower to Guarantor shall be marked with a legend that the same are subject to this Guaranty and shall be delivered to Lender. Guarantor agrees, and Lender is hereby authorized, in the name of Guarantor, from time to time to execute and file financing statements and continuation statements and to execute such other documents and to take such other actions as Lender deems necessary or appropriate to perfect, preserve and enforce its rights under this Guaranty.

**GARNISHMENT.** Guarantor consents to the issuance of a continuing writ of garnishment or attachment against Guarantor's disposable earnings, in accordance with Section 222.11, Florida Statutes, in order to satisfy, in whole or in part, any money judgment entered in favor of Lender.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Guaranty:

**Amendments.** This Guaranty, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Guaranty. No alteration of or amendment to this Guaranty shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Arbitration.** Borrower and Guarantor and Lender agree that all disputes, claims and controversies between them whether individual, joint, or class in nature, arising from this Guaranty or otherwise, including without limitation contract and tort disputes, shall be arbitrated pursuant to the Rules of the American Arbitration Association in effect at the time the claim is filed, upon request of either party. No act to take or dispose of any Collateral shall constitute a waiver of this arbitration agreement or be prohibited by this arbitration agreement. This includes, without limitation, obtaining injunctive relief or a temporary restraining order; invoking a power of sale under any deed of trust or mortgage; obtaining a writ of attachment or imposition of a receiver; or exercising any rights relating to personal property, including taking or disposing of such property with or without judicial process pursuant to Article 9 of the Uniform Commercial Code. Any disputes, claims, or controversies concerning the lawfulness or reasonableness of any act, or exercise of any right, concerning any Collateral, including any claim to rescind, reform, or otherwise modify any agreement relating to the Collateral, shall also be arbitrated, provided however that no arbitrator shall have the right or the power to enjoin or restrain any act of any party. Judgment upon any award rendered by any arbitrator may be entered in any court having jurisdiction. Nothing in this Guaranty shall preclude any party from seeking equitable relief from a court of competent jurisdiction. The statute of limitations, estoppel, waiver, laches, and similar doctrines which would otherwise be applicable in an action brought by a party shall be applicable in any arbitration proceeding, and the commencement of an arbitration proceeding shall be deemed the commencement of an action for these purposes. The Federal Arbitration Act shall apply to the construction, interpretation, and enforcement of this arbitration provision.

**Attorneys' Fees; Expenses.** Guarantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's reasonable attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Guaranty. Lender may hire or pay someone else to help enforce this Guaranty, and Guarantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's reasonable attorneys' fees and legal expenses whether or not there is a lawsuit, including reasonable attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Guarantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Guaranty are for convenience purposes only and are not to be used to interpret or define the provisions of this Guaranty.

**Governing Law.** This Guaranty will be governed by, construed and enforced in accordance with federal law and the laws of the State of Florida. This Guaranty has been accepted by Lender in the State of Florida.

**Integration.** Guarantor further agrees that Guarantor has read and fully understands the terms of this Guaranty; Guarantor has had the opportunity to be advised by Guarantor's attorney with respect to this Guaranty; the Guaranty fully reflects Guarantor's intentions and parol evidence is not required to interpret the terms of this Guaranty. Guarantor hereby indemnifies and holds Lender harmless from all losses, claims, damages, and costs (including Lender's attorneys' fees) suffered or incurred by Lender as a result of any breach by Guarantor of the warranties, representations and agreements of this paragraph.

**Interpretation.** In all cases where there is more than one Borrower or Guarantor, then all words used in this Guaranty in the singular shall be deemed to have been used in the plural where the context and construction so require; and where there is more than one Borrower named in this Guaranty or when this Guaranty is executed by more than one Guarantor, the words "Borrower" and "Guarantor" respectively shall mean all and any one or more of them. The words "Guarantor," "Borrower," and "Lender" include the heirs, successors, assigns, and transferees of each of them. If a court finds that any provision of this Guaranty is not valid or should not be enforced, that fact by itself will not mean that the rest of this Guaranty will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Guaranty even if a provision of this Guaranty may be found to be invalid or unenforceable. If any one or more of Borrower or Guarantor are corporations, partnerships, limited liability companies, or similar entities, it is not necessary for Lender to inquire into the powers of Borrower or Guarantor or of the officers, directors, partners, managers, or other agents acting or purporting to act on their behalf, and any Loan Indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Guaranty.

**Notices.** Any notice required to be given under this Guaranty shall be given in writing, and, except for revocation notices by Guarantor, shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Guaranty. All revocation notices by Guarantor shall be in

COMMERCIAL GUARANTY
(Continued)

writing and shall be effective upon delivery to Lender as provided in the section of this Guaranty entitled "DURATION OF GUARANTY." Any party may change its address for notices under this Guaranty by giving written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Guarantor agrees to keep Lender informed at all times of Guarantor's current address. Unless otherwise provided or required by law, if there is more than one Guarantor, any notice given by Lender to any Guarantor is deemed to be notice given to all Guarantors.

No Waiver by Lender. Lender shall not be deemed to have waived any rights under this Guaranty unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Guaranty shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Guaranty. No prior waiver by Lender, nor any course of dealing between Lender and Guarantor, shall constitute a waiver of any of Lender's rights or of any of Guarantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Guaranty, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

Successors and Assigns. Subject to any limitations stated in this Guaranty on transfer of Guarantor's interest, this Guaranty shall be binding upon and inure to the benefit of the parties, their successors and assigns.

Waive Jury. Lender and Guarantor hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Borrower against the other.

CONSTRUCTION WITH OTHER GUARANTIES. No guaranty hereafter executed and delivered with respect to any liability, obligation or debt of Borrower to Lender shall be construed or deemed (i) to limit, restrict or otherwise adversely affect any security interest or other interest in property, or any other right, power or remedy, granted to or vested in Lender under or pursuant to either this Guaranty or any Related Document, or (ii) to alter or amend this Guaranty, or (iii) to be, or to give rise to, any waiver by Lender of any right under this Guaranty, unless such guaranty, or another written instrument signed by Lender, so provides by express reference to this Guaranty.

In addition, this Guaranty shall not be construed or deemed (a) to limit, restrict or otherwise adversely affect any security interest or other interest in property, or any other right, power or remedy, granted to or vested in Lender under or pursuant to any guaranty now existing with respect to any liability, obligation or debt of Borrower to Lender, or (ii) to alter or amend any such guaranty, or (iii) to be, or to give rise to, any waiver by Lender of any right under any such guaranty.

DEFINITIONS. The following capitalized words and terms shall have the following meanings when used in this Guaranty. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Guaranty shall have the meanings attributed to such terms in the Uniform Commercial Code:

Borrower. The word "Borrower" means ANNABELLA'S, LLC and includes all co-signers and co-makers signing the Note.

Guarantor. The word "Guarantor" means each and every person or entity signing this Guaranty, including without limitation MYRA REED.

Guaranty. The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

Indebtedness. The word "Indebtedness" means Borrower's Indebtedness to Lender as more particularly described in this Guaranty.

Lender. The word "Lender" means REGIONS BANK, its successors and assigns.

Note. The word "Note" means and includes without limitation all of Borrower's promissory notes and/or credit agreements evidencing Borrower's loan obligations in favor of Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of and substitutions for promissory notes or credit agreements.

Related Documents. The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

EACH UNDERSIGNED GUARANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS GUARANTY AND AGREES TO ITS TERMS. IN ADDITION, EACH GUARANTOR UNDERSTANDS THAT THIS GUARANTY IS EFFECTIVE UPON GUARANTOR'S EXECUTION AND DELIVERY OF THIS GUARANTY TO LENDER AND THAT THE GUARANTY WILL CONTINUE UNTIL TERMINATED IN THE MANNER SET FORTH IN THE SECTION TITLED "DURATION OF GUARANTY". NO FORMAL ACCEPTANCE BY LENDER IS NECESSARY TO MAKE THIS GUARANTY EFFECTIVE. THIS GUARANTY IS DATED NOVEMBER 5, 2003.

GUARANTOR:

X _____
MYRA REED

File # 2009013722, OR BK 3135 Page 451, Recorded 03/06/2009 at 03:38 PM, Bill
Kinsaul, Clerk Bay County, Florida Deputy Clerk erecord Trans # 920380

## IN THE CIRCUIT COURT IN AND FOR BAY COUNTY, FLORIDA

ANNABELLAS ASSET
MANAGEMENT, LLC,
ASSIGNEE OF REGIONS
BANK;

       Plaintiff,

v.

                                    CASE NO.: 07-4044-CA

ANNABELLA'S, LLC;
MELANIE A. LEDMAN;
WILBUR THOMAS LEDMAN;
VALORIE F. WOOD;
FRANK D. WOOD;
MICHAEL W. REED; and
MYRA A. REED;

             Defendants.

                                /

FILED JE
2009 MAR -6 A 11: 25
BILL KINSAUL
CLERK OF COURT
BAY COUNTY, FLORIDA

### FINAL JUDGMENT IN FAVOR OF ANNABELLAS ASSET MANAGEMENT, FINAL JUDGMENT OF FORECLOSURE, AND FINAL JUDGMENT ON COUNTERCLAIM FILED BY MYRA A. REED

THIS CAUSE came for hearing on March 6, 2009 upon the Motion for Summary Judgment

filed by ANNABELLAS ASSET MANAGEMENT, LLC (hereinafter referred to as "Asset

Management"), as assignee of Regions Bank (Asset Management, individually and as assignee of

Regions Bank, is hereinafter referred to as "Plaintiff"), whose municipal address is 2303 E. Pass

Road, Gulfport, MS 39507. The Defendants, ANNABELLA'S, LLC (hereinafter "Annabella's"),

whose address is 1815 Turner Wood Lane, Panama City Beach, FL 32407-2460; MELANIE A.

LEDMAN (hereinafter "Melanie Ledman"), whose address is 3614 Preserve Blvd., Panama City

Beach, FL 32408-7169; WILBUR THOMAS LEDMAN (hereinafter "Wilbur Ledman"), whose address

is 3614 Preserve Blvd., Panama City Beach, FL 32408-7169, VALORIE F. WOOD (hereinafter

"Valorie Wood"), whose address is 1815 Turner Wood Lane, Panama City Beach, FL 32407-2460,

FRANK D. WOOD (hereinafter "Frank Wood"), whose address is 1815 Turner Wood Lane, Panama

City Beach, FL 32407-2460, MICHAEL W. REED (hereinafter "Michael Reed"), whose address is

500 West 19th Street, Panama City, FL 32405, and MYRA A. REED (hereinafter "Myra Reed"),



OR BK 3135 PG 452

whose address is 3238 W. HWY 390, Panama City, FL 32405, have been properly served and filed their answers through their attorneys of record. Proper notice of said hearing has been provided to Annabella's, Melanie Ledman, Wilbur Ledman, Valorie Wood, Frank Wood, Michael Reed, and Myra Reed (collectively, individually and interchangeably the "Defendants"). This Court being fully advised and having considered the arguments, pleadings, applicable law and evidence before the Court finds that Plaintiff has sustained the allegations of the complaint against the Defendants; and Plaintiff is entitled to the relief prayed for, and that the Court has jurisdiction to grant same. It is, therefore, ORDERED AND ADJUDGED as follows:

     1.    This Court has jurisdiction of the parties in this cause and the subject matter hereof and has jurisdiction to render this judgment; further, that the allegations contained herein have been proved by competent evidence, and there are no material issues of fact or law and this final judgment (hereinafter "Final Judgment") is in satisfaction of all counts which Plaintiff has asserted in the complaint.

     2.    That the equities of this cause are with the Plaintiff and against the Defendants.

     3.    As to the counterclaim filed by Myra Reed against Plaintiff (hereinafter the "Counterclaim"), this Court finds in favor of Plaintiff and against Myra Reed and hereby dismisses the Counterclaim commenced against Plaintiff, with prejudice.

     4.    The Court finds that $275.00 per hour, 250.00 per hour, $160.00 per hour, $150.00 per hour, and $140.00 per hour are appropriate and reasonable hourly rates to be charged by Plaintiff's attorneys in this action, that 186.6 hours is an appropriate and reasonable amount of time to be expended by attorneys in connection with this action, and 38.9 hours for paralegal time at $80.00 per hour, $65.00 per hour, $60.00 per hour, $50.00 per hour, and $45.00 per hour are appropriate and reasonable hourly rates and reasonable amount of time to be expended by the paralegals in connection with this action, and that no enhancement or reduction of the fee is appropriate. Accordingly, attorneys' fees in the amount described below in this Judgment are awarded to Plaintiff.

OR BK 3135 PG 453

**AS TO COUNT 1 (Foreclosure of the Mortgage), COUNT 2 (Suit on Note-1 and Guarantees) and COUNT 3 (Suit on Note-2 and Guarantees):**

      5.     That Plaintiff recover from Annabella's, Melanie Ledman, Wilbur Ledman, Valorie Wood, Frank Wood, Michael Reed and Myra Reed, jointly and severally, the following amounts due under the promissory notes and mortgage sued upon:

| NOTE-1 | |
|---|---|
| Principal Due on Note-1 | $4,071,371.20 |
| Interest as of 01/21/09 | $135,826.35 |
| Late Charges | $7,815.29 |
| Subtotal | $4,215,012.84 |
| Interest 1/21/09 thru 3/6/09 $367.55434/day | $16,172.39 |
| TOTAL | $4,231,185.23 |

With the above indebtedness due under Note-1 being subject to a credit of any net-balances remaining in the account at Regions Bank (pursuant to the Stipulated Order as defined below) as of the date of the entry of this Judgment, after debiting said account for any homeowners association obligations that may be due and owing in connection with the property subject to the mortgage described herein; AND

| NOTE-2 | |
|---|---|
| Principal Due on Note-2 | $4,448,275.00 |
| Interest as of 01/21/09 | $237,241.48 |
| Late Charges | $6,369.96 |
| Subtotal | $4,691,886.44 |
| Interest 1/21/09 thru 3/6/09 $494.2578/day | $21,747.34 |
| TOTAL | $4,713,633.78 |

AND

    **FORECLOSURE COSTS**

| | |
|---|---|
| Filing Fee | $277.00 |
| Service of Process Fees | $267.00 |
| Title Search Costs | $375.00 |
| Postage | $72.39 |
| Federal Express | $65.54 |
| Photocopies | $247.50 |
| Travel Expenses - Deposition | $121.00 |
| Deposition Charge | $245.10 |
| Outside Copy Charges | $7.53 |

3

OR BK 3135 PG 454

| | |
|---|---|
| Foreclosure Costs Subtotal | $1,678.06 |

| | |
|---|---|
| JUDGMENT SUBTOTAL | $8,946,497.07 |
| ATTORNEYS' FEES | $34,448.50 |
| **JUDGMENT TOTAL** | **$8,980,945.57** |

AND with interest continuing to accrue on the total indebtedness described above (subject to any credit for rents per the Stipulated Order as described above) at the per diem rate of $367.55434 on Note-1 and at the per diem rate of $494.2578 on Note-2 until the date of this judgment, plus interest continuing to accrue on the entire judgment at the rate of 8.00% per year pursuant to §55.03, Florida Statutes, from the date of this judgment until paid, plus any further sums in connection herewith, for all of which let execution issue.

**AS TO COUNT 1 (Foreclosure of Mortgage):**

6.     Plaintiff holds a lien for the amount equal to the total indebtedness described in paragraph 5 above upon the property covered by that certain Construction Mortgage, dated November 23, 2004 and recorded on the 24th day of November 2004, in Official Records Book 2531 at Page 540 of the Public Records of Bay County, Florida, as subsequently assigned to Asset Management, pursuant to the Assignment of Construction Mortgage, dated December 30, 2008 and recorded in Official Records Book 3119, Page 1782 of the Public Records of Bay County, Florida and attached as Exhibit "C" to the Affidavit of W. Lee Brumfield previously filed with this Court, as thereafter modified by various partial releases (collectively the "Mortgage"), which Mortgage lien is prior, paramount and superior to all rights, claim, title, interest, liens, encumbrances and equities of the Defendants, and all persons, firms or corporations claiming by, through or under them, and any junior lienholders.  If said indebtedness is not paid, said property herein sought to be foreclosed and described in the complaint and in the Mortgage (less the various partial releases of certain property subject to the Mortgage), situate, lying and being in Bay County, Florida (hereinafter the "Property"), and also described as to-wit:

SEE ATTACHED EXHIBIT "1"

4

OR BK 3135 PG 455

be sold by the Clerk of this Court at public sale at 11:00 A.M. CENTRAL STANDARD TIME on the
6th day of April, 2009, to the highest and best bidder or bidders for cash, except
as set forth hereinafter, AT THE NORTH FRONT DOOR OF THE BAY COUNTY COURTHOUSE
LOCATED AT 300 EAST 4TH STREET, PANAMA CITY, FLORIDA, after having first given notice
as required by Section 45.031, Florida Statutes. Said property shall not be sold by the Clerk if
Plaintiff's duly authorized representative or Plaintiff's counsel is not present at the public sale.

7.   Plaintiff shall advance all subsequent costs of this action and shall be reimbursed for
them by the clerk if Plaintiff is not the purchaser of the property for sale, except as indicated
otherwise. If Plaintiff is the purchaser, the clerk shall credit Plaintiff's bid with the total sum with
interest and cost accruing subsequent to this judgment, or such part of it, as is necessary to pay the
bid in full. If prior to or after the sale, Plaintiff shall be required to advance any monies pursuant to
the provisions hereof, then Plaintiff or its attorneys shall so certify to the Clerk of this Court by
affidavit, and the amount due to Plaintiff as set forth above shall be increased by the amount of such
advances without further order of the Court. If Plaintiff is the successful bidder at the sale, Plaintiff's
rights as such may be assigned to a third party and, in that event, the Clerk of this Court is hereby
ordered and directed to issue the Certificate of Title to Plaintiff's assignee upon notice to the Clerk by
Plaintiff of said assignments and without further order of this Court.

8.   On filing the Certificate of Title, the Clerk shall, except as otherwise indicated,
distribute the proceeds of the sale, so far as they are sufficient by paying: first, all of Plaintiff's costs;
second, documentary stamps affixed to the certificate; third, Plaintiff's attorney's fees; fourth, the total
sum due to Plaintiff, plus interest at the rate prescribed above from the date referenced in this
judgment to the date of the disbursement; and by retaining any remaining amount pending the further
order of this Court. If the high bidder at the sale is any party other than Plaintiff, then that high bidder
shall, as a condition of being high bidder, pay to the Clerk of the Court all sums bid, plus the registry
fee and all documentary stamps tax necessary for the issuance of the Certificate of Title.

5

9.    IF THIS PROPERTY IS SOLD AT PUBLIC AUCTION, THERE MAY BE ADDITIONAL MONEY FROM THE SALE AFTER PAYMENT OF PERSONS WHO ARE ENTITLED TO BE PAID FROM THE SALE PROCEEDS PURSUANT TO THIS FINAL JUDGMENT.

IF YOU ARE A SUBORDINATE LIENHOLDER CLAIMING A RIGHT TO FUNDS REMAINING AFTER THE SALE, YOU MUST FILE A CLAIM WITH THE CLERK NO LATER THAN 60 DAYS AFTER THE SALE. IF YOU FAIL TO FILE A CLAIM, YOU WILL NOT BE ENTITLED TO ANY REMAINING FUNDS.

10.    On filing the Certificate of Title, the Defendants, and all persons claiming under or against them since the filing of the Notice of Lis Pendens shall be forever barred and foreclosed of any and all estate, claim, or equity in and to the above described property, and the sale shall stand confirmed and the purchaser at the sale shall be let into possession of the property.

11.    The Defendants are hereby ordered to remove themselves, family members or agents and any and all personal property owned by the Defendants from the above described property no later than three (3) days from the date of the Certificate of Title. Upon the failure of said Defendants to comply herewith and upon the filing of an affidavit by the purchaser of the property involved herein, affirmatively showing that possession of the premises has not been delivered to said purchaser within the time stated herein the Clerk of the Court shall, without further order, issue a Writ of Possession, upon request for same by Purchaser or Plaintiff for the premises, commanding the Sheriff of said County, to remove said Defendants, family members or agents and personal belongings from the above described property and then put the purchaser named on the Certificate of Title in immediate possession of the said premises as conveyed.

12.    As to the Stipulated Order entered by this Court on October 14, 2008 (hereinafter the "Stipulated Order"), this Court hereby confirms that the Stipulated Order shall continue to be binding upon the parties until the recordation of the Certificate of Title, following the foreclosure sale. Any and all rents relating to the property received by Defendants, prior to the recording of the Certificate

of Title, shall be deposited into the account at Regions Bank, all as set forth in the Stipulated Order. Any and all rents erroneously paid to Defendants relating to the property, after the recording of the Certificate of Title, shall be delivered to the party identified in the Certificate of Title. Accordingly, the Stipulated Order remains valid and effective until recordation of the Certificate of Title.

13.    Jurisdiction over this action and all aspects of this Judgment is retained, to enter such further orders as are proper, including, without limitation, Writs of Assistance, Possession, Deficiency Judgments, and Sequestration of Rents; and the Defendants are enjoined and restrained from damaging, molesting, vandalizing or otherwise harming the improvements located on the real property described in this Final Judgment, or from removing from said property anything affixed to the property in such fashion that it has become part of the realty or improvements, and the Court cautions said Defendants that any violation of this provision by themselves or anyone could subject them to contempt powers of this Court.

14.    If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact the office of Linda A. Hoffman, Esquire, of Carver, Darden, Koretzky, Tessier, Finn, Blossman & Areaux, LLC, 1300 W. Main Street, Pensacola, Florida, 32502, (850) 266-2300, within two (2) working days of your receipt of this Final Judgment of Foreclosure.

DONE AND ORDERED in Chambers at Panama City, Bay County, Florida, this 6 day of March, 2009.

CIRCUIT COURT JUDGE

Conformed Copies to:

Linda A. Hoffman, Esquire
Robert S. Rushing, Esquire
Carver, Darden, Koretzky, Tessier,
Finn, Blossman & Areaux, LLC
1300 W. Main Street
Pensacola, Florida 32502
Telephone: (850) 266-2300
Attorneys for Plaintiff,
Annabellas Asset Management, LLC

7

OR BK 3135 PG 458

James M. DuRant, Jr., Esq.
Boyd, DuRant & Sliger, P.L.
1407 Piedmont Drive East
Tallahassee, Florida 32308

Bill R. Hutto, Esq.
620 McKenzie Avenue
Panama City, FL 32401

Christine D. Smallwood Miranda, Esq.
John L. Gioiello, P.A.
404 Jenks Avenue
Panama City, FL  32401

OR BK 3135 PG 459

## EXHIBIT "1"

PARCEL I: Commence at the Southeast corner of Lot 8, Block D, Gulf Coast Highway Subdivision, according to the plat recorded in Plat Book 3, Page 3, in the public records of Bay County, Florida; thence North 13 degrees 14 minutes 12 seconds West 200 feet to the Northeast corner of Lot 7, said Block D, for the Point of Beginning; thence South 72 degrees 53 minutes 08 seconds West along the North line of said Lot 7 and extension thereof and the North line of Lots 2 and 17, Block G, of said Plat to the West boundary of said Gulf Coast Highway Subdivision; thence North 14 degrees 50 minutes 08 seconds West along said West boundary for 952.21 feet to the centerline of Fourth Street; thence South 73 degrees 11 minutes 52 seconds East along said centerline for 297.94 feet to the Southerly extension of the West line of Lot 2, Block H, said Gulf Coast Highway Subdivision; thence North 13 degrees 14 minutes 12 seconds West along said Southerly extension and the West line of Lot 2 for 113.33 feet to the Southerly right of way line of State Road Number 30-A; thence South 86 degrees 30 minutes 13 seconds East along said Southerly right of way line for 344.59 feet to the centerline of Second Street; thence South 13 degrees 14 minutes 12 seconds East along said centerline for 529.30 feet to the Westerly extension of the North line of Lot 6, Block D, said Gulf Coast Highway Subdivision; thence North 72 degrees 47 minutes 15 seconds East along said Westerly extension of the North line of said Lot 6, and the Easterly extension for 330.11 feet to the East line of Lot 4, said Block D; thence South 13 degrees 11 minutes 33 seconds East along said East line of Lot 4 for 250.04 feet to the North line of Lot 2 said Block D; thence South 72 degrees 53 minutes 08 seconds West along said North line of Lot 2 for 75.00 feet to the Point of Beginning at the Northeast corner of said Lot 7, said Block D.

PARCEL II: Begin at the Southeast corner of Lot 8, Block D, Gulf Coast Highway Subdivision, according to the plat recorded in Plat Book 3, Page 3, in the public records of Bay County, Florida; thence South 72 degrees 53 minutes 08 seconds West along the Northerly right of way line of Singletary Avenue (Formally Fifth Street) for 811.94 feet to the Westerly boundary of said Gulf Coast Highway Subdivision; thence North 14 degrees 50 minutes 08 seconds West along said West boundary for 199.70 feet to the intersection with the Westerly extension of the Northerly line of Lot 17, Block G, of said Gulf Coast Highway Subdivision; thence North 72 degrees 53 minutes 08 seconds East along the Northerly lines of Lots 17 and 2 and the North line of Lot 7, Block D, and the Westerly and Easterly extensions of said Northerly Lot lines across the Platted First and Second Streets to the Northeast corner of said Lot 7, Block D; thence South 13 degrees 14 minutes 12 seconds East along the East line of Lots 7 and 8, said Block D for 200 feet to the Point of Beginning.

Above PARCELS I and II have been combined and more particularly described as follows:
Begin at the Southeast corner of Lot 8, Block D, Gulf Coast Highway Subdivision, according to the plat recorded in Plat Book 3, Page 3, in the public records of Bay County, Florida; thence South 72 degrees 53 minutes 08 West along the Northerly right of way line of Singletary Avenue (Formerly Fifth Street) for 811.94 feet to the West boundary of said Gulf Coast Highway Subdivision; thence North 14 degrees 50 minutes 08 seconds West along said West boundary for 1151.91 feet to the centerline of Fourth Street; thence South 73 degrees 11 minutes 52 seconds East along said centerline for 297.94 feet to the Southerly extension of the West line of Lot 2, Block H, said Gulf Coast Highway Subdivision; thence North 13 degrees 14 minutes 12 seconds West along said Southerly extension and the West line of Lot 2 for 113.33 feet to the Southerly right of way line of State Road No. 30-A; thence South 86 degrees 30 minutes 13 seconds East along said Southerly right of way line for 344.59 feet to the centerline of Second Street; thence South 13 degrees 14 minutes 12 seconds East along said centerline for 529.30 feet to the Westerly extension of the North line of Lot 6, Block D, said Gulf Coast Highway Subdivision; thence North 72 degrees 47 minutes 15 seconds East along said Westerly extension of the North line of said Lot 6, and the Easterly extension for 330.11 feet to the East line of Lot 4, said Block D; thence South 13 degrees 11 minutes 33 seconds East along said East line of Lot 4 for 250.04 feet to the North line of Lot 2, said Block D; thence South 72 degrees 53 minutes 08 seconds West along said North line of Lot 2 for 75.0 feet to the Northeast corner of Lot 7, said Block D; thence South 13 degrees 14 minutes 12 seconds East along the East line of Lots 7 and 8, said Block D for 200 feet to the Point of Beginning.

1

OR BK 3135 PG 460

LESS AND EXCEPT THE FOLLOWING UNITS IN ANNABELLA TOWNHOMES:

DESCRIPTION OF UNIT 1601: COMMENCE AT THE INTERSECTION OF THE SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A WITH THE CENTERLINE OF SECOND STREET, GULF COAST HIGHWAY SUBDIVISION, ACCORDING TO THE PLAT RECORDED IN PLAT BOOK 3, PAGE 3, IN THE PUBLIC RECORDS OF BAY COUNTY, FLORIDA. THENCE NORTH 86°27'18" WEST ALONG SAID SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A FOR 49.62 FEET; THENCE SOUTH 04°48'02" WEST FOR 185.42 FEET; THENCE SOUTH 13°14'18" EAST FOR 19.75 FEET; THENCE SOUTH 76°46'56" WEST FOR 82.15 FEET; THENCE NORTH 86°29'05" WEST FOR 65.04 FEET; THENCE NORTH 03°30'55" EAST FOR 159.18 FEET TO THE WESTERLY EXTENSION OF THE CENTERLINE OF A WALL; THENCE SOUTH 86°32'58" EAST ALONG SAID EXTENSION FOR 31.87 FEET TO THE FACE OF A BUILDING FOR THE POINT OF BEGINNING; THENCE CONTINUE SOUTH 86°32'58" EAST ALONG SAID CENTERLINE OF WALL FOR 48.30 FEET TO A BUILDING FACE, THENCE NORTH 03°31'30" EAST ALONG SAID BUILDING FACE FOR 24.65 FEET; THENCE NORTH 86°31'41" WEST ALONG SAID BUILDING FACE AND THE WESTERLY EXTENSION THEREOF FOR 48.29 FEET TO THE NORTHERLY EXTENSION OF A BUILDING FACE; THENCE SOUTH 03°33'10" WEST ALONG SAID NORTHERLY EXTENSION AND FACE OF BUILDING FOR 24.67 FEET TO THE POINT OF BEGINNING. SAID PARCEL LYING AND BEING SITUATE IN SECTIONS 31 AND 32, TOWNSHIP 3 SOUTH, RANGE 15 WEST, BAY COUNTY, FLORIDA.

AND

DESCRIPTION OF UNIT 1603: COMMENCE AT THE INTERSECTION OF THE SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A WITH THE CENTERLINE OF SECOND STREET, GULF COAST HIGHWAY SUBDIVISION, ACCORDING TO THE PLAT RECORDED IN PLAT BOOK 3, PAGE 3, IN THE PUBLIC RECORDS OF BAY COUNTY, FLORIDA. THENCE NORTH 86 DEGREES 27 MINUTES 18 SECONDS WEST ALONG SAID SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A FOR 49.62 FEET; THENCE SOUTH 04 DEGREES 48 MINUTES 02 SECONDS WEST FOR 185.42 FEET, THENCE SOUTH 13 DEGREES 14 MINUTES 18 SECONDS EAST FOR 19.75 FEET, THENCE SOUTH 76 DEGREES 46 MINUTES 56 SECONDS WEST FOR 82.15 FEET; THENCE NORTH 86 DEGREES 29 MINUTES 05 SECONDS WEST FOR 65.04 FEET; THENCE NORTH 03 DEGREES 30 MINUTES 55 SECONDS EAST FOR 159.18 FEET TO THE WESTERLY EXTENSION OF THE CENTERLINE OF A WALL; THENCE SOUTH 86 DEGREES 32 MINUTES 58 SECONDS EAST ALONG SAID EXTENSION FOR 31.87 FEET TO THE FACE OF A BUILDING FOR THE POINT OF BEGINNING. THENCE CONTINUE SOUTH 86 DEGREES 32 MINUTES 58 SECONDS EAST ALONG SAID CENTERLINE OF WALL FOR 48.30 FEET TO A BUILDING FACE; THENCE SOUTH 03 DEGREES 51 MINUTES 30 SECONDS WEST ALONG SAID BUILDING FACE FOR 24.41 FEET TO THE CENTERLINE OF A WALL, THENCE NORTH 86 DEGREES 27 MINUTES 52 SECONDS WEST ALONG SAID CENTERLINE OF WALL AND THE WESTERLY EXTENSION THEREOF FOR 48.31 FEET TO THE SOUTHERLY EXTENSION OF A BUILDING FACE; THENCE NORTH 03 DEGREES 33 MINUTES 10 SECONDS EAST ALONG SAID SOUTHERLY EXTENSION AND FACE OF BUILDING FOR 21.34 FEET TO THE POINT OF BEGINNING. SAID PARCEL LYING AND BEING SITUATE IN SECTIONS 31 AND 32, TOWNSHIP 3 SOUTH, RANGE 15 WEST, BAY COUNTY, FLORIDA.

AND

2

OR BK 3135 PG 461

DESCRIPTION OF UNIT 1605: COMMENCE AT THE INTERSECTION OF THE SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A WITH THE CENTERLINE OF SECOND STREET, GULF COAST HIGHWAY SUBDIVISION, ACCORDING TO THE PLAT RECORDED IN PLAT BOOK 3, PAGE 3, IN THE PUBLIC RECORDS OF BAY COUNTY, FLORIDA. THENCE NORTH 86 DEGREES 27 MINUTES 18 SECONDS WEST ALONG SAID SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A FOR 49.62 FEET; THENCE SOUTH 04 DEGREES 48 MINUTES 02 SECONDS WEST FOR 185.42 FEET; THENCE SOUTH 13 DEGREES 14 MINUTES 18 SECONDS EAST FOR 19.75 FEET; THENCE SOUTH 76 DEGREES 46 MINUTES 54 SECONDS WEST FOR 82.15 FEET; THENCE NORTH 86 DEGREES 29 MINUTES 05 SECONDS WEST FOR 65.04 FEET; THENCE NORTH 03 DEGREES 30 MINUTES 55 SECONDS EAST FOR 116.36 FEET TO THE WESTERLY EXTENSION OF THE CENTERLINE OF A WALL, THENCE SOUTH 86 DEGREES 37 MINUTES 26 SECONDS EAST ALONG SAID EXTENSION FOR 31.84 FEET TO THE FACE OF A BUILDING FOR THE POINT OF BEGINNING. THENCE CONTINUE SOUTH 86 DEGREES 37 MINUTES 26 SECONDS EAST ALONG SAID CENTERLINE OF WALL FOR 48.32 FEET TO A BUILDING FACE; THENCE NORTH 03 DEGREES 31 MINUTES 30 SECONDS EAST ALONG SAID BUILDING FACE FOR 21.31 FEET TO THE CENTERLINE OF A WALL; THENCE NORTH 86 DEGREES 37 MINUTES 52 SECONDS WEST ALONG SAID CENTERLINE OF WALL AND THE WESTERLY EXTENSION THEREOF FOR 48.31 FEET TO THE NORTHERLY EXTENSION OF A BUILDING FACE; THENCE SOUTH 03 DEGREES 33 MINUTES 10 SECONDS WEST ALONG SAID NORTHERLY EXTENSION AND FACE OF BUILDING FOR 21.44 FEET TO THE POINT OF BEGINNING, SAID PARCEL LYING AND BEING SITUATE IN SECTION 31 AND 32, TOWNSHIP 3 SOUTH, RANGE 15 WEST, BAY COUNTY, FLORIDA.

AND

DESCRIPTION OF UNIT 1607: COMMENCE AT THE INTERSECTION OF THE SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A WITH THE CENTERLINE OF SECOND STREET, GULF COAST HIGHWAY SUBDIVION, ACCORDING TO THE PLAT RECORDED IN PLAT BOOK 3, PAGE 3, IN THE PUBLIC RECORDS OF BAY COUNTY, FLORIDA; THENCE NORTH 86°27'18" WEST ALONG SAID SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A FOR 49.62 FEET; THENCE SOUTH 04°48'02" WEST FOR 185.42 FEET; THENCE SOUTH 13°14'18" EAST FOR 19.75 FEET; THENCE SOUTH 76°46'55" WEST FOR 82.15 FEET; THENCE NORTH 86°29'06" WEST FOR 65.04 FEET; THENCE NORTH 03°30'55" EAST FOR 116.36 FEET TO THE WESTERLY EXTENSION OF THE CENTERLINE OF A WALL; THENCE SOUTH 86°37'26" EAST ALONG SAID EXTENSION FOR 31.84 FEET TO THE FACE OF A BUILDING FOR THE POINT OF BEGINNING; THENCE CONTINUE SOUTH 86°37'26" EAST ALONG SAID CENTERLINE OF WALL FOR 48.32 FEET TO A BUILDING FACE; THENCE SOUTH 03°31'30" WEST ALONG SAID BUILDING FACE FOR 21.41 FEET TO THE CENTERLINE OF A WALL; THENCE NORTH 86°38'14" WEST ALONG SAID CENTERLINE OF WALL AND THE WESTERLY EXTENSION THEREOF FOR 48.33 FEET TO THE SOUTHERLY EXTENSION OF A BUILDING FACE; THENCE NORTH 03°33'10" EAST ALONG SAID SOUTHERLY EXTENSION AND FACE OF BUILDING FOR 21.39 FEET TO THE POINT OF BEGINNING, SAID PARCEL LYING AND BEING SITUATE IN SECTIONS 31 AND 32, TOWNSHIP 3 SOUTH, RANGE 15 WEST, BAY COUNTY, FLORIDA.

AND

DESCRIPTION OF UNIT 1609: COMMENCE AT THE INTERSECTION OF THE SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A WITH THE CENTERLINE OF SECOND STREET, GULF COAST HIGHWAY SUBDIVISION, ACCORDING TO THE PLAT RECORDED IN PLAT BOOK 3, PAGE 3, IN THE PUBLIC RECORDS OF BAY COUNTY, FLORIDA. THENCE NORTH 86 DEGREES 27 MINUTES 18 SECONDS WEST ALONG SAID SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A FOR 49.62 FEET; THENCE SOUTH 04 DEGREES 48 MINUTES 02 SECONDS WEST FOR 185.42 FEET; THENCE SOUTH 13 DEGREES 14 MINUTES 18 SECONDS EAST FOR 19.75 FEET; THENCE SOUTH 76 DEGREES 46 MINUTES 54 SECONDS WEST FOR 82.15 FEET; THENCE NORTH 86 DEGREES 29 MINUTES 05 SECONDS WEST FOR 65.04 FEET; THENCE NORTH 03 DEGREES 30 MINUTES 55 SECONDS EAST FOR 116.36 FEET TO THE WESTERLY EXTENSION OF THE CENTERLINE OF A WALL; THENCE SOUTH 86 DEGREES 37 MINUTES 26 SECONDS EAST ALONG SAID EXTENSION FOR 31.84 FEET TO THE FACE OF A BUILDING FOR THE POINT OF BEGINNING. THENCE CONTINUE SOUTH 86 DEGREES 37 MINUTES 26 SECONDS EAST ALONG SAID CENTERLINE OF WALL FOR 48.34 FEET TO A BUILDING FACE; THENCE NORTH 03 DEGREES 31 MINUTES 30 SECONDS EAST ALONG SAID BUILDING FACE FOR 21.41 FEET TO THE CENTERLINE OF A WALL; THENCE NORTH 86 DEGREES 37 MINUTES 52 SECONDS WEST ALONG SAID CENTERLINE OF WALL AND THE WESTERLY EXTENSION THEREOF FOR 48.33 FEET TO THE NORTHERLY EXTENSION OF A BUILDING FACE; THENCE SOUTH 03 DEGREES 33 MINUTES 10 SECONDS WEST ALONG SAID NORTHERLY EXTENSION AND FACE OF BUILDING FOR 21.43 FEET TO THE POINT OF BEGINNING, SAID PARCEL LYING AND BEING SITUATE IN SECTIONS 31 AND 32, TOWNSHIP 3 SOUTH, RANGE 15 WEST, BAY COUNTY, FLORIDA.

OR BK 3135 PG 462

AND

DESCRIPTION OF UNIT 1611: COMMENCE AT THE INTERSECTION OF
THE SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A WITH
THE CENTERLINE OF SECOND STREET, GULF COAST HIGHWAY
SUBDIVISION, ACCORDING TO THE PLAT RECORDED IN PLAT BOOK 3,
PAGE 3, IN THE PUBLIC RECORDS OF BAY COUNTY, FLORIDA, THENCE
NORTH 04 DEGREES 27 MINUTES 18 SECONDS WEST ALONG SAID
SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A FOR 49.62
FEET, THENCE SOUTH 04 DEGREES 48 MINUTES 02 SECONDS WEST FOR
185.42 FEET, THENCE SOUTH 15 DEGREES 11 MINUTES 10 SECONDS
EAST FOR 19.75 FEET; THENCE SOUTH 76 DEGREES 46 MINUTES 56
SECONDS WEST FOR 82.15 FEET; THENCE NORTH 86 DEGREES 29
MINUTES 05 SECONDS WEST FOR 65.04 FEET, THENCE NORTH 03
DEGREES 30 MINUTES 55 SECONDS EAST FOR 73.54 FEET TO THE
WESTERLY EXTENSION OF THE CENTERLINE OF A WALL, THENCE SOUTH
86 DEGREES 37 MINUTES 35 SECONDS EAST ALONG SAID EXTENSION
FOR 31.81 FEET TO THE FACE OF A BUILDING FOR THE POINT OF
BEGINNING, THENCE CONTINUE SOUTH 86 DEGREES 37 MINUTES 35
SECONDS EAST ALONG SAID CENTERLINE OF WALL FOR 48.34 FEET TO
A BUILDING FACE, THENCE SOUTH 03 DEGREES 31 MINUTES 30
SECONDS WEST ALONG SAID BUILDING FACE FOR 24.68 FEET, THENCE
NORTH 86 DEGREES 28 MINUTES 30 SECONDS WEST ALONG SAID
BUILDING FACE AND THE WESTERLY EXTENSION THEREOF FOR 48.35
FEET TO THE SOUTHERLY EXTENSION OF A BUILDING FACE, THENCE
NORTH 03 DEGREES 33 MINUTES 10 SECONDS EAST ALONG SAID
SOUTHERLY EXTENSION AND FACE OF BUILDING FOR 24.56 FEET TO
THE POINT OF BEGINNING, SAID PARCEL LYING AND BEING SITUATE
IN SECTIONS 31 AND 32, TOWNSHIP 3 SOUTH, RANGE 15 WEST, BAY
COUNTY, FLORIDA.

AND

DESCRIPTION OF UNIT 1600: COMMENCE AT THE INTERSECTION OF
THE SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A WITH
THE CENTERLINE OF SECOND STREET, GULF COAST HIGHWAY
SUBDIVISION, ACCORDING TO THE PLAT RECORDED IN PLAT BOOK 3,
PAGE 3, IN THE PUBLIC RECORDS OF BAY COUNTY, FLORIDA, THENCE
NORTH 04 DEGREES 27 MINUTES 18 SECONDS WEST ALONG SAID
SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A FOR 49.62
FEET, THENCE SOUTH 04 DEGREES 48 MINUTES 02 SECONDS WEST FOR
185.42 FEET, THENCE SOUTH 15 DEGREES 11 MINUTES 10 SECONDS
EAST FOR 19.75 FEET; THENCE SOUTH 76 DEGREES 46 MINUTES 56
SECONDS WEST FOR 82.15 FEET; THENCE NORTH 86 DEGREES 29
MINUTES 05 SECONDS WEST FOR 65.04 FEET; THENCE NORTH 03
DEGREES 30 MINUTES 55 SECONDS EAST FOR 159.28 FEET TO THE
EASTERLY EXTENSION OF THE CENTERLINE OF A WALL, THENCE NORTH
86 DEGREES 24 MINUTES 40 SECONDS WEST ALONG SAID EXTENSION
FOR 31.73 FEET TO THE FACE OF A BUILDING FOR THE POINT OF
BEGINNING, THENCE CONTINUE NORTH 86 DEGREES 24 MINUTES 40
SECONDS WEST ALONG SAID CENTERLINE OF WALL FOR 48.25 FEET TO
A BUILDING FACE, THENCE NORTH 03 DEGREES 35 MINUTES 20
SECONDS EAST ALONG SAID BUILDING FACE FOR 24.47 FEET, THENCE
SOUTH 86 DEGREES 39 MINUTES 18 SECONDS EAST ALONG SAID
BUILDING FACE AND THE EASTERLY EXTENSION THEREOF FOR 48.25
FEET TO THE NORTHERLY EXTENSION OF A BUILDING FACE, THENCE
SOUTH 03 DEGREES 35 MINUTES 20 SECONDS WEST ALONG SAID
NORTHERLY EXTENSION AND FACE OF BUILDING FOR 24.68 FEET TO
THE POINT OF BEGINNING, SAID PARCEL LYING AND BEING SITUATE
IN SECTION 31, TOWNSHIP 3 SOUTH, RANGE 15 WEST, BAY COUNTY,
FLORIDA.

AND

4

OR BK 3135 PG 463

DESCRIPTION OF UNIT 1604:  COMMENCE AT THE INTERSECTION OF THE SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A WITH THE CENTERLINE OF SECOND STREET, GULF COAST HIGHWAY SUBDIVISION, ACCORDING TO THE PLAT RECORDED IN PLAT BOOK 3, PAGE 3, IN THE PUBLIC RECORDS OF BAY COUNTY, FLORIDA; THENCE NORTH 86°27'18" WEST ALONG SAID SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A FOR 49.62 FEET; THENCE SOUTH 04°48'02" WEST FOR 185.42 FEET; THENCE SOUTH 13°14'18" EAST FOR 19.75 FEET; THENCE SOUTH 76°48'56" WEST FOR 82.15 FEET; THENCE NORTH 86°29'05" WEST FOR 65.04 FEET; THENCE NORTH 03°30'55" EAST FOR 116.40 FEET TO THE EASTERLY EXTENSION OF THE CENTERLINE OF A WALL; THENCE NORTH 86°24'40" WEST ALONG SAID EXTENSION FOR 31.78 FEET TO THE FACE OF A BUILDING FOR THE POINT OF BEGINNING; THENCE CONTINUE NORTH 86°24'40" WEST ALONG SAID CENTERLINE OF WALL FOR 48.25 FEET TO A BUILDING FACE; THENCE NORTH 03°35'20" EAST ALONG SAID BUILDING FACE FOR 21.40 FEET TO THE CENTERLINE OF A WALL; THENCE SOUTH 86°24'40" EAST ALONG SAID CENTERLINE OF WALL AND THE EASTERLY EXTENSION THEREOF FOR 48.25 FEET TO THE NORTHERLY EXTENSION OF A BUILDING FACE; THENCE SOUTH 03°35'20" WEST ALONG SAID NORTHERLY EXTENSION AND FACE OF BUILDING FOR 21.40 FEET TO THE POINT OF BEGINNING.  SAID PARCEL LYING AND BEING SITUATE IN SECTION 31, TOWNSHIP 3 SOUTH, RANGE 15 WEST, BAY COUNTY, FLORIDA.

AND

DESCRIPTION OF UNIT 1606:  COMMENCE AT THE INTERSECTION OF THE SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A WITH THE CENTERLINE OF SECOND STREET, GULF COAST HIGHWAY SUBDIVISION, ACCORDING TO THE PLAT RECORDED IN PLAT BOOK 3, PAGE 3, IN THE PUBLIC RECORDS OF BAY COUNTY, FLORIDA; THENCE NORTH 86°27'18" WEST ALONG SAID SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A FOR 49.62 FEET; THENCE SOUTH 04°48'02" WEST FOR 185.42 FEET; THENCE SOUTH 13°14'18" EAST FOR 19.75 FEET; THENCE SOUTH 76°48'56" WEST FOR 82.15 FEET; THENCE NORTH 86°29'05" WEST FOR 65.04 FEET; THENCE NORTH 03°30'55" EAST FOR 116.40 FEET TO THE EASTERLY EXTENSION OF THE CENTERLINE OF A WALL; THENCE NORTH 86°24'40" WEST ALONG SAID EXTENSION FOR 31.78 FEET TO THE FACE OF A BUILDING FOR THE POINT OF BEGINNING; THENCE CONTINUE NORTH 86°24'40" WEST ALONG SAID CENTERLINE OF WALL FOR 48.25 FEET TO THE CENTERLINE OF A WALL; THENCE SOUTH 03°35'20" WEST ALONG SAID BUILDING FACE FOR 21.36 FEET TO THE CENTERLINE OF A WALL; THENCE SOUTH 86°24'40" EAST ALONG SAID CENTERLINE OF WALL AND THE EASTERLY EXTENSION THEREOF FOR 48.25 FEET TO THE SOUTHERLY EXTENSION OF A BUILDING FACE; THENCE NORTH 03°35'20" EAST ALONG SAID SOUTHERLY EXTENSION AND FACE OF BUILDING FOR 21.36 FEET TO THE POINT OF BEGINNING, SAID PARCEL LYING AND BEING SITUATE IN SECTION 31, TOWNSHIP 3 SOUTH, RANGE 15 WEST, BAY COUNTY, FLORIDA.

AND

DESCRIPTION OF UNIT 1608:  COMMENCE AT THE INTERSECTION OF THE SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A WITH THE CENTERLINE OF SECOND STREET, GULF COAST HIGHWAY SUBDIVISION, ACCORDING TO THE PLAT RECORDED IN PLAT BOOK 3, PAGE 3, IN THE PUBLIC RECORDS OF BAY COUNTY, FLORIDA, THENCE NORTH 86 DEGREES 27 MINUTES 18 SECONDS WEST ALONG SAID SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A FOR 49.62 FEET; THENCE SOUTH 04 DEGREES 48 MINUTES 02 SECONDS WEST FOR 185.42 FEET; THENCE SOUTH 13 DEGREES 14 MINUTES 18 SECONDS EAST FOR 19.75 FEET; THENCE SOUTH 76 DEGREES 48 MINUTES 56 SECONDS WEST FOR 82.15 FEET; THENCE NORTH 86 DEGREES 29 MINUTES 05 SECONDS WEST FOR 65.04 FEET; THENCE NORTH 03 DEGREES 30 MINUTES 55 SECONDS EAST FOR 73.68 FEET TO THE EASTERLY EXTENSION OF THE CENTERLINE OF A WALL; THENCE NORTH 86 DEGREES 24 MINUTES 40 SECOND WEST ALONG SAID EXTENSION FOR 31.84 FEET TO THE FACE OF A BUILDING FOR THE POINT OF BEGINNING;  THENCE CONTINUE NORTH 86 DEGREES 24 MINUTES 40 SECONDS WEST ALONG SAID CENTERLINE OF WALL FOR 48.25 FEET TO A BUILDING FACE; THENCE NORTH 03 DEGREES 35 MINUTES 20 SECONDS EAST ALONG SAID BUILDING FACE FOR 21.36 FEET TO THE CENTERLINE OF A WALL; THENCE SOUTH 86 DEGREES 24 MINUTES 40 SECONDS EAST ALONG SAID CENTERLINE OF WALL AND THE EASTERLY EXTENSION THEREOF FOR 48.25 FEET TO THE NORTHERLY EXTENSION OF A BUILDING FACE;  THENCE SOUTH 03 DEGREES 35 MINUTES 20 SECONDS WEST ALONG SAID NORTHERLY EXTENSION AND FACE OF BUILDING FOR 21.36 FEET TO THE POINT OF BEGINNING, SAID PARCEL LYING AND BEING SITUATE IN SECTION 31, TOWNSHIP 3 SOUTH, RANGE 15 WEST, BAY COUNTY, FLORIDA.

5

OR BK 3135 PG 464

AND

DESCRIPTION OF UNIT 1610: COMMENCE AT THE INTERSECTION OF THE SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A WITH THE CENTERLINE OF SECOND STREET, GULF COAST HIGHWAY SUBDIVISION, ACCORDING TO THE PLAT RECORDED IN PLAT BOOK 3, PAGE 3, IN THE PUBLIC RECORDS OF BAY COUNTY, FLORIDA; THENCE NORTH 86°27'18" WEST ALONG SAID SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A FOR 49.62 FEET; THENCE SOUTH 04°48'02" WEST FOR 185.42 FEET; THENCE SOUTH 13°14'18" EAST FOR 19.75 FEET; THENCE SOUTH 76°46'56" WEST FOR 82.15 FEET; THENCE NORTH 88°29'05" WEST FOR 86.04 FEET; THENCE NORTH 03°30'55" EAST FOR 73.88 FEET TO THE EASTERLY EXTENSION OF THE CENTERLINE OF A WALL; THENCE NORTH 88°24'40" WEST ALONG SAID EXTENSION FOR 31.84 FEET TO THE FACE OF A BUILDING FOR THE POINT OF BEGINNING; THENCE CONTINUE NORTH 88°24'40" WEST ALONG SAID CENTERLINE OF WALL FOR 48.25 FEET TO A BUILDING FACE; THENCE SOUTH 03°35'20" WEST ALONG SAID BUILDING FACE FOR 24.62 FEET; THENCE SOUTH 86°24'40" EAST ALONG S AID BUILDING FACE AND THE EASTERLY EXTENSION THEREOF FOR 48.25 FEET TO THE SOUTHERLY EXTENSION OF A BUILDING FACE; THENCE NORTH 03°36'20" EAST ALONG SAID SOUTHERLY EXTENSION AND FACE OF BUILDING FOR 24.62 FEET TO THE POINT OF BEGINNING. SAID PARCEL LYING AND BEING SITUATE IN SECTION 31, TOWNSHIP 3 SOUTH, RANGE 15 WEST, BAY COUNTY, FLORIDA.

AND

DESCRIPTION OF UNIT 8200: COMMENCE AT THE INTERSECTION OF THE SOUTHERLY RIGHT OF WAY LINE OF SECOND STREET, GULF COAST HIGHWAY SUBDIVISION, ACCORDING TO THE PLAT RECORDED IN PLAT BOOK 3, PAGE 3, IN THE PUBLIC RECORDS OF BAY COUNTY, FLORIDA. THENCE NORTH 86 DEGREES 27 MINUTES 18 SECONDS WEST ALONG SAID SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A FOR 49.62 FEET; THENCE SOUTH 04 DEGREES 48 MINUTES 02 SECONDS WEST FOR 185.42 FEET; THENCE SOUTH 13 DEGREES 14 MINUTES 18 SECONDS EAST FOR 19.75 FEET; THENCE SOUTH 76 DEGREES 46 MINUTES 56 SECONDS WEST FOR 82.15 FEET; THENCE NORTH 86 DEGREES 29 MINUTES 05 SECONDS WEST FOR 150.60 FEET; THENCE NORTH 73 DEGREES 06 MINUTES 30 SECONDS WEST FOR 57.57 FEET TO THE SOUTHERLY EXTENSION OF THE CENTERLINE OF A WALL; THENCE NORTH 16 DEGREES 52 MINUTES 20 SECONDS EAST ALONG SAID EXTENSION FOR 42.91 FEET TO THE POINT OF BEGINNING. THENCE CONTINUE NORTH 16 DEGREES 52 MINUTES 20 SECONDS EAST ALONG SAID EXTENSION AND CENTERLINE OF WALL FOR 40.23 FEET TO A BUILDING FACE, THENCE SOUTH 73 DEGREES 07 MINUTES 40 SECONDS EAST ALONG SAID BUILDING FACE FOR 17.80 FEET; THENCE SOUTH 16 DEGREES 52 MINUTES 20 SECONDS WEST ALONG SAID BUILDING FACE FOR 40.23 FEET; THENCE NORTH 73 DEGREES 07 MINUTES 40 SECONDS WEST ALONG SAID BUILDING FACE AND THE WESTERLY EXTENSION THEREOF FOR 17.80 FEET TO THE POINT OF BEGINNING. SAID PARCEL LYING AND BEING SITUATE IN SECTION 31, TOWNSHIP 3 SOUTH, RANGE 15 WEST, BAY COUNTY, FLORIDA.

AND

Description of Unit 8214: Commence at the intersection of the Southerly right of way line of State Road No. 30-A with the centerline of Second Street, Gulf Coast Highway Subdivision, according to the plat recorded in Plat Book 3, Page 3, in the public records of Bay County, Florida. Thence North 86°27'18" West along said Southerly right of way line of State Road No. 30-A for 49.62 feet; thence South 04°48'02" West for 185.42 feet; thence South 13°14'18" East for 19.75 feet; thence South 76°46'56" West for 82.15 feet; thence North 86°29'05" West for 150.60 feet; thence North 73°06'30" West for 164.55 feet to the Southerly extension of the centerline of a wall; thence North 16°52'20" East along said extension for 42.88 feet to the POINT OF BEGINNING; thence continue North 16°52'20" East along said extension and centerline of wall for 40.23 feet to a building face; thence North 73°07'40" West along said building face for 17.80 feet; thence South 16°52'20" West along said building face for 40.23 feet; thence South 73°07'40" East along said building face and the Easterly extension thereof for 17.80 feet to the POINT OF BEGINNING; said parcel lying and being situate in Section 31, Township 3 South, Range 15 West, Bay County, Florida.

6

AND

DESCRIPTION OF UNIT 8215:  COMMENCE AT THE INTERSECTION OF THE SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A WITH THE CENTERLINE OF SECOND STREET, GULF COAST HIGHWAY SUBDIVISION, ACCORDING TO THE PLAT RECORDED IN PLAT BOOK 3, PAGE 3, IN THE PUBLIC RECORDS OF BAY COUNTY, FLORIDA; THENCE NORTH 86 DEGREES 27 MINUTES 18 SECONDS WEST ALONG SAID SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A FOR 49.62 FEET; THENCE SOUTH 04 DEGREES 48 MINUTES 02 SECONDS WEST FOR 185.42 FEET; THENCE SOUTH 13 DEGREES 14 MINUTES 18 SECONDS EAST FOR 19.75 FEET; THENCE SOUTH 76 DEGREES 46 MINUTES 56 SECONDS WEST FOR 82.15 FEET; THENCE NORTH 86 DEGREES 29 MINUTES 05 SECONDS WEST FOR 150.60 FEET; THENCE NORTH 73 DEGREES 06 MINUTES 30 SECONDS WEST FOR 223.63 FEET TO THE SOUTHERLY EXTENSION OF THE CENTERLINE OF A WALL; THENCE NORTH 16 DEGREES 52 MINUTES 18 SECONDS EAST ALONG SAID EXTENSION FOR 42.95 FEET TO THE POINT OF BEGINNING; THENCE CONTINUE NORTH 16 DEGREES 52 MINUTES 18 SECONDS EAST ALONG SAID EXTENSION AND CENTERLINE OF WALL FOR 40.22 FEET TO A BUILDING FACE; THENCE NORTH 73 DEGREES 03 MINUTES 19 SECONDS WEST ALONG SAID BUILDING FACE FOR 17.82 FEET TO THE CENTERLINE OF A WALL; THENCE SOUTH 16 DEGREES 48 MINUTES 52 SECONDS WEST ALONG SAID CENTERLINE OF WALL FOR 40.21 FEET TO A BUILDING FACE; THENCE SOUTH 73 DEGREES 02 MINUTES 19 SECONDS EAST ALONG SAID BUILDING FACE AND THE EASTERLY EXTENSION THEREOF FOR 17.78 FEET TO THE POINT OF BEGINNING.  SAID PARCEL LYING AND BEING SITUATE IN SECTION 31, TOWNSHIP 3 SOUTH, RANGE 15 WEST, BAY COUNTY, FLORIDA.

AND

DESCRIPTION OF UNIT 8203:  COMMENCE AT THE INTERSECTION OF THE SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A WITH THE CENTERLINE OF SECOND STREET, GULF COAST HIGHWAY SUBDIVISION, ACCORDING TO THE PLAT RECORDED IN PLAT BOOK 3, PAGE 3, IN THE PUBLIC RECORDS OF BAY COUNTY, FLORIDA.  THENCE NORTH 86°27'18" WEST ALONG SAID SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A FOR 49.62 FEET; THENCE SOUTH 04°48'02" WEST FOR 185.42 FEET; THENCE SOUTH 13°14'18" EAST FOR 19.75 FEET; THENCE SOUTH 76°46'56" WEST FOR 82.15 FEET; THENCE NORTH 86°29'05" WEST FOR 150.60 FEET; THENCE NORTH 73°06'30" WEST FOR 64.14 FEET TO THE NORTHERLY EXTENSION OF THE CENTERLINE OF A WALL; THENCE SOUTH 16°50'32" WEST ALONG SAID EXTENSION FOR 42.81 FEET TO THE POINT OF BEGINNING; THENCE CONTINUE SOUTH 16°50'32" WEST ALONG SAID EXTENSION AND CENTERLINE OF WALL FOR 40.26 FEET TO A BUILDING FACE; THENCE NORTH 73°09'28" WEST ALONG SAID BUILDING FACE FOR 17.85 FEET TO THE CENTERLINE OF A WALL; THENCE NORTH 16°50'32" EAST ALONG SAID CENTERLINE OF WALL FOR 40.26 FEET TO A BUILDING FACE; THENCE SOUTH 73°09'28" EAST ALONG SAID BUILDING FACE AND THE EASTERLY EXTENSION THEREOF FOR 17.85 FEET TO THE POINT OF BEGINNING.  SAID PARCEL LYING AND BEING SITUATE IN SECTION 31, TOWNSHIP 3 SOUTH, RANGE 15 WEST, BAY COUNTY, FLORIDA.

AND

DESCRIPTION OF UNIT 8207:  COMMENCE AT THE INTERSECTION OF THE SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A WITH THE CENTERLINE OF SECOND STREET, GULF COAST HIGHWAY SUBDIVISION, ACCORDING TO THE PLAT RECORDED IN PLAT BOOK 3, PAGE 3, IN THE PUBLIC RECORDS OF BAY COUNTY, FLORIDA. THENCE NORTH 86 DEGREES 27 MINUTES 18 SECONDS WEST ALONG SAID SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A FOR 49.62 FEET, THENCE SOUTH 04 DEGREES 48 MINUTES 02 SECONDS WEST FOR 185.42 FEET, THENCE SOUTH 13 DEGREES 14 MINUTES 18 SECONDS EAST FOR 19.75 FEET, THENCE SOUTH 76 DEGREES 46 MINUTES 56 SECONDS WEST FOR 82.15 FEET, THENCE NORTH 86 DEGREES 29 MINUTES 05 SECONDS WEST FOR 150.60 FEET, THENCE NORTH 73 DEGREES 06 MINUTES 30 SECONDS WEST FOR 99.85 FEET TO THE NORTHERLY EXTENSION OF THE CENTERLINE OF A WALL, THENCE SOUTH 16 DEGREES 50 MINUTES 32 SECONDS WEST ALONG SAID EXTENSION FOR 42.84 FEET TO THE POINT OF BEGINNING.  THENCE CONTINUE SOUTH 16 DEGREES 50 MINUTES 32 SECONDS WEST ALONG SAID EXTENSION AND CENTERLINE OF WALL FOR 40.26 FEET TO A BUILDING FACE, THENCE NORTH 73 DEGREES 09 MINUTES 28 SECONDS WEST ALONG SAID BUILDING FACE FOR 17.82 FEET TO THE CENTERLINE OF A WALL, THENCE NORTH 16 DEGREES 50 MINUTES 32 SECONDS EAST ALONG SAID CENTERLINE OF WALL, FOR 40.26 FEET TO A BUILDING FACE, THENCE SOUTH 73 DEGREES 09 MINUTES 28 SECONDS EAST ALONG SAID BUILDING FACE AND THE EASTERLY EXTENSION THEREOF FOR 17.85 FEET TO THE POINT OF BEGINNING. SAID PARCEL LYING AND BEING SITUATE IN SECTION 31, TOWNSHIP 3 SOUTH, RANGE 15 WEST, BAY COUNTY, FLORIDA.

7

OR BK 3135 PG 466

AND

DESCRIPTION OF UNIT #209:  COMMENCE AT THE INTERSECTION OF THE SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A WITH THE CENTERLINE OF SECOND STREET, GULF COAST HIGHWAY SUBDIVISION, ACCORDING TO THE PLAT RECORDED IN PLAT BOOK 3, PAGE 3, IN THE PUBLIC RECORDS OF BAY COUNTY, FLORIDA, THENCE NORTH 86 DEGREES 27 MINUTES 18 SECONDS WEST ALONG SAID SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO.30-A FOR 49.62 FEET, THENCE SOUTH 04 DEGREES 48 MINUTES 02 SECONDS WEST FOR 185.42 FEET, THENCE SOUTH 13 DEGREES 14 MINUTES 18 SECONDS EAST FOR 19.75 FEET, THENCE SOUTH 76 DEGREES 46 MINUTES 56 SECONDS WEST FOR 82.15 FEET, THENCE NORTH 86 DEGREES 29 MINUTES 05 SECONDS WEST FOR 150.60 FEET, THENCE NORTH 73 DEGREES 06 MINUTES 30 SECONDS WEST FOR 135.50 FEET TO THE NORTHERLY EXTENSION OF THE CENTERLINE OF A WALL, THENCE SOUTH 16 DEGREES 50 MINUTES 32 SECONDS WEST ALONG SAID EXTENSION FOR 42.87 FEET TO THE POINT OF BEGINNING.  THENCE CONTINUE SOUTH 16 DEGREES 50 MINUTES 32 SECONDS WEST ALONG SAID EXTENSION AND CENTERLINE OF WALL FOR 40.26 FEET TO A BUILDING FACE, THENCE SOUTH 73 DEGREES 09 MINUTES 28 SECONDS EAST ALONG SAID BUILDING FACE FOR 17.82 FEET TO THE CENTERLINE OF A WALL, THENCE NORTH 16 DEGREES 50 MINUTES 32 SECOND EAST ALONG SAID CENTERLINE OF WALL FOR 40.26 FEET TO THE FACE OF A BUILDING, THENCE NORTH 73 DEGREES 09 MINUTES 28 SECONDS WEST ALONG SAID BUILDING FACE AND THE WESTERLY EXTENSION THEREOF FOR 17.83 FEET TO THE POINT OF BEGINNING.  SAID PARCEL LYING AND BEING SITUATE IN SECTION 31, TOWNSHIP 3 SOUTH, RANGE 15 WEST, BAY COUNTY, FLORIDA.

AND

DESCRIPTION OF UNIT #211:  COMMENCE AT THE INTERSECTION OF THE SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A WITH THE CENTERLINE OF SECOND STREET, GULF COAST HIGHWAY SUBDIVISION, ACCORDING TO THE PLAT RECORDED IN PLAT BOOK 3, PAGE 3, IN THE PUBLIC RECORDS OF BAY COUNTY, FLORIDA. THENCE NORTH 86 DEGREES 27 MINUTES 18 SECONDS WEST ALONG SAID SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A FOR 49.62 FEET; THENCE SOUTH 04 DEGREES 48 MINUTES 02 SECONDS WEST FOR 185.42 FEET; THENCE SOUTH 13 DEGREES 14 MINUTES 18 SECONDS EAST FOR 19.75 FEET; THENCE SOUTH 76 DEGREES 46 MINUTES 56 SECONDS WEST FOR 82.15 FEET; THENCE NORTH 86 DEGREES 29 MINUTES 05 SECONDS WEST FOR 150.60 FEET; THENCE NORTH 73 DEGREES 06 MINUTES 30 SECONDS WEST FOR 135.50 FEET TO THE NORTHERLY EXTENSION OF THE CENTERLINE OF A WALL; THENCE SOUTH 16 DEGREES 50 MINUTES 32 SECONDS WEST ALONG SAID EXTENSION FOR 42.87 FEET TO THE POINT OF BEGINNING. THENCE CONTINUE SOUTH 16 DEGREES 50 MINUTES 32 SECONDS WEST ALONG SAID EXTENSION AND CENTERLINE OF WALL FOR 40.26 FEET TO A BUILDING FACE; THENCE NORTH 73 DEGREES 09 MINUTES 28 SECONDS WEST ALONG SAID BUILDING FACE FOR 17.85 FEET TO THE CENTERLINE OF A WALL; THENCE NORTH 16 DEGREES 50 MINUTES 32 SECONDS EAST ALONG SAID CENTERLINE OF WALL FOR 40.26 FEET TO A BUILDING FACE; THENCE SOUTH 73 DEGREES 09 MINUTES 28 SECONDS EAST ALONG SAID BUILDING FACE AND THE EASTERLY EXTENSION THEREOF FOR 17.85 FEET TO THE POINT OF BEGINNING, SAID PARCEL LYING AND BEING SITUATE IN SECTION 31, TOWNSHIP 3 SOUTH, RANGE 15 WEST, BAY COUNTY, FLORIDA.

OR BK 3135 PG 467

AND

DESCRIPTION OF UNIT #215: COMMENCE AT THE INTERSECTION OF THE SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A WITH THE CENTERLINE OF SECOND STREET, GULF COAST HIGHWAY SUBDIVISION, ACCORDING TO THE PLAT RECORDED IN PLAT BOOK 3, PAGE 3, IN THE PUBLIC RECORDS OF BAY COUNTY, FLORIDA. THENCE NORTH 86 DEGREES 27 MINUTES 18 SECONDS WEST ALONG SAID SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A FOR 49.62 FEET, THENCE SOUTH 04 DEGREES 48 MINUTES 02 SECONDS WEST FOR 185.42 FEET, THENCE SOUTH 13 DEGREES 14 MINUTES 18 SECONDS EAST FOR 19.75 FEET, THENCE SOUTH 76 DEGREES 46 MINUTES 56 SECONDS WEST FOR 82.15 FEET, THENCE NORTH 86 DEGREES 29 MINUTES 05 SECONDS WEST FOR 190.60 FEET, THENCE NORTH 73 DEGREES 06 MINUTES 30 SECONDS WEST FOR 171.20 FEET TO THE NORTHERLY EXTENSION OF THE CENTERLINE OF A WALL, THENCE SOUTH 16 DEGREES 50 MINUTES 32 SECONDS WEST ALONG SAID EXTENSION FOR 42.90 FEET TO THE POINT OF BEGINNING. THENCE CONTINUE SOUTH 16 DEGREES 50 MINUTES 32 SECONDS WEST ALONG SAID EXTENSION AND CENTERLINE OF A WALL FOR 40.26 FEET TO A BUILDING FACE, THENCE NORTH 73 DEGREES 09 MINUTES 28 SECONDS WEST ALONG SAID BUILDING FACE FOR 17.75 FEET, THENCE NORTH 16 DEGREES 50 MINUTES 32 SECONDS EAST ALONG SAID BUILDING FACE FOR 40.26 FEET, THENCE SOUTH 73 DEGREES 09 MINUTES 28 SECONDS EAST ALONG SAID BUILDING FACE AND THE EASTERLY EXTENSION THEREOF FOR 17.75 FEET TO THE POINT OF BEGINNING. SAID PARCEL LYING AND BEING SITUATE IN SECTION 31, TOWNSHIP 3 SOUTH, RANGE 15 WEST, BAY COUNTY, FLORIDA.

AND

DESCRIPTION OF UNIT 1702: COMMENCE AT THE INTERSECTION OF THE SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A WITH THE CENTERLINE OF SECOND STREET, GULF COAST HIGHWAY SUBDIVISION, ACCORDING TO THE PLAT RECORDED IN PLAT BOOK 3, PAGE 3, IN THE PUBLIC RECORDS OF BAY COUNTY, FLORIDA. THENCE NORTH 86 DEGREES 27 MINUTES 18 SECONDS WEST ALONG SAID SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A FOR 49.62 FEET THENCE SOUTH 04 DEGREES 48 MINUTES 02 SECONDS WEST FOR 185.42 FEET THENCE SOUTH 13 DEGREES 14 MINUTES 18 SECONDS EAST FOR 131.57 FEET; THENCE SOUTH 76 DEGREES 46 MINUTES 56 SECONDS WEST FOR 62.28 FEET TO THE SOUTHERLY EXTENSION OF THE CENTERLINE OF A WALL; THENCE NORTH 13 DEGREES 12 MINUTES 23 SECONDS WEST ALONG SAID EXTENSION FOR 33.96 FEET TO THE FACE OF A BUILDING FOR THE POINT OF BEGINNING. THENCE CONTINUE NORTH 13 DEGREES 12 MINUTES 23 SECONDS WEST ALONG SAID CENTERLINE OF WALL FOR 48.20 FEET TO A BUILDING FACE; THENCE SOUTH 76 DEGREES 47 MINUTES 37 SECONDS WEST ALONG SAID BUILDING FACE FOR 21.35 FEET TO THE CENTERLINE OF A WALL; THENCE SOUTH 13 DEGREES 12 MINUTES 23 SECONDS EAST ALONG SAID CENTERLINE OF WALL AND THE SOUTHERLY EXTENSION THEREOF FOR 48.20 FEET TO THE WESTERLY EXTENSION OF A BUILDING FACE THENCE NORTH 76 DEGREES 47 MINUTES 37 SECONDS EAST ALONG SAID WESTERLY EXTENSION AND FACE OF BUILDING FOR 21.35 FEET TO THE POINT OF BEGINNING, SAID PARCEL LYING AND BEING SITUATE IN SECTION 32, TOWNSHIP 3 SOUTH, RANGE 15 WEST, BAY COUNTY, FLORIDA.

AND

DESCRIPTION OF UNIT 1704: COMMENCE AT THE INTERSECTION OF THE SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A WITH THE CENTERLINE OF SECOND STREET, GULF COAST HIGHWAY SUBDIVISION, ACCORDING TO THE PLAT RECORDED IN PLAT BOOK 3, PAGE 3, IN THE PUBLIC RECORDS OF BAY COUNTY, FLORIDA. THENCE NORTH 86 DEGREES 27 MINUTES 18 SECONDS WEST ALONG SAID SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A FOR 49.62 FEET; THENCE SOUTH 04 DEGREES 48 MINUTES 02 SECONDS WEST FOR 185.42 FEET; THENCE SOUTH 13 DEGREES 14 MINUTES 18 SECONDS EAST FOR 131.57 FEET; THENCE SOUTH 76 DEGREES 46 MINUTES 56 SECONDS WEST FOR 105.03 FEET TO THE SOUTHERLY EXTENSION OF THE CENTERLINE OF A WALL; THENCE NORTH 13 DEGREES 12 MINUTES 23 SECONDS WEST ALONG SAID EXTENSION FOR 33.97 FEET TO THE FACE OF A BUILDING FOR THE POINT OF BEGINNING. THENCE CONTINUE NORTH 13 DEGREES 12 MINUTES 23 SECONDS WEST ALONG SAID CENTERLINE OF WALL FOR 48.20 FEET TO A BUILDING FACE; THENCE NORTH 76 DEGREES 47 MINUTES 37 SECONDS WEST ALONG SAID BUILDING FACE FOR 21.40 FEET TO THE CENTERLINE OF A WALL; THENCE SOUTH 13 DEGREES 12 MINUTES 23 SECONDS EAST ALONG SAID CENTERLINE OF WALL AND THE SOUTHERLY EXTENSION THEREOF FOR 48.20 FEET TO THE EASTERLY EXTENSION OF A BUILDING FACE; THENCE SOUTH 76 DEGREES 47 MINUTES 37 SECONDS WEST ALONG SAID EASTERLY EXTENSION AND FACE OF BUILDING FOR 21.40 FEET TO THE POINT OF BEGINNING, SAID PARCEL LYING AND BEING SITUATE IN SECTIONS 31 AND 32, TOWNSHIP 3 SOUTH, RANGE 15 WEST, BAY COUNTY, FLORIDA.

9

OR BK 3135 PG 468

AND

DESCRIPTION OF UNIT 1706: COMMENCE AT THE INTERSECTION OF THE SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A WITH THE CENTERLINE OF SECOND STREET, GULF COAST HIGHWAY SUBDIVISION, ACCORDING TO THE PLAT RECORDED IN PLAT BOOK 3, PAGE 3, IN THE PUBLIC RECORDS OF BAY COUNTY, FLORIDA; THENCE NORTH 86°27'18" WEST ALONG SAID SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A FOR 49.82 FEET; THENCE SOUTH 04°48'02" WEST FOR 185.42; THENCE SOUTH 13°14'18" EAST FOR 131.57 FEET; THENCE SOUTH 76°46'56" WEST FOR 105.03 FEET TO THE SOUTHERLY EXTENSION OF THE CENTERLINE OF A WALL; THENCE NORTH 13°12'23" WEST ALONG SAID EXTENSION FOR 33.97 FEET TO THE FACE OF A BUILDING FOR THE POINT OF BEGINNING; THENCE CONTINUE NORTH 13°12'23" WEST ALONG SAID CENTERLINE OF WALL FOR 48.20 FEET TO A BUILDING FACE; THENCE SOUTH 76°47'37" WEST ALONG SAID BUILDING FACE FOR 21.35 FEET TO THE CENTERLINE OF A WALL; THENCE SOUTH 13°12'23" EAST ALONG SAID CENTERLINE OF WALL AND THE SOUTHERLY EXTENSION THEREOF FOR 48.20 FEET TO THE WESTERLY EXTENSION OF A BUILDING FACE; THENCE NORTH 76°47'37" EAST ALONG SAID WESTERLY EXTENSION OF AND FACE OF BUILDING FOR 21.35 FEET TO THE POINT OF BEGINNING. SAID PARCEL LYING AND BEING SITUATE IN SECTION 31 AND 32, TOWNSHIP 3 SOUTH, RANGE 15 WEST, BAY COUNTY, FLORIDA.

AND

DESCRIPTION OF UNIT 1708: COMMENCE AT THE INTERSECTION OF THE SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A WITH THE CENTERLINE OF SECOND STREET, GULF COAST HIGHWAY SUBDIVISION, ACCORDING TO THE PLAT RECORDED IN PLAT BOOK 3, PAGE 3, IN THE PUBLIC RECORDS OF BAY COUNTY, FLORIDA; THENCE NORTH 86°27'18" WEST ALONG SAID SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A FOR 49.82 FEET; THENCE SOUTH 04°48'02" WEST FOR 185.42 FEET; THENCE SOUTH 13°14'18" EAST FOR 131.57 FEET; THENCE SOUTH 76°46'56" WEST FOR 147.73 FEET TO THE SOUTHERLY EXTENSION OF THE CENTERLINE OF A WALL; THENCE NORTH 13°12'23" WEST ALONG SAID EXTENSION FOR 33.98 FEET TO THE FACE OF A BUILDING FOR THE POINT OF BEGINNING; THENCE CONTINUE NORTH 13°12'23" WEST ALONG SAID CENTERLINE OF WALL FOR 48.20 FEET TO A BUILDING FACE; THENCE NORTH 76°47'37" EAST ALONG SAID BUILDING FACE FOR 21.35 FEET TO THE CENTERLINE OF A WALL; THENCE SOUTH 13°12'23" EAST ALONG SAID CENTERLINE OF WALL AND THE SOUTHERLY EXTENSION THEREO F FOR 48.20 FEET TO THE EASTERLY EXTENSION OF A BUILDING FACE; THENCE SOUTH 76°47'37" WEST ALONG SAID EASTERLY EXTENSION AND FACE OF A BUILDING FOR 21.35 FEET TO THE POINT OF BEGINNING. SAID PARCEL LYING AND BEING SITUATE IN SECTION 31, TOWNSHIP 3 SOUTH, RANGE 15 WEST, BAY COUNTY, FLORIDA.

AND

DESCRIPTION OF UNIT 1710: COMMENCE AT THE INTERSECTION OF THE SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A WITH THE CENTERLINE OF SECOND STREET, GULF COAST HIGHWAY SUBDIVISION, ACCORDING TO THE PLAT RECORDED IN PLAT BOOK 3, PAGE 3, IN THE PUBLIC RECORDS OF BAY COUNTY, FLORIDA; THENCE NORTH 86°27'18" WEST ALONG SAID SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A FOR 49.82 FEET; THENCE SOUTH 04°48'02" WEST FOR 185.42 FEET; THENCE SOUTH 13°14'18" EAST FOR 131.57 FEET; THENCE SOUTH 76°46'56" WEST FOR 147.73 FEET TO THE SOUTHERLY EXTENSION OF THE CENTERLINE OF A WALL; THENCE NORTH 13°12'23" WEST ALONG SAID EXTENSION FOR 33.98 FEET TO THE FACE OF A BUILDING FOR THE POINT OF BEGINNING; THENCE CONTINUE NORTH 13°12'23" WEST ALONG SAID CENTERLINE OF WALL FOR 48.20 FEET TO A BUILDING FACE; THENCE SOUTH 76°47'37" WEST ALONG SAID BUILDING FACE FOR 24.70 FEET; THENCE SOUTH 13°12'23" EAST ALONG SAID BUILDING FACE AND THE SOUTHERLY EXTENSION THEREOF FOR 48.20 FEET TO THE WESTERLY E XTENSION OF A BUILDING FACE; THENCE NORTH 76°47'37" EAST ALONG SAID WESTERLY EXTENSION AND FACE OF BUILDING FOR 24.70 FEET TO THE POINT OF BEGINNING. SAID PARCEL LYING AND BEING SITUATE IN SECTION 31, TOWNSHIP 3 SOUTH, RANGE 15 WEST, BAY COUNTY, FLORIDA.

OR BK 3135 PG 469

AND

Description of Unit 1872: Commence at the intersection of the Southerly Right of Way line of State Road No. 30-A with the centerline of Second Street, Gulf Coast Highway Subdivision, according to the plat recorded in Plat Book 3, Page 3, in the Public Records of Bay County, Florida. Thence North 86 degrees 27 minutes 18 seconds West along said Southerly Right of Way line of State Road No. 30-A for 49.62 feet; thence South 04 degrees 48 minutes 02 seconds West for 185.42 feet; thence South 13 degrees 14 minutes 18 seconds East for 114.39 feet to the Westerly extension of the centerline of a wall; thence North 76 degrees 43 minutes 09 seconds East along said extension for 31.72 feet to the face of a building for the Point of Beginning. thence continue North 76 degrees 43 minutes 09 seconds East along said centerline of wall for 48.20 feet to a building face; thence South 13 degrees 16 minutes 51 seconds East along said building face for 24.70 feet; thence South 76 degrees 43 minutes 09 seconds West along said building face and the Westerly extension thereof for 48.20 feet to the Southerly extension of a building face; thence North 13 degrees 16 minutes 51 seconds West along said Southerly extension and face of building for 24.70 feet to the Point of Beginning, said parcel lying and being situate in Section 32, Township 3 South, Range 15 West, Bay County, Florida.

AND

DESCRIPTION OF UNIT 1874: COMMENCE AT THE INTERSECTION OF THE SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A WITH THE CENTERLINE OF SECONDS STREET, GULF COAST HIGHWAY SUBDIVISION, ACCORDING TO THE PLAT RECORDED IN PLAT BOOK 3, PAGE 3, IN THE PUBLIC RECORDS OF BAY COUNTY, FLORIDA; THENCE NORTH 86 DEGREES 27 MINUTES 18 SECONDS WEST ALONG SAID SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A FOR 49.62 FEET; THENCE SOUTH 04 DEGREES 48 MINUTES 02 SECONDS WEST FOR 185.42 FEET; THENCE SOUTH 13 DEGREES 14 MINUTES 18 SECONDS EAST FOR 114.39 FEET TO THE WESTERLY EXTENSION OF THE CENTERLINE OF A WALL; THENCE NORTH 76 DEGREES 43 MINUTES 09 SECONDS EAST ALONG SAID EXTENSION FOR 31.72 FEET TO THE FACE OF A BUILDING FOR THE POINT OF BEGINNING; THENCE CONTINUE NORTH 76 DEGREES 43 MINUTES 09 SECONDS EAST ALONG SAID CENTERLINE OF WALL FOR 48.20 FEET TO A BUILDING FACE; THENCE NORTH 13 DEGREES 16 MINUTES 51 SECONDS WEST ALONG SAID BUILDING FACE FOR 21.37 FEET TO THE CENTERLINE OF A WALL; THENCE SOUTH 76 DEGREES 43 MINUTES 09 SECONDS WEST ALONG SAID CENTERLINE OF WALL AND THE WESTERLY EXTENSION THEREOF FOR 48.20 FEET TO THE NORTHERLY EXTENSION OF A BUILDING FACE; THENCE SOUTH 13 DEGREES 16 MINUTES 51 SECONDS EAST ALONG SAID NORTHERLY EXTENSION AND FACE OF BUILDING FOR 21.37 FEET TO THE POINT OF BEGINNING. SAID PARCEL LYING AND BEING SITUATE IN SECTION 32, TOWNSHIP 3 SOUTH, RANGE 15 WEST, BAY COUNTY, FLORIDA.

AND

DESCRIPTION OF UNIT 1876: COMMENCE AT THE INTERSECTION OF THE SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A WITH THE CENTERLINE OF SECOND STREET, GULF COAST HIGHWAY SUBDIVISION, ACCORDING TO THE PLAT RECORDED IN PLAT BOOK 3, PAGE 3, IN THE PUBLIC RECORDS OF BAY COUNTY, FLORIDA; THENCE NORTH 86°27'18" WEST ALONG SAID SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A FOR 49.62 FEET; THENCE SOUTH 04°48'02" WEST FOR 185.42 FEET; THENCE SOUTH 13°14'18" EAST FOR 71.69 FEET TO THE WESTERLY EXTENSION OF THE CENTERLINE OF A WALL; THENCE NORTH 76°43'09" EAST ALONG SAID EXTENSION FOR 31.69 FEET TO THE FACE OF A BUILDING FOR THE POINT OF BEGINNING; THENCE CONTINUE NORTH 70°43'09" EAST ALONG SAID CENTERLINE OF WALL FOR 48.20 FEET TO A BUILDING FACE; THENCE SOUTH 13°16'51" EAST ALONG SAID BUILDING FACE FOR 21.33 FEET TO THE CENTERLINE OF A WALL; THENCE SOUTH 76°43'09" WEST ALONG SAID CENTERLINE OF WALL AND THE WESTERLY EXTENSION THEREOF FOR 48.20 FEET TO THE SOUTHERLY EXTENSION OF A BUILDING FACE; THENCE NORTH 13°16'51" WEST ALONG SAID SOUTHERLY EXTENSION AND FACE OF BUILDING FOR 21.33 FEET TO THE POINT OF BEGINNING. SAID PARCEL LYING AND BEING SITUATE IN SECTION 32, TOWNSHIP 3 SOUTH, RANGE 15 WEST, BAY COUNTY, FLORIDA.

OR BK 3135 PG 470

AND

DESCRIPTION OF UNIT 1878: COMMENCE AT THE INTERSECTION OF THE SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A WITH THE CENTERLINE OF SECOND STREET, GULF COAST HIGHWAY SUBDIVISION, ACCORDING TO THE PLAT RECORDED IN PLAT BOOK 3, PAGE 3, IN THE PUBLIC RECORDS OF BAY COUNTY, FLORIDA. THENCE NORTH 86°27'18" WEST ALONG SAID SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A FOR 49.62 FEET; THENCE SOUTH 04°48'02" WEST FOR 185.42 FEET; THENCE SOUTH 13°14'18" EAST FOR 71.69 FEET TO THE WESTERLY EXTENSION OF THE CENTERLINE OF A WALL; THENCE NORTH 76°43'09" EAST ALONG SAID EXTENSION FOR 31.69 FEET TO THE FACE OF A BUILDING FOR THE POINT OF BEGINNING. THENCE CONTINUE NORTH 76°43'09" EAST ALONG SAID CENTERLINE OF WALL FOR 48.20 FEET TO A BUILDING FACE; THENCE NORTH 13°16'51" WEST ALONG SAID BUILDING FACE FOR 21.34 FEET TO THE CENTERLINE OF A WALL.; THENCE SOUTH 76°43'09" WEST ALONG SAID CENTERLINE OF WALL AND THE WESTERLY EXTENSION THEREOF FOR 48.20 FEET TO THE NORTHERLY EXTENSION OF A BUILDING FACE; THENCE SOUTH 13°16'51" EAST ALONG SAID NORTHERLY EXTENSION AND FACE OF BUILDING FOR 21.34 FEET TO THE POINT OF BEGINNING. SAID PARCEL LYING AND BEING SITUATE IN SECTION 32, TOWNSHIP 3 SOUTH, RANGE 15 WEST, BAY COUNTY, FLORIDA.

AND

DESCRIPTION OF UNIT 1880:  COMMENCE AT THE INTERSECTION OF THE SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A WITH THE CENTERLINE OF SECOND STREET, GULF COAST HIGHWAY SUBDIVISION, ACCORDING TO THE PLAT RECORDED IN PLAT BOOK 3, PAGE 3, IN THE PUBLIC RECORDS OF BAY COUNTY, FLORIDA. THENCE NORTH 86°27'18" WEST ALONG SAID SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A FOR 49.62 FEET; THENCE SOUTH 04°48'02" WEST FOR 185.42 FEET; THENCE SOUTH 13°14'18" EAST FOR 29.09 FEET TO THE WESTERLY EXTENSION OF THE CENTERLINE OF A WALL; THENCE NORTH 76°43'09" EAST ALONG SAID EXTENSION FOR 31.66 FEET TO THE FACE OF A BUILDING FOR THE POINT OF BEGINNING; THENCE CONTINUE NORTH 76°43'09" EAST ALONG SAID CENTERLINE OF WALL FOR 48.20 FEET TO A BUILDING FACE; THENCE SOUTH 13°16'51" EAST ALONG SAID BUILDING FACE FOR 21.26 FEET TO THE CENTERLINE OF A WALL; THENCE SOUTH 76°43'09" WEST ALONG SAID CENTERLINE OF WALL AND THE WESTERLY EXTENSION THEREOF FOR 48.20 FEET TO THE SOUTHERLY EXTENSION OF A BUILDING FACE; THENCE NORTH 13°16'51" WEST ALONG SAID SOUTHERLY EXTENSION AND FACE OF A BUILDING FOR 21.26 FEET TO THE POINT OF BEGINNING. SAID PARCEL LYING AND BEING SITUATE IN SECTION 32, TOWNSHIP 3 SOUTH, RANGE 15 WEST, BAY COUNTY, FLORIDA.

AND

DESCRIPTION OF UNIT 1711: COMMENCE AT THE INTERSECTION OF THE SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A WITH THE CENTERLINE OF SECOND STREET, GULF COAST HIGHWAY SUBDIVISION ACCORDING TO THE PLAT RECORDED IN PLAT BOOK 3, PAGE 3, IN THE PUBLIC RECORDS OF BAY COUNTY, FLORIDA. THENCE NORTH 86°27'18" WEST ALONG SAID SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A FOR 49.62 FEET; THENCE SOUTH 04°48'02" WEST FOR 185.42 FEET; THENCE SOUTH 13°14'18" EAST FOR 131.57 FEET; THENCE SOUTH 76°46'56" WEST FOR 151.83 FEET TO THE NORTHERLY EXTENSION OF THE CENTERLINE OF A WALL; THENCE SOUTH 13°07'19" EAST ALONG SAID EXTENSION FOR 33.97 FEET TO THE FACE OF A BUILDING FOR THE POINT OF BEGINNING. THENCE CONTINUE SOUTH 13°07'19" EAST, ALONG SAID BUILDING FACE AND CENTERLINE OF WALL FOR 48.29 FEET TO A BUILDING FACE. THENCE SOUTH 76°52'41" WEST ALONG SAID BUILDING FACE FOR 21.40 FEET TO THE CENTERLINE OF A WALL, THENCE NORTH 13°07'19" WEST ALONG SAID CENTERLINE OF WALL FOR 48.29 FEET TO A BUILDING FACE; THENCE NORTH 76°52'41" EAST ALONG SAID BUILDING FACE AND THE EASTERLY EXTENSION THEREOF FOR 21.40 FEET TO THE POINT OF BEGINNING, SAID PARCEL LYING AND BEING SITUATE IN SECTION 31, TOWNSHIP 3 SOUTH, RANGE 15 WEST, BAY COUNTY, FLORIDA.

12

OR BK 3135 PG 471

AND

Unit #1715, Building 8, of ANNABELLA'S TOWN HOMES, being more particularly described as follows:

Commence at the intersection of the Southerly right of way line of State Road #30-A with the centerline of Second Street, Gulf Coast Highway Subdivision, according to the plat recorded in Plat Book 3, Page 3, in the Public Records of Bay County, Florida; thence North 86°27'18" West along said Southerly right of way line of State Road #30-A for 49.62 feet; thence South 04°48'02" West for 185.42 feet; thence South 13°14'18" East for 131.57 feet; thence South 76°46'56" West for 194.73 feet to the Northerly extension of the centerline of a wall; thence South 13°07'19" East along said extension for 33.90 feet to the face of a building for the Point of Beginning; thence continue South 13°07'19" East along said building face and centerline of wall for 48.29 feet to a building face; thence South 76°52'41" West along said building face for 24.60 feet to a building face; thence North 13°07'19" West along said building face and the Northerly extension thereof for 48.29 feet to the Westerly extension of a building face; thence North 76°52'41" East along Westerly extension and building face for 24.60 feet to the Point of Beginning, said parcel lying and being situate in Section 31, Township 3 South, Range 15 West, Bay County, Florida.

AND

DESCRIPTION OF UNIT 1709: COMMENCE AT THE INTERSECTION OF THE SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A WITH THE CENTERLINE OF SECOND STREET, GULF COAST HIGHWAY SUBDIVISION, ACCORDING TO THE PLAT RECORDED IN PLAT BOOK 3, PAGE 3, IN THE PUBLIC RECORDS OF BAY COUNTY, FLORIDA; THENCE NORTH 86 DEGREES 27 MINUTES 18 SECONDS WEST ALONG SAID SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A FOR 49.62 FEET; THENCE SOUTH 04 DEGREES 48 MINUTES 02 SECONDS WEST FOR 185.42 FEET; THENCE SOUTH 13 DEGREES 14 MINUTES 18 SECONDS EAST FOR 131.57 FEET; THENCE SOUTH 76 DEGREES 46 MINUTES 56 SECONDS WEST FOR 151.83 FEET TO THE NORTHERLY EXTENSION OF THE CENTERLINE OF A WALL; THENCE SOUTH 13 DEGREES 07 MINUTES 19 SECONDS EAST ALONG SAID EXTENSION FOR 33.97 FEET TO THE FACE OF A BUILDING FOR THE POINT OF BEGINNING; THENCE CONTINUE SOUTH 13 DEGREES 07 MINUTES 19 SECONDS EAST ALONG SAID BUILDING FACE AND CENTERLINE OF WALL FOR 48.29 FEET TO A BUILDING FACE; THENCE NORTH 76 DEGREES 52 MINUTES 41 SECONDS EAST ALONG SAID BUILDING FACE FOR 24.70 FEET; THENCE NORTH 13 DEGREES 07 MINUTES 19 SECONDS WEST ALONG SAID BUILDING FACE AND THE NORTHERLY EXTENSION THEREOF FOR 48.29 FEET TO THE EASTERLY EXTENSION OF A BUILDING FACE; THENCE SOUTH 76 DEGREES 52 MINUTES 41 SECONDS WEST ALONG SAID EASTERLY EXTENSION AND BUILDING FACE FOR 24.70 FEET TO THE POINT OF BEGINNING. SAID PARCEL LYING AND BEING SITUATE IN SECTIONS 31 AND 32, TOWNSHIP 3 SOUTH, RANGE 15 WEST, BAY COUNTY, FLORIDA.

AND

13

OR BK 3135 PG 472

DESCRIPTION OF UNIT 1864: COMMENCE AT THE INTERSECTION OF THE SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A WITH THE CENTERLINE OF SECOND STREET, GULF COAST HIGHWAY SUBDIVISION, ACCORDING TO THE PLAT RECORDED IN PLAT BOOK 3, PAGE 3, IN THE PUBLIC RECORDS OF BAY COUNTY, FLORIDA. THENCE NORTH 86 DEGREES 27 MINUTES 18 SECONDS WEST ALONG SAID SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A FOR 49.62 FEET; THENCE SOUTH 04 DEGREES 48 MINUTES 02 SECONDS WEST FOR 185.42 FEET; THENCE SOUTH 13 DEGREES 14 MINUTES 18 SECONDS EAST FOR 231.58 FEET TO THE WESTERLY EXTENSION OF THE CENTERLINE OF A WALL; THENCE NORTH 76 DEGREES 42 MINUTES 52 SECONDS EAST ALONG SAID EXTENSION FOR 31.72 FEET TO THE FACE OF A BUILDING FOR THE POINT OF BEGINNING. THENCE CONTINUE NORTH 76 DEGREES 42 MINUTES 52 SECONDS EAST ALONG SAID BUILDING FACE AND CENTERLINE OF WALL FOR 48.22 FEET TO A BUILDING FACE; THENCE SOUTH 13 DEGREES 08 SECONDS EAST ALONG SAID BUILDING FACE FOR 24.50 FEET; THENCE SOUTH 76 DEGREES 42 MINUTES 52 SECONDS WEST ALONG SAID BUILDING FACE AND THE WESTERLY EXTENSION THEREOF FOR 48.22 FEET TO THE SOUTHERLY EXTENSION OF A BUILDING FACE; THENCE NORTH 13 DEGREES 17 MINUTES 08 SECONDS WEST ALONG SAID SOUTHERLY EXTENSION AND BUILDING FACE FOR 24.50 FEET TO THE POINT OF BEGINNING. SAID PARCEL LYING AND BEING SITUATE IN SECTION 32, TOWNSHIP 3 SOUTH, RANGE 15 WEST, BAY COUNTY, FLORIDA.

AND

DESCRIPTION OF UNIT 1868: COMMENCE AT THE INTERSECTION OF THE SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A WITH THE CENTERLINE OF SECOND STREET, GULF COAST HIGHWAY SUBDIVISION, ACCORDING TO THE PLAT RECORDED IN PLAT BOOK 3, PAGE 3, IN THE PUBLIC RECORDS OF BAY COUNTY, FLORIDA. THENCE NORTH 86°27'18" WEST ALONG SAID SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO 30-A FOR 49.62 FEET; THENCE SOUTH 04°48'02" WEST FOR 185.42 FEET; THENCE SOUTH 13°14'18" EAST FOR 188.78 FEET TO THE WESTERLY EXTENSION OF THE CENTERLINE OF A WALL; THENCE NORTH 76°42'52" EAST ALONG SAID EXTENSION FOR 31.69 FEET TO THE FACE OF A BUILDING FOR THE POINT OF BEGINNING; THENCE CONTINUE NORTH 76°42'52" EAST ALONG SAID BUILDING FACE AND CENTERLINE OF WALL FOR 48.22 FEET TO A BUILDING FACE; THENCE SOUTH 13°17'08" EAST ALONG SAID BUILDING FACE FOR 21.30 FEET TO THE CENTERLINE OF A WALL; THENCE SOUTH 76°42'52" WEST ALONG SAID CENTERLINE OF A WALL FOR 48.22 FEET TO A BUILDING FACE; THENCE NORTH 13°17'08" WEST ALONG SAID BUILDING FACE AND THE NORTHERLY EXTENSION THEREOF FOR 21.30 FEET TO THE POINT OF BEGINNING. SAID PARCEL LYING AND BEING SITUATE IN SECTION 32, TOWNSHIP 3 SOUTH, RANGE 15 WEST, BAY COUNTY, FLORIDA.

AND

Description of Unit 1870: Commence at the intersection of the Southerly right of way line of State Road No. 30-A with the centerline of Second Street, Gulf Coast Highway subdivision, according to the plat recorded in Plat Book 3, Page 3, in the Public Records of Bay County, Florida. thence N86°27'18"W along said Southerly right of way line of State Road No. 30-A for 49.62 feet; thence S04°48'02"W for 185.42 feet; thence S13°14'18"E for 188.78 feet to the Westerly extension of the centerline of a wall; thence N76°42'52"E along said extension for 31.69 feet to the face of a building for the Point of Beginning. thence continue N76°42'52"E along said centerline of wall for 48.22 feet to a building face; thence S13°17'08"E along said building face for 24.70 feet; thence S76°42'52"W along said building face and the Westerly extension thereof for 48.22 feet to the Northerly extension of a building face; thence S13°17'08"E along said Northerly extension and building face for 24.70 feet to the Point of Beginning, said parcel lying and being situate in Section 32, Township 3 South, Range 15 West, Bay County, Florida.

14

OR BK 3135 PG 473

AND

Townhome Unit #11D, Building 1856, of ANNABELLA'S TOWN HOMES, being more particularly described as follows:

Commence at the intersection of the Southerly right of way line of State Road No. 30-A with the centerline of Second Street, GULF COAST HIGHWAY SUBDIVISION, according to the Plat recorded in Plat Book 3, Page 3, in the Public Records of BAY County, Florida; thence North 86°27'18" West along said Southerly right of way line of State Road No. 30-A for 49.62 feet; thence South 04°48'02" West for 185.42 feet; thence South 13°14'18" East for 348.28 feet to the Westerly extension of the centerline of a wall; thence North 76°39'07" East along said extension for 31.94 feet to the face of a building for the POINT OF BEGINNING; thence continue North 76°39'07" East along said building face and centerline of wall for 48.25 feet to a building face; thence South 13°20'53" East along said building face for 24.60 feet; thence South 76°39'07" West along said building face and the Westerly extension thereof for 48.25 feet to the Southerly extension of a building face; thence North 13°20'53" West along said Southerly extension and building face for 24.60 feet to the POINT OF BEGINNING. Said parcel lying and being situate in Section 32, Township 3 south, Range 15 West, BAY County, Florida.

AND

DESCRIPTION OF UNIT 1858: COMMENCE AT THE INTERSECTION OF THE SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A WITH THE CENTERLINE OF SECOND STREET, GULF COAST HIGHWAY SUBDIVISION, ACCORDING TO THE PLAT RECORDED IN PLAT BOOK 3, PAGE 3, IN THE PUBLIC RECORDS OF BAY COUNTY, FLORIDA. THENCE NORTH 86 DEGREES 27 MINUTES 18 SECONDS WEST ALONG SAID SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A FOR 49.62 FEET; THENCE SOUTH 04 DEGREES 48 MINUTES 02 SECONDS WEST FOR 185.42 FEET; THENCE SOUTH 13 DEGREES 14 MINUTES 18 SECONDS EAST FOR 348.28 FEET TO THE WESTERLY EXTENSION OF THE CENTERLINE OF A WALL; THENCE NORTH 76 DEGREES 39 MINUTES 07 SECONDS EAST ALONG SAID EXTENSION FOR 31.94 FEET TO THE FACE OF A BUILDING FOR THE POINT OF BEGINNING, THENCE CONTINUE NORTH 76 DEGREES 39 MINUTES 07 SECONDS EAST ALONG SAID BUILDING FACE AND CENTERLINE OF WALL FOR 48.25 FEET TO A BUILDING FACE; THENCE NORTH 13 DEGREES 20 MINUTES 53 SECONDS WEST ALONG SAID BUILDING FACE FOR 21.44 FEET TO THE CENTERLINE OF A WALL; THENCE SOUTH 76 DEGREES 39 MINUTES 07 SECONDS WEST ALONG SAID CENTERLINE OF WALL FOR 48.25 FEET TO A BUILDING FACE: THENCE SOUTH 13 DEGREES 20 MINUTES 53 SECONDS EAST ALONG SAID BUILDING FACE AND THE SOUTHERLY EXTENSION THEREOF FOR 21.44 FEET TO THE POINT OF BEGINNING, SAID PARCEL LYING AND BEING SITUATE IN SECTION 32, TOWNSHIP 3 SOUTH, RANGE 15 WEST, BAY COUNTY, FLORIDA.

AND

DESCRIPTION OF UNIT 1860: COMMENCE AT THE INTERSECTION OF THE SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A WITH THE CENTERLINE OF SECOND STREET, GULF COAST HIGHWAY SUBDIVISION, ACCORDING TO THE PLAT RECORDED IN PLAT BOOK 3, PAGE 3, IN THE PUBLIC RECORDS OF BAY COUNTY, FLORIDA; THENCE NORTH 86 DEGREES 27 MINUTES 18 SECONDS WEST ALONG SAID SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A FOR 49.62 FEET; THENCE SOUTH 04 DEGREES 48 MINUTES 02 SECONDS WEST FOR 185.42 FEET; THENCE SOUTH 13 DEGREES 14 MINUTES 18 SECONDS EAST FOR 308.34 FEET TO THE WESTERLY EXTENSION OF THE CENTERLINE OF A WALL; THENCE NORTH 76 DEGREES 39 MINUTES 07 SECONDS EAST ALONG SAID EXTENSION FOR 31.85 FEET TO THE FACE OF A BUILDING FOR THE POINT OF BEGINNING, THENCE CONTINUE NORTH 76 DEGREES 39 MINUTES 07 SECONDS EAST ALONG SAID BUILDING FACE AND CENTERLINE OF WALL FOR 48.25 FEET TO A BUILDING FACE; THENCE SOUTH 13 DEGREES 20 MINUTES 53 SECONDS EAST ALONG SAID BUILDING FACE FOR 21.51 FEET TO THE CENTERLINE OF A WALL; THENCE SOUTH 76 DEGREES 39 MINUTES 07 SECONDS WEST ALONG SAID CENTERLINE OF WALL FOR 48.25 FEET TO A BUILDING FACE; THENCE NORTH 13 DEGREES 20 MINUTES 53 SECONDS WEST ALONG SAID BUILDING FACE AND THE NORTHERLY EXTENSION THEREOF FOR 21.51 FEET TO THE POINT OF BEGINNING, SAID PARCEL LYING AND BEING SITUATE IN SECTION 32, TOWNSHIP 3 SOUTH, RANGE 15 WEST, BAY COUNTY, FLORIDA.

15

OR BK 3135 PG 474

AND

DESCRIPTION OF UNIT 8111: COMMENCE AT THE INTERSECTION OF THE SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A WITH THE CENTERLINE OF SECOND STREET, GULF COAST HIGHWAY SUBDIVISION, ACCORDING TO THE PLAT RECORDED IN PLAT BOOK 3, PAGE 3, IN THE PUBLIC RECORDS OF BAY COUNTY, FLORIDA. THENCE NORTH 86 DEGREES 27 MINUTES 18 SECONDS WEST ALONG SAID SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A FOR 49.62 FEET, THENCE SOUTH 04 DEGREES 48 MINUTES 02 SECONDS WEST FOR 185.42 FEET, THENCE SOUTH 13 DEGREES 14 MINUTES 18 SECONDS EAST FOR 390.68 FEET, THENCE SOUTH 63 DEGREES 49 MINUTES 35 SECONDS EAST FOR 133.88 FEET, THENCE NORTH 72 DEGREES 47 MINUTES 14 SECONDS EAST FOR 211.59 FEET TO THE NORTHERLY EXTENSION OF THE CENTERLINE OF A WALL, THENCE SOUTH 17 DEGREES 12 MINUTES 51 SECONDS EAST ALONG SAID EXTENSION FOR 42.91 FEET TO THE POINT OF BEGINNING. THENCE CONTINUE SOUTH 17 DEGREES 12 MINUTES 51 SECONDS EAST ALONG SAID EXTENSION AND CENTERLINE OF WALL FOR 40.30 FEET TO A BUILDING FACE, THENCE SOUTH 72 DEGREES 47 MINUTES 09 SECONDS WEST ALONG SAID BUILDING FACE FOR 17.85 FEET TO THE CENTERLINE OF A WALL, THENCE NORTH 17 DEGREES 12 MINUTES 51 SECONDS WEST ALONG SAID CENTERLINE OF WALL FOR 40.30 FEET TO A BUILDING FACE, THENCE NORTH 72 DEGREES 47 MINUTES 09 SECONDS EAST ALONG SAID BUILDING FACE AND THE EASTERLY EXTENSION THEREOF FOR 17.85 FEET TO THE POINT OF BEGINNING. SAID PARCEL LYING AND BEING SITUATE IN SECTION 32, TOWNSHIP 3 SOUTH. RANGE 15 WEST, BAY COUNTY, FLORIDA.

AND

DESCRIPTION OF UNIT 8115: COMMENCE AT THE INTERSECTION OF THE SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A WITH THE CENTERLINE OF SECOND STREET, GULF COAST HIGHWAY SUBDIVISION, ACCORDING TO THE PLAT RECORDED IN PLAT BOOK 3, PAGE 3, IN THE PUBLIC RECORDS OF BAY COUNTY, FLORIDA. THENCE NORTH 86 DEGREES 27 MINUTES 18 SECONDS WEST ALONG SAID SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A FOR 49.62 FEET; THENCE SOUTH 04 DEGREES 48 MINUTES 02 SECONDS WEST FOR 185.42 FEET; THENCE SOUTH 13 DEGREES 14 MINUTES 18 SECONDS EAST FOR 390.68 FEET, THENCE SOUTH 63 DEGREES 49 MINUTES 35 SECONDS EAST FOR 133.88 FEET, THENCE NORTH 72 DEGREES 47 MINUTES 14 SECONDS EAST FOR 175.89 FEET TO THE NORTHERLY EXTENSION OF THE CENTERLINE OF A WALL; THENCE SOUTH 17 DEGREES 12 MINUTES 51 SECONDS EAST ALONG SAID EXTENSION FOR 42.91 FEET TO THE POINT OF BEGINNING. THENCE CONTINUE SOUTH 17 DEGREES 12 MINUTES 51 SECONDS EAST ALONG SAID EXTENSION AND CENTERLINE OF WALL FOR 40.30 FEET TO A BUILDING FACE, THENCE SOUTH 72 DEGREES 47 MINUTES 09 SECONDS WEST ALONG SAID BUILDING FACE FOR 17.78 FEET; THENCE NORTH 17 DEGREES 12 MINUTES 51 SECONDS WEST ALONG SAID BUILDING FACE FOR 40.30 FEET, THENCE NORTH 72 DEGREES 47 MINUTES 09 SECONDS EAST ALONG SAID BUILDING FACE AND THE EASTERLY EXTENSION THEREOF FOR 17.77 FEET TO THE POINT OF BEGINNING. SAID PARCEL LYING AND BEING SITUATE IN SECTION 32, TOWNSHIP 3 SOUTH, RANGE 15 WEST, BAY COUNTY, FLORIDA.

AND

16

OR BK 3135 PG 475

Description of Unit 1845:

Commence at the intersection of the southerly right of way line of state road no. 30-A with the centerline of second street, Gulf Coast Highway subdivision. According to the plat recorded in plat book 3, page 3, in the public records of Bay County, Florida. Thence north 86 degrees 27 minutes 18 seconds west along said southerly right of way line of State Road no. 30-A for 49.62 feet; thence north 04 degrees 48 minutes 02 seconds west for 185.42 feet; thence south 13 degrees 14 minutes 18 seconds east for 390.68 feet; thence south 63 degrees 49 minutes 35 seconds east for 133.88 feet; thence north 72 degrees 47 minutes 14 seconds east for 33.44 feet to the northerly extension of the centerline of a wall; thence south 17 degrees 21 minutes 17 seconds east along said extension for 33.74 feet to the face of a building for the point of beginning. Thence continue south 17 degrees 21 minutes 17 seconds east along said building face and centerline of wall for 48.40 feet to a building face, thence south 72 degrees 47 minutes 42 seconds west along said building face for 24.66 feet to a building face; thence north 17 degrees 18 minutes 15 seconds west along said building face and the northerly extension thereof for 48.40 feet to the westerly extension of a building face; thence north 72 degrees 47 minutes 42 seconds east along westerly extension and building face for 24.90 feet to the point of beginning, said parcel lying and being situate in section 32, township 3 south, range 15 west, Bay County, Florida.

AND

Townhome Unit #1847 of ANNABELLA'S TOWN HOMES, being more particularly described as follows:

Commence at the intersection of the Southerly right of way of State Road No. 30-A with the centerline of Second Street, Gulf Coast Highway Subdivision, according to the plat recorded in Plat Book 3, Page 3, in the public records of Bay County, Florida. Thence North 86° 27 minutes 18 seconds West along said southerly right of way line of State Road No. 30-A for 49.62 feet, Thence South 4° 48 minutes 2 seconds West for 185.42 feet. Thence South 13° 14 minutes 18 seconds East for 390.68 feet. Thence South 63° 49 minutes 35 seconds East for 123.91 feet to the Northerly extension of the centerline of a wall. Thence South 26° 35 minutes 49 seconds West along said extension for 33.71 feet to the face of a building for the Point of Beginning. Thence continue South 26° 35 minutes 49 seconds West along said building face and centerline of wall for 48.40 feet to a building face. Thence South 63° 24 minutes 11 seconds East along said building face and the Northerly extension thereof for 48.40 feet to the Easterly extension of a building face. Thence North 63° 24 minutes 11 seconds West along said Easterly extension and building face for 24.66 feet to the Point of Beginning, said parcel lying and being situate in Section 32, Township 3 South, Range 15 West, Bay County, Florida.

AND

DESCRIPTION OF UNIT 1851: COMMENCE AT THE INTERSECTION OF THE SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A WITH THE CENTERLINE OF SECOND STREET, GULF COAST HIGHWAY SUBDIVISION, ACCORDING TO THE PLAT RECORDED IN PLAT BOOK 3, PAGE 3, IN THE PUBLIC RECORDS OF BAY COUNTY, FLORIDA; THENCE NORTH 86 DEGREES 27 MINUTES 18 SECONDS WEST ALONG SAID SOUTHERLY RIGHT OF WAY LINE OF STATE ROAD NO. 30-A FOR 49.62 FEET; THENCE SOUTH 04 DEGREES 48 MINUTES 02 SECONDS WEST FOR 185.42 FEET; THENCE SOUTH 13 DEGREES 14 MINUTES 18 SECONDS EAST FOR 390.68 FEET; THENCE SOUTH 63 DEGREES 49 MINUTES 35 SECONDS EAST FOR 80.79 FEET TO THE NORTHERLY EXTENSION OF THE CENTERLINE OF A WALL; THENCE SOUTH 26 DEGREES 17 MINUTES 48 SECONDS WEST ALONG SAID EXTENSION FOR 33.40 FEET TO THE FACE OF A BUILDING FOR THE POINT OF BEGINNING; THENCE CONTINUE SOUTH 26 DEGREES 17 MINUTES 48 SECONDS WEST ALONG SAID BUILDING FACE AND CENTERLINE OF WALL FOR 48.40 FEET TO A BUILDING FACE: THENCE SOUTH 63 DEGREES 24 MINUTES 11 SECONDS EAST ALONG SAID BUILDING FACE FOR 21.30 FEET TO THE CENTERLINE OF A WALL; THENCE NORTH 26 DEGREES 35 MINUTES 49 SECONDS EAST ALONG SAID CENTERLINE OF WALL FOR 48.40 FEET TO A BUILDING FACE; THENCE NORTH 63 DEGREES 24 MINUTES 11 SECONDS WEST ALONG SAID BUILDING FACE AND THE WESTERLY EXTENSION THEREOF FOR 21.55 FEET TO THE POINT OF BEGINNING. SAID PARCEL LYING AND BEING SITUATE IN SECTION 32, TOWNSHIP 3 SOUTH, RANGE 15 WEST, BAY COUNTY, FLORIDA.

17



A CERTIFIED TRUE COPY
BILL KINSAUL CLERK
OF THE CIRCUIT COURT
By
Deputy Clerk

IN THE CIRCUIT COURT IN AND FOR BAY COUNTY, FLORIDA

ANNABELLAS ASSET
MANAGEMENT, LLC,
ASSIGNEE OF REGIONS
BANK;

       Plaintiff,

v.

                              CASE NO.: 07-4044-CA

ANNABELLA'S, LLC;
MELANIE A. LEDMAN;
WILBUR THOMAS LEDMAN;
VALORIE F. WOOD;
FRANK D. WOOD;
MICHAEL W. REED; and
MYRA A. REED;

       Defendants.

_____/

## SUPPLEMENT TO FINAL JUDGMENT

WHEREAS, on the 9TH day of October, 2009, the following Motions were presented for hearing
before this Court:

a)    Myra Reed's Motion for Determination of Deficiency Judgment filed on May 22, 2009;
and

b)    Motion of Michael Reed, filed on May 6, 2009, in which he seeks a credit for the value of
the foreclosed property plus other equitable adjustments; and

c)    Motion of Melanie Ledman and Wilbur Ledman (hereinafter the "Ledmans") filed on
September 1, 2009, seeking a credit for the fair market value of the Property, plus
damages allegedly resulting from the delay in foreclosing on the Property due to the
increased accrual of interest charges and failure to mitigate damages, plus a credit
because Asset Management allegedly purchased the note and mortgage at a discount,



so Asset Management is purportedly precluded from recovering more than what they paid for the note and mortgage; and

WHEREAS, counsel present at the hearing included: Bill R. Hutto, counsel for Michael W. Reed ("Michael Reed"); Linda A. Hoffman, counsel for Annabella's Asset Management, LLC ("Asset Management"); James M. DuRant, Jr., counsel for Myra R. Reed, and Rowlette Bryant, counsel for the Ledmans; and

WHEREAS, Frank Wood, a defendant who is no longer represented by counsel, was also present at the hearing; and

This Court, having reviewed and considered the pleadings, exhibits, and testimony of the witnesses, and the arguments of counsel and being otherwise fully advised in the premises, enters the following findings of fact and conclusions of law, as it related to the above motions:

1)    Neither Asset Management nor Regions Bank did anything to delay the timely conclusion of this case, so the value of the townhomes and vacant property owned by Annabella's LLC which was subject to the mortgage held by Asset Management (hereinafter the "Foreclosed Property") shall be valued as of April 6, 2009, which is the date of the foreclosure sale.

2)    The fair market value of the Foreclosed Property, as of April 6, 2009, is determined to be $6,720,000.

3)    In accordance with the Final Judgment which this Court entered on March 6, 2009 (the "Final Judgment"), the amount due under the Final Judgment on April 6, 2009 (immediately prior to the foreclosure sale) was the principal amount of $8,980,945.57, plus interest of $61,021.22, for a total amount of $9,041,966.79. Therefore, effective April 6, 2009, the $9,041,966.79 owed to Asset Management shall be reduced by $6,720,000.

4)    Except as supplemented above, the Final Judgment remains unchanged.

2

DONE AND ORDERED in Chambers at Panama City, Bay County, Florida, the 11 day

of November, 2009.

_____

CIRCUIT COURT JUDGE

Conformed Copies to:

Linda A. Hoffman, Esquire
Carver, Darden, Koretzky, Tessier,
Finn, Blossman & Areaux, LLC
801 West Romana St., Suite A
Pensacola, Florida 32502

James M. DuRant, Jr., Esq.
Boyd, DuRant & Sliger, P.L.
1407 Piedmont Drive East
Tallahassee, Florida 32308

Bill R. Hutto, Esq.
620 McKenzie Avenue
Panama City, FL 32401

Frank D. Wood and Valorie Wood
1815 Turnerwood Lane
Panama City, Florida 32407

Rowlette Bryant, Esquire
Bryant & Higby, Chartered
Attorneys for Melanie A. Ledman; Wilbur Thomas Ledman;
833 Harrison Avenue
Panama City, FL 32402

File # 2010022501, OR BK 3237, Page 1749, Recorded 05/05/2010 at 08:49 PM, Bill Kinsaul, Clerk Bay County, Florida     Deputy Clerk CL     Trans # 983314

Case 13-05011-KKS   Doc 19   Filed 10/07/13   Page 60 of 66

Prepared By and Return to:
Linda A. Hoffman
Carver, Darden, Koretzky, Tessier,
Finn, Blossman & Areaux, LLC
801 W. Romana Street, Suite A
Pensacola, FL 32502
File No: # 4080.40730

## PARTIAL RELEASE OF JUDGMENT
### (Melanie Ledman, Wilbur Ledman and Michael Reed)

KNOW ALL MEN BY THESE PRESENTS, that the undersigned holder of a Final Judgment against ANNABELLA'S, LLC, a Florida limited liability company, MELANIE A. LEDMAN, WILBUR THOMAS LEDMAN, VALORIE F. WOOD, FRANK D. WOOD, MICHAEL W. REED and MYRA A. REED, in favor of ANNABELLAS ASSET MANAGEMENT LLC, a Mississippi limited liability company ("ASSET MANAGEMENT"), which Final Judgment is dated March 6, 2009, and is recorded in the following counties:

1) recorded in Official Records Book 3135, Page 451 and Official Records Book 3135, Page 1825, all of the Public Records of Bay County, Florida; and

2) recorded in Official Records Book 809, Page 36 of the Public Records of Washington County, Florida;; and

3) recorded in Official Records Book 2812, Page 2790 of the Public Records of Walton County, Florida.

The above Judgment, as recorded in each county, is hereinafter collectively referred to as the "Judgment".

Asset Management does hereby release MELANIE A. LEDMAN, WILBUR THOMAS LEDMAN and MICHAEL W. REED from all personal liability under said Judgment and does hereby further release from the lien of said Judgment, all real estate titled in the name of MELANIE A. LEDMAN, WILBUR THOMAS LEDMAN and MICHAEL W. REED.

Moreover, except as provided herein, all other terms and condition of the Judgment remain in full force and effect. Specifically, ASSET MANAGEMENT hereby reserves its rights under the Judgment against ANNABELLA'S, LLC, a Florida limited liability company, VALORIE F. WOOD and FRANK D. WOOD, and the execution of this Partial Release of Judgment does not release VALORIE F. WOOD or FRANK D. WOOD from personal liability under the Judgment nor does it release from the lien of the Judgment property titled in the name of ANNABELLA'S, LLC, a Florida limited liability company, VALORIE F. WOOD and/or FRANK D. WOOD.

This Partial Release is executed on the date set forth below.

ANNABELLAS ASSET MANAGEMENT LLC, A
MISSISSIPPI LIMITED LIABILTIY COMPANY

By: _____
W. L. Brumfield, Managing Member

EXHIBIT "A"



STATE OF _Mississippi_

COUNTY OF _Harrison_

The foregoing instrument was acknowledged before me this _29_ day of April, 2010, by W. L. Brumfield, Managing Member of Annabellas Asset Management LLC, a Mississippi limited liability company, on behalf of the company, (✔) who is personally known to me or ( ) who has produced _Miss Lic # 801774653_ as identification and who did not take an oath.

(Affix Notary Seal)

_Marlene L W_

NOTARY PUBLIC
Printed name: _Marlene L Wilson_
My commission expires: _____

2

File # 2010022210 OR BK 3237 Page 912 Recorded 05/04/2010 at 04:13 PM Bill
Kinsaul, Clerk Bay County, Florida Deputy Clerk DW Trans # 1018

Case 13-05011-KKS Doc 49 Filed 10/07/13 Page 62 of 66

Prepared By and Return to:
Linda A. Hoffman
Carver, Darden, Koretzky, Tessier,
Finn, Blossman & Areaux, LLC
801 W. Romana Street, Suite A
Pensacola, FL 32502
File No: # 4080.40730

## PARTIAL RELEASE OF JUDGMENT

KNOW ALL MEN BY THESE PRESENTS, that the undersigned holder of a Final Judgment against ANNABELLA'S, LLC, a Florida limited liability company, MELANIE A. LEDMAN, WILBUR THOMAS LEDMAN, VALORIE F. WOOD, FRANK D. WOOD, MICHAEL W. REED and MYRA A. REED, in favor of ANNABELLAS ASSET MANAGEMENT LLC, a Mississippi limited liability company ("ASSET MANAGEMENT"), which Final Judgment is dated March 6, 2009, and is recorded in the following counties:

1) recorded in Official Records Book 3135, Page 451 and Official Records Book 3135, Page 1825, all of the Public Records of Bay County, Florida; and

2) recorded in Official Records Book 809, Page 36 of the Public Records of Washington County, Florida;; and

3) recorded in Official Records Book 2812, Page 451 of the Public Records of Walton County, Florida.

The above Judgment, as recorded in each county, is hereinafter collectively referred to as the "Judgment".

With the exception of the real property described on Exhibit "A" attached hereto and incorporated herein does, Asset Management does hereby release MYRA A. REED from all personal liability under said Judgment and does hereby further release from the lien of said Judgment, all real estate titled in the name of MYRA A. REED.

As clarification, this Partial Release of Judgment shall not serve to release from the lien of the Judgment the property previously titled in the name of MYRA A. REED, more particularly described on Exhibit "A" attached hereto and incorporated herein.

Moreover, except as provided herein, all other terms and condition of the Judgment remain in full force and effect. Specifically, ASSET MANAGEMENT hereby reserves its rights under the Judgment against ANNABELLA'S, LLC, a Florida limited liability company, MELANIE A. LEDMAN, WILBUR THOMAS LEDMAN, VALORIE F. WOOD, FRANK D. WOOD, and MICHAEL W. REED and the execution of this Partial Release of Judgment does not release ANNABELLA'S, LLC, a Florida limited liability company, MELANIE A. LEDMAN, WILBUR THOMAS LEDMAN, VALORIE F. WOOD, FRANK D. WOOD, and MICHAEL W. REED from personal liability under the Judgment nor does it release from the lien of the Judgment property titled in the name of ANNABELLA'S, LLC, a Florida limited liability company, MELANIE A. LEDMAN, WILBUR THOMAS LEDMAN, VALORIE F. WOOD, FRANK D. WOOD, and / or MICHAEL W. REED.

This Partial Release is executed on the date set forth below.

ANNABELLAS ASSET MANAGEMENT LLC, A
MISSISSIPPI LIMITED LIABILTIY COMPANY

By: _____
W. L. Brumfield, Managing Member

1



STATE OF Mississippi

COUNTY OF Harrison

The foregoing instrument was acknowledged before me this 22 day of April, 2010, by W. L. Brumfield, Managing Member of Annabellas Asset Management LLC, a Mississippi limited liability company, on behalf of the company, ( ) who is personally known to me or ( ) who has produced _MS DL # 807741603_ as identification and who did not take an oath.

*(Affix Notary Seal)*

NOTARY PUBLIC
Printed name: Stacey Courtney
My commission expires: 9-28-2012

2

EXHIBIT "A"

Lot 4, Block H, Carillon Beach Phase Two, according to the plat thereof, as recorded in Plat Book 16, Pages 2 & 3, of the Public Records of Bay County, Florida.

and

Commence at the most Northwest corner of Lot 641 of Bay Point Unit One-A according to the plat thereof as recorded in Plat Book 11, Pages 70 and 71 of the public records, Bay County, Florida; thence S52°05'02"W, 15.96 feet; thence S53°14'43"W, 174.28 feet to the Point of Beginning:  Thence continue S53°14'43"W, 60.08 feet to the P.C. of a curve concave to the Southeast having a radius of 120.00 feet; thence Southwesterly along said curve an arc distance of 26.72 feet, said arc having a chord of 26.67 feet and a chord bearing of S46°51'56"W; thence S49°30'51"E, 179.48 feet to an iron pipe at the edge of Grand Lagoon; thence Northeasterly along the edge of said Grand Lagoon, 85 feet more or less to an iron pipe that bears S49°30'51"E from the point of beginning; thence N49°30'51"W, 171.03 feet to the Point of Beginning; also known as Lot 3, Weakfish Way Extension, Bay Point Yacht & Country Club.

3

Prepared By and Return to:
Linda A. Hoffman
Carver, Darden, Koretzky, Tessier,
Finn, Blossman & Areaux, LLC
801 W. Romana Street, Suite A
Pensacola, FL 32502
File No: # 4080.40730

$1,650,000

Parcel ID #: 36459-168-000

# WARRANTY DEED
## (Deed in Lieu of Foreclosure and Execution)

This WARRANTY DEED, which is in lieu of foreclosure and execution of the Final Judgment described below, is dated effective March 25, 2010, and is by **MYRA A. REED**, an unmarried woman, whose post office address is 3664 Preserve Boulevard, Panama City Beach, FL 32408 (hereinafter called the GRANTOR), to **ANNABELLAS ASSET MANAGEMENT LLC, a Mississippi limited liability company**, whose post office address is 2303 East Pass Road, Gulfport, MS 39507 (hereinafter called the GRANTEE). Wherever used herein the terms "Grantor" and "Grantee" include all parties to this instrument and the heirs, legal representatives and assigns of individuals, and the successors and assigns of corporations.

WITNESSETH: That the GRANTOR, for and in consideration of the sum of $10.00 and other valuable considerations, receipt whereof is hereby acknowledged, hereby grants, bargains, sells, aliens, remises, releases, conveys and confirms unto the GRANTEE, all that certain land situate in Bay County, Florida, to-wit:

> Lot 4, Block H, Carillon Beach Phase Two, according to the plat thereof, as
> recorded in Plat Book 16, Pages 2 & 3, of the Public Records of Bay County,
> Florida.

Said property is not the homestead of the Grantor under the laws and constitution of the State of Florida in that neither Grantor nor any member of the household of Grantor reside thereon.

SUBJECT TO covenants, conditions, restrictions, reservations, limitations, easements and agreements of record, if any; taxes and assessments for the year 2010 and subsequent years; and to all applicable zoning ordinances and/or restrictions and prohibitions imposed by governmental authorities, if any.

TOGETHER with all the tenements, hereditaments and appurtenances thereto belonging or in anywise appertaining.

GRANTOR DOES HEREBY WARRANT and shall forever defend the right and title to said tract or parcel of land unto Grantee, and its heirs, legal representatives, successors and assigns of Grantee, against the claims of all persons whomsoever. TO HAVE AND TO HOLD, the same in fee simple forever.



AND THE GRANTOR hereby covenants with said GRANTEE that except as above noted, the GRANTOR is lawfully seized of said land in fee simple; that the GRANTOR has good right and lawful authority to sell and convey said land; that the GRANTOR hereby fully warrants the title to said land and will defend the same against the lawful claims of all persons whomsoever.

THIS CONVEYANCE is given in lieu of foreclosure and execution, but not in satisfaction of that certain Final Judgment against Grantor and Annabella's, LLC, a Florida limited liability company, Melanie A. Ledman, Wilbur Thomas Ledman, Valorie F. Wood, Frank D. Wood and Michael W. Reed, in favor of Grantee and recorded in Official Records Book 3135, Page 451, with Supplement to Final Judgment recorded in Official Records Book 3202, Page 454, all of the Public Records of Bay County, Florida (the "Judgment"). This is an absolute conveyance. This conveyance is not and should not be construed as a conveyance to secure a debt. It is the intent of Grantor and Grantee that title to the property should not be merged with the lien of the aforesaid Judgment and this conveyance should be so construed. Accordingly, if for any reason this conveyance does not provide clear and acceptable title to Grantee, or is held ineffective for any reason, or in the event of the setting aside of this conveyance in any proceedings instituted under the Bankruptcy Code, the Grantee shall be considered to have retained, all of its lien, title and rights under the Judgment and the debt secured thereby, and in any such event the Grantee shall have the right to proceed to a foreclosure and execution of the Judgment in all respects as if this instrument had not been executed. Merger of title and the lien of the Judgment shall not occur until Grantee executes and records in the public records a cancellation of said Judgment or until the interest of Grantor is foreclosed and a Certificate of Title is issued to Grantee.

IN WITNESS WHEREOF, GRANTOR has signed and sealed these presents the date set forth above.

SIGNED IN THE PRESENCE OF
THE FOLLOWING WITNESSES:

Print Name: _Kim Smith_

_MYRA A. REED_

Print Name: _Elaine A. Carr_

STATE OF FLORIDA
COUNTY OF _Bay_

THE FOREGOING INSTRUMENT was sworn and acknowledged before me on the _23_ day of March, 2010, by Myra A. Reed, an unmarried woman, who is _X_ personally known to me or who has ( ) produced _____ as identification.

(Affix Notary Seal)

NOTARY PUBLIC
Print name: _10/6/24+ Avi Whitted_
My commission expires: _10/6/2010_

AVE R. WHITTED
MY COMMISSION #DD828765
EXPIRES: OCT 06, 2012
Bonded through 1st State Insurance